UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

In re:                                                    Case No. 26-19312-PDR

777 PARTNERS LLC,                                         Chapter 7

      Alleged Debtor.
_____/

**ALLEGED DEBTOR'S EMERGENCY MOTION
FOR ENTRY OF AN ORDER TRANSFERRING VENUE TO
THE NORTHERN DISTRICT OF TEXAS AND GRANTING RELATED RELIEF
(Emergency Hearing Requested)**

**Basis For Requested Emergency Hearing**

The Alleged Debtor seeks to have venue of this case transferred to the United States Bankruptcy Court for the Northern District of Texas where the Alleged Debtor and twenty-two of its affiliates (collectively, the "Debtors") have filed jointly administered Chapter 11 Cases. The Debtors have obtained commitments for post-petition financing and have sought other urgent relief before the Texas court. The financing commitments are predicated on venue of the Debtors' cases being in Texas. Without access to the financing, the Debtors' reorganization is in jeopardy. As required by Local Rule 9013-4, the Alleged Debtor made a bona fide effort to resolve the matter by requesting the Petitioning Creditors' consent to the transfer of venue to the Texas court. The Petitioning Creditors do not consent to the relief requested herein.

777 Partners LLC ("777 Partners") respectfully states the following in support of this motion (this "Motion"):[1]

**PRELIMINARY STATEMENT**

1.      On August 9, 2026, each of the Debtors filed a voluntary chapter 11 petition (collectively, the "Chapter 11 Cases") in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division (the "Texas Bankruptcy Court") (Lead Case No. 26-90190 (ELM) (Joint Administration Pending)). The filing of the Chapter 11 Cases was not a reflexive,

---

[1] Capitalized terms used but not yet defined herein shall have the meanings ascribed to them later in this Motion.

last-minute response to the above-captioned involuntary case. To the contrary, the Chapter 11

Cases are the product of a coordinated, extensive, two- year-long winddown process—including

the negotiation and execution of a fully documented debtor in possession credit agreement (as

amended, the "DIP Credit Agreement") providing approximately $14.9 in new money financing

pre- and post-petition—predicated on the express agreement that the Debtors' Chapter 11 Cases

would proceed in a Texas bankruptcy court.  The DIP Lenders provided prepetition funding,

committed capital, negotiated milestones, and structured the DIP Facility based on the Debtors'

chosen forum.  The involuntary filing merely accelerated the timeline for the filing of the Chapter

11 Cases which, as stated above, were already in progress and fully planned.

2.       Rewarding the Petitioning Creditors' race to the courthouse would set a dangerous

precedent, incentivizing creditors to engage in anticipatory filings to usurp a debtor's legitimate

restructuring efforts.  Retaining 777 Partners' case in the forum chosen by three related creditors

out of hundreds rather than deferring to 777 Partners' business judgment would only harm parties

in interest and "serve to breed mistrust in the Court's evenhandedness and the bankruptcy process

itself, thereby jeopardizing the opportunity to conserve and protect the value remaining in these

estates to the detriment of all creditors."  *See In re Cox Operating, LLC*, 652 B.R. 49, 59 (Bankr.

E.D. La. 2023).

3.       For the reasons set forth below, the interests of justice and the convenience of

parties overwhelmingly favor transfer of the above-captioned involuntary chapter 7 proceeding to

the Northern District of Texas.

## JURISDICTION AND VENUE

4.       This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and this

is a core matter pursuant to 28 U.S.C. § 157(b).

5. The bases for the relief requested herein are section 105(a) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), rule 1014(b) of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules"), and 28 U.S.C. §§ 1404(a) and 1412.

## BACKGROUND

6. 777 Partners and its affiliate, 600 Partners LLC, were founded as investment companies with operating subsidiaries and investment vehicles in numerous industries, including structured settlement portfolios, insurance and reinsurance, aviation, media and entertainment, and professional sports. Over time, the Debtors' enterprises expanded through a complex network of affiliated entities, special purpose vehicles, reinsurers, and portfolio companies operating across the United States, Canada, Europe, South America, Australia, and the Caribbean. The Debtors' growth strategy depended heavily upon continued access to external capital, including private credit markets, asset-backed lending facilities, and insurance and reinsurance financing arrangements.

7. The Debtors' capital structure and asset base were built upon financing arrangements that are now the subject of extensive civil litigation, a pending SEC civil enforcement action, and a related federal criminal prosecution—each arising out of allegations that the Debtors' founders and others caused certain Debtor and non-Debtor entities to pledge the same collateral to more than one lender, divert loan and investor proceeds for personal benefit, and misrepresented 777 Partners' and 600 Partners' financial condition to investors and creditors. The unraveling of these arrangements began in 2023, accelerating events leading to the loss of substantially all of the Debtors' operating sports and aviation assets and a series of adverse and escalating litigation. As a result, the Debtors have been winding down their historical operations in an effort to maximize value for creditors while managing substantial, overlapping litigation exposure.

8.     A detailed description of the Debtors, their businesses and the facts and circumstances supporting the Debtors' Chapter 11 Cases are set forth in the *Declaration of Mark Shapiro, Chief Operating Officer, in Support of Chapter 11 Petitions and First Day Motions*, filed as Docket No. 14 in the Chapter 11 Cases, which is attached hereto as **Exhibit B**.

9.     On July 16, 2026, just three days after entry of their Amended Judgment against 777 Partners and certain of the other Debtors, Vida Longevity Fund, LP, Vida Insurance Credit Opportunity Fund II, LP, and Vida Insurance Credit Opportunity Fund III, LP (collectively, the "Petitioning Creditors") filed the above-captioned chapter 7 case against 777 Partners (the "Involuntary Case").  The Petitioning Creditors assert unsecured debts in the total amount of $26,000,000, or approximately 0.96% of the Debtors' total prepetition indebtedness.

10.     On August 9, 2026 (the "Petition Date"), following an extensive, multi-year prepetition process—including the negotiation and execution of the DIP Credit Agreement on June 9, 2026 and an amendment thereto —each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Northern District of Texas, Fort Worth Division.  The Debtors are seeking joint administration of their estates under the caption *In re Signal National LLC*, No. No. 26-90190 (ELM).   The Debtors are operating as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

11.     The DIP Credit Agreement, attached hereto as **Exhibit C**, provides total new-money financing of approximately $14.9 million, approximately $8.6 million of which was advanced prepetition and approximately $6.2 million of which is committed for postpetition use (the "DIP Facility").  The DIP Facility is structured to fund the Debtors' operations and an orderly chapter 11 process.  The DIP Credit Agreement contains stringent milestones, including deadlines for the entry of an order transferring this Involuntary Case to the Northern District of Texas (30

4

days), entry of interim and final DIP orders (five days and 35 days, respectively), delivery to the DIP Lenders of a complete set of documents comprising a proposed chapter 11 plan (40 days), and filing a chapter 11 plan (55 days), which reflect the time-sensitive nature of the Chapter 11 Cases. The DIP Facility and the Debtors' prepetition preparations were extensively negotiated with the assumption of a filing in Texas.

12.     The circumstances surrounding the filing of the Involuntary Case bear the hallmarks of an anticipatory, tactical filing.  The Debtors were in the midst of preparing for an orderly chapter 11 process.  The DIP Credit Agreement had been executed.  This Involuntary Case—filed by a small minority of affiliated creditors in a separate district—appears calculated to disrupt these efforts and wrest control of the bankruptcy process from the Debtors and their supporting creditors.

## RELIEF REQUESTED

By this Motion, 777 Partners seeks entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Order"): (a) transferring venue of this Involuntary Case to the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division and (b) granting related relief.

## BASIS FOR REQUESTED RELIEF

The Petitioning Creditors filed this involuntary case in the Southern District of Florida presumably under the impression that 777 Partners' principal place of business is located in Miami. *See Involuntary Petition Against a Non-Individual*, Dkt. No. 1 at p. 1.  Although 777 Partners previously operated out of the Miami location listed in the involuntary petition, that office has been closed and 777 Partners has therefore moved to reject the Miami lease in the Chapter 11 Cases.  Venue of the 777 Partners' chapter 11 case is proper in Texas because 777 Partners' affiliate, Signal National LLC, is a Texas entity and is the subject of a pending chapter 11 case in Texas.

5

*See* 28 U.S.C. § 1408 (providing that "a case under title 11 may be commenced in the district…in which there is pending a case under title 11 concerning such person's affiliate[.]").[2]

Section 1412 of title 28 provides that "[a] district court may transfer a case or proceeding under title 11 to a district court for another district, in the interest of justice or for the convenience of the parties." Justice and convenience are two independent bases for transfer—either alone is sufficient. *In re Cox Operating, LLC*, 652 B.R. at 55; *LSREF2 Baron, LLC v. Aguilar*, No. 3:12-CV-1242-M, 2013 WL 230381, at *4 (N.D. Tex. Jan. 18, 2013). Similarly, when competing petitions are filed in different districts regarding the same debtor or its affiliates, Bankruptcy Rule 1014(b) directs the court to determine venue "in the interest of justice or for the convenience of the parties." Fed. R. Bankr. 1014(b)(2).

Where competing voluntary and involuntary petitions are pending in different districts, the burden of proof "is, in a manner of speaking, on the Court." *In re Cox Operating, LLC*, 652 B.R. at 55–56 (quoting *In re Caesars Ent. Operating Co., Inc.*, No. 15-10047 (KG), 2015 WL 495259, at *5 (Bankr. D. Del. Feb. 2, 2015) (internal quotation marks omitted)). The Court must determine which party's choice is entitled to deference. *See id.* at 56 ("Ultimately, this issue is best viewed in terms of deference [to one or the other party's choice] as opposed to burden of proof." (alternation in original) (quoting *In re Caesars Ent. Operating Co., Inc.*, 2015 WL 495259 at *5 (internal quotation marks omitted)). Here, 777 Partners respectfully submits that its choice of venue is entitled to deference in the interest of justice and under all relevant standards.

## I.       The Convenience of the Parties

Courts consider the following factors in assessing the convenience of the parties:

      a.     the proximity of creditors of every kind to the court;

---

[2] Signal National LLC is indirectly wholly owned by 777 Partners.

b.    the proximity of the debtor to the court;

c.    the proximity of the witnesses necessary to the administration of the estate;

d.    the location of the assets;

e.    the economic and efficient administration of the estate; and

f.    the necessity for ancillary administration if bankruptcy should result.

*Commonwealth of Puerto Rico v. Commonwealth Oil Refining Co. (In re Commonwealth Oil Refining Co.)*, 596 F.2d 1239, 1247 (5th Cir. 1979) ("CORCO"), *cert. denied*, 444 U.S. 1045 (1980)[3]; *see also In re Fontainebleau Las Vegas Holdings, LLC*, No. 09-21481-BKC-AJC, 2009 WL 3669648, at *2 (Bankr. S.D. Fla. Oct. 26, 2009).

However, as courts have recognized, in the modern era of electronic filing, remote hearings, and national law firms, these geographic-convenience factors are often a "push" and are not determinative of the venue analysis. *See In re Cox Operating, LLC*, 652 B.R. at 57; *In re Caesars Ent. Operating Co., Inc.*, 2015 WL 495259 at *7. Notwithstanding the limited probative value of the traditional convenience factors, here, each factor either favors transfer or is, at worst, neutral.

*The Proximity of Creditors to the Court*.  Out of the Debtors' combined 30 largest creditors, only five are located in Florida. These five creditors' claims total only approximately $10 million out of the Debtors' total $2.7 billion indebtedness.  Even the Petitioning Creditors are located outside of Florida.  *See* Dkt. No. 6, *Notice of Filing*, Exhibit A at p. 2 (listing the Petitioning Creditors' business address as 437 Madison Ave., 26th Fl., New York, NY 10022).  The Petitioning Creditors' choice of forum provides no meaningful convenience or advantage relative to the Texas Bankruptcy Court for the creditor body as a whole.  Thus, this factor is neutral.

---

[3] The decisions of the United States Court of Appeals for the Fifth Circuit issued before October 1, 1981 are binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard,* 661 F.2d 1206, 1207-1209 (11th Cir. 1981).

7

*The Proximity of the Debtor and Witnesses to the Court*.  The Debtors' only remaining office is located in Dallas, Texas.  777 Partners full-time employees all work remotely.

Mark Shapiro, the Debtors' interim Chief Operating Officer and first day declarant, is also located in Texas.  GlassRatner Advisory & Capital Group LLC serves as financial advisor to the Debtors.  Although it has several offices across the United States, the primary individuals working on this matter are located in the Dallas office.  Similarly, the Debtors' proposed bankruptcy counsel is located in Dallas, Texas.  The Texas court will be significantly more convenient for the Debtors and their professionals.

This factor weighs in favor of venue in Texas.

*The Location of the Assets*.  777 Partners has very few assets of its own—its primary assets constitute equity interests in other entities.  777 Partners owns negligible tangible assets that were formerly located in the Miami office and are now being transferred to the Dallas headquarters or will be abandoned to the landlord.

The Debtors' assets are predominantly financial in nature, including structured settlement receivables, insurance-linked investments, aviation assets, and sports interests, and are distributed across numerous domestic and international jurisdictions.  No single geographic location predominates.  This factor thus weighs in favor of Texas or is neutral and does not favor either forum.

*The Economic and Efficient Administration of the Estate and Necessity of Ancillary Administration*.  Promotion of the economic and efficient administration of the estate is the most important factor.  *See In re Bumshteyn*, No. 18-23930-PDR, 2022 WL 126612, at *4 (Bankr. S.D. Fla. Jan. 13, 2022) ("[T]his Court is bound to consider the economic and efficient administration

8

of the estate as the most important factor." (internal quotation marks omitted) (citing *CORCO*, 596 F.2d at 1247)).

As previously discussed, the Debtors' primary witness and professionals are located in Texas. Additionally, the lead counsel for each of the lenders under the DIP Credit Agreement (collectively, the "DIP Lenders") are located in Dallas. Requiring professionals to travel from Texas to Florida (even in the age of remote appearances, with the need to hire additional Florida-based counsel in any event) will result in unnecessary expense and inefficiencies that would be avoided if the Chapter 11 Cases proceed in Texas.

The Debtors comprise interrelated enterprises with shared management, shared operations, multi-party DIP financing, cross-default provisions, and overlapping collateral pools. Allowing the Involuntary Case to proceed separately in this Court while the remaining 22 affiliated chapter 11 cases proceed in the Texas Bankruptcy Court would create immense logistical, administrative, operational, and legal complications and inefficiencies.

777 Partners is a borrower under the DIP Facility, the obligations under which are cross-defaulted among the Debtors. Permitting a separate case to go forward in this Court against the lead borrower would upend the DIP Facility, triggering cross-defaults and jeopardizing the continued availability of the new-money financing on which the entire chapter 11 process depends. The DIP Facility's tight milestones cannot be met if the Debtors are simultaneously prosecuting the Involuntary Case in a separate forum. Two courts presiding over interrelated matters involving the same debtor and its affiliates will inevitably produce conflicting orders, duplicative proceedings, and wasted resources—the antithesis of efficient administration. The inefficiency created by two proceedings, the location of relevant professionals, and the risk of losing funding

9

that will preserve value weighs heavily in favor of transferring this Involuntary Case to the Northern District of Texas.

Transferring this Involuntary Case will allow all 23 Debtors' cases to proceed together under a single court's supervision, ameliorating the chaos, delay, and added expense that would ensue as a result of creditors pursuing remedies against the Debtors in two different courts. Transfer will cause no prejudice to the Petitioning Creditors, who are not located in Florida and are free to appear and participate fully in the Texas Bankruptcy Court just as any other party in interest.

## II.     The Interest of Justice

The interest of justice—a "broad and flexible standard" encompassing efficient administration, judicial economy, fairness, and the integrity of the bankruptcy system— overwhelmingly favors transfer.  *See In re Cox Operating, LLC*, 652 B.R. at 57; *In re Enron Corp*., 274 B.R. 327, 349 (Bankr. S.D.N.Y. 2002).

As detailed above, efficient administration and economy weigh in favor of proceeding in the Texas bankruptcy court.  So, too, fairness and the integrity of the bankruptcy system weigh heavily in favor of venue in Texas. Few of 777 Partners' creditors holding a small percentage of 777 Partners' total indebtedness are located in Florida.  Only a few *di minimus* assets remain in Florida and will be either abandoned or transferred to Texas.

The only reason there is a bankruptcy case in Florida against 777 Partners is because the Petitioning Creditors chose to file the involuntary petition here.  However, any "first-filed" considerations to venue transfer do not apply in this context, where there are competing voluntary and involuntary petitions. *See In re Cox Operating, LLC*, 652 B.R. at 56 ("the Petitioning Creditors are not entitled to deference with respect to their choice of forum based solely on rote application of the "first-filed" rule").  Retaining venue in Florida will only "foster[] a perception that the

10

decision was made solely to advantage the Petitioning Creditors over all other stakeholders [and] would only serve to breed mistrust in the Court's evenhandedness and the bankruptcy process itself, thereby jeopardizing the opportunity to conserve and protect the value remaining in these estates to the detriment of all creditors." *See id*. at 59.

The Debtors have been winding down and generally preparing their chapter 11 filings for the last two years to address approximately $2.6 billion in secured obligations, approximately $142 million in unsecured liabilities, and effectuate a value-maximizing winddown of their operations. Their extensive prepetition preparations are evident by the full suite of first day papers filed in the Chapter 11 Cases, including a heavily negotiated DIP Credit Agreement with their major prepetition lenders, each of which have agreed to serve as postpetition lenders in the Chapter 11 Cases.

The DIP Lenders negotiated and committed to the DIP Facility on the express assumption that the Debtors would file chapter 11 (not chapter 7) cases that would proceed in Texas. *See* DIP Credit Agreement at pp. 1, 18. The DIP Lenders' preference for the Debtors' chosen venue is relevant because the Debtors are relying heavily upon them for the success of the Chapter 11 Cases and recoveries to creditors. There is no reason for this Court to allow the Petitioning Creditors to disrupt what has been a carefully orchestrated plan, and jeopardize the Debtors' ability to fund operations, meet payroll, preserve going-concern value, and pursue a path that maximizes recoveries for all creditors.

Maintaining this chapter 7 case separate from the chapter 11 cases of the remaining Debtors will undermine the Debtors' careful prepetition efforts to smoothly transition into chapter 11 and maximize value and will incentivize creditors in future cases to "race to the courthouse" to force venue. If creditors can disrupt a debtor's restructuring merely by racing to file an involuntary

petition in a different forum, debtors will be deterred from engaging in the very kind of prepetition negotiation and consensus-building that maximizes estate value for all stakeholders.

Conversely, transferring venue to the Northern District of Texas will allow the Debtors to effectuate a wind-down built on consensus, with adequate funding to pay employees, effectively administer their bankruptcy cases, and preserve going concern value, all to the benefit of creditors. No creditors will be prejudiced by this relief.

777 Partners respectfully requests that this Court permit its bankruptcy case to proceed with its 22 Debtor affiliates in chapter 11 in the forum where it has been planned and funded—a forum that was chosen for the orderly and efficient administration of these complex estates.

WHEREFORE, 777 Partners respectfully requests that the Court enter the Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Dated:  August 10, 2026

Respectfully submitted,

BERGER SINGERMAN LLP
*Counsel for the Alleged Debtor*
1450 Brickell Avenue, Suite 1900
Miami, FL 33131
Telephone: (305) 755-9500
Facsimile: (305) 714-4340

By: */s/ Jordi Guso*
　　　Jordi Guso
　　　Florida Bar No. 863580
　　　jguso@bergersingerman.com
　　　Erin M. Hoskins
　　　Florida Bar No. 1003283
　　　ehoskins@bergersingerman.com

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was served on August

10, 2026, electronically through the Court's CM/ECF system upon all parties listed on the

Electronic Mail Notice List.

*/s/ Jordi Guso*
Jordi Guso

**Electronic Mail Notice List**

The following is the list of **parties** who are currently on the list to receive email notice/service for this case.

- **Daniel Gielchinsky**    dan@dgimlaw.com,
  colleen@dgimlaw.com;dan_1836@ecf.courtdrive.com;eservice@dgimlaw.com
- **Office of the US Trustee**    USTPRegion21.MM.ECF@usdoj.gov

13

## **EXHIBIT A**

**Proposed Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

In re:                                          Case No. 26-19312-PDR

777 PARTNERS LLC,                               Chapter 7

      Alleged Debtor.

_____/

**ORDER GRANTING ALLEGED DEBTOR'S EMERGENCY MOTION FOR ENTRY OF
AN ORDER TRANSFERRING VENUE TO THE NORTHERN DISTRICT OF TEXAS
AND GRANTING RELATED RELIEF**

**THIS CAUSE** came before the Court on August __, 2026 at _____ upon the *Alleged*

*Debtor's Emergency Motion for Entry of an Order Transferring Venue to the Northern District of*

*Texas and Granting Related Relief* (the "Motion") [Dkt. No. __][1] filed by 777 Partners LLC (the

"Alleged Debtor") for entry of an order (this "Order") (a) transferring venue of this Involuntary

Case to the Northern District of Texas and (b) granting related relief, all as more fully set forth in

the Motion; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334; and

this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

Court having found that it may enter a final order consistent with Article III of the United States Constitution; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and the Court having determined that the legal and factual bases set forth in the Motion and the record of the hearing on such Motion establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, IT IS HEREBY ORDERED THAT:

1. The Motion is granted as set forth herein.

2. The above-captioned Involuntary Case is hereby transferred to the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division. The Clerk of the United States Bankruptcy Court for the Southern District of Florida is directed to effectuate this transfer.

3. The Alleged Debtor is authorized to take all reasonable actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

4. The Alleged Debtor must serve a copy of this order on all parties entitled to notice thereof and file a certificate of service as required by Local Rule 9036-2.

5. This Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

### #

Submitted by:

Jordi Guso, Esq.
BERGER SINGERMAN LLP
1450 Brickell Avenue, Suite 1900
Miami, FL 33131
Telephone: (305) 755-9500
Facsimile: (305) 714-4340

*Proposed Co-Counsel to 777 Partners LLC*

2

# **EXHIBIT B**

## **First Day Declaration**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| SIGNAL NATIONAL LLC, *et al.*,[1] | § | Case No. 26-90190 (ELM) |
| | § | |
| Debtors. | § | (Joint Administration Requested) |
| | § | |
| | § | |

**DECLARATION OF MARK SHAPIRO IN SUPPORT OF**
**CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

Mark Shapiro, declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1.      I am over the age of 18, and I am authorized to submit this declaration (this "Declaration") on behalf of the debtors and debtors in possession in the above captioned chapter 11 cases (the "Chapter 11 Cases"). I submit this Declaration in support of the Debtors' chapter 11 petitions and the relief sought in the first-day pleadings filed contemporaneously herewith (collectively, the "First Day Motions").

2.      Since May 2024, I have been the independent Chief Operating Officer ("COO") of 777 Partners LLC ("777 Partners") and 600 Partners LLC ("600 Partners"), the parent holding companies for the broader company enterprises described in this Declaration. I am the authorized signatory for Signal National LLC ("Signal National") and each of the other above-captioned affiliated debtors and debtors in possession (each, a "Debtor" and collectively, with 777 Partners and 600 Partners, the "Debtors" or the "Company").

---

[1] A complete list of each of the Debtors in these chapter 11 cases and the last four digits of their tax identification numbers may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/SignalNational. The Debtors' principal offices are located at 3500 Maple Avenue, Suite 420, Dallas, Texas 75219.

3.       I am a Senior Managing Director of GlassRatner Advisory & Capital Group LLC ("GlassRatner"), where I have been employed since 2016.[2] Prior to that time, I managed Challenger Advisors LLC, a Dallas-based turnaround financial advisory firm, and before that served as chief financial officer for a number of public companies, including Big Lots Inc. and Central Parking Corp, as well as private equity-owned portfolio businesses. I received my Bachelor of Science degree in accounting from The Ohio State University and began my career with Ernst & Young in New York. I am a Certified Public Accountant (inactive).

4.       I have over thirty years' experience as a turnaround advisor and corporate financial executive and have advised debtors, secured lenders, trade creditors, and equity holders in both out-of-court and in-court proceedings. As a turnaround consultant, I have experience in a number of disciplines needed to help improve a company's performance including assessing a company's financial performance, comparing operating results to industry norms, providing financial forecasts, providing cash management assistance, developing and executing business strategy and plans, analyzing markets, recreating a company's prior year financial statements, assessing business valuations, determining cost reduction opportunities, among others. I have extensive experience in United States Bankruptcy Courts, including the U.S. Bankruptcy Court for the Northern District of Texas. My prior engagements Debtor-side engagements in bankruptcy cases include:

- Buddy Mac Holdings LLC. (chief restructuring officer; United States Bankruptcy Court for the Northern District of Texas, Dallas Division);
- Bela Flor Nurseries, Inc. (chief restructuring officer; United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division);

---

[2] B. Riley Financial purchased GlassRatner in or around July 2018, which then for a time did business as B. Riley Advisory Services. In June 2025, GlassRatner was sold out of B. Riley and once again became its own stand-alone entity.

4911-5404-5636

- Eye Care Leaders Portfolio Holdings LLC (financial advisor to the Debtors; United States Bankruptcy Court for the Northern District of Texas, Dallas Division);

- Kalera Inc. (chief restructuring officer; United States Bankruptcy Court for the Southern District of Texas, Houston Division);

- Christian Care Centers Inc. (chief restructuring officer and liquidating trustee; United States Bankruptcy Court for the Northern District of Texas, Dallas Division);

- Limetree Bay Services, LLC (chief restructuring officer; United States Bankruptcy Court for the Southern District of Texas, Houston Division);

- Fresh Acquisitions, LLC (chief restructuring officer; United States Bankruptcy Court for the Northern District of Texas, Dallas Division);

- Loves Furniture, Inc. (financial advisor to the Debtors; United States Bankruptcy Court for the Eastern District of Michigan);

- PBS Brand Co., LLC/Punch Bowl Social (chief restructuring officer; United States Bankruptcy Court for the District of Delaware);

- GGI Holdings LLC/Gold's Gym (financial advisor to the Debtors and liquidating trustee; United States Bankruptcy Court for the Northern District of Texas, Dallas division);

- Eagle Pipe LLC (financial advisor to the Debtors; United States Bankruptcy Court for the Southern District of Texas, Houston Division);

- Pine Creek Medical Center LLC (chief restructuring officer; United States Bankruptcy Court for the Northern District of Texas, Dallas Division);

- Lockwood Holdings LLC (chief restructuring officer; United States Bankruptcy Court for the Southern District of Texas, Houston Division);

- Uplift Rx LLC/Alliance Health (financial advisor to the Debtors and liquidating trustee; United States Bankruptcy Court for the Southern District of Texas, Houston Division)

5. In my capacity as COO, I have been managing the Debtors' daily operations since May 2024 and am familiar with their books and records and their business and financial affairs. I have been directly involved in over 30 sales and other dispositions of assets and/or business units involving the Debtors and / or their affiliates and I have spent extensive time overseeing and developing a path for maximizing the value of the Debtors' remaining businesses and assets.

6. Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents and information, my discussions with

4911-5404-5636

the Debtors' employees and professional advisors, or my opinions based upon experience, knowledge and information concerning the Debtors' operations and financial affairs. In preparing this Declaration, I have drawn upon my day-to-day involvement in managing the Debtors' operations since May 2024, my oversight of the retention of the Debtors' restructuring counsel and other professional advisors, and my review of the forensic accounting analysis conducted with respect to the Debtors' financial records. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

7. On August 9, 2026, the Debtors each filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with this Court. The Debtors are, and intend to continue, in possession of their assets and managing their respective businesses as debtors in possession. As explained further below, the filing of these Chapter 11 Cases was accelerated as a result of a recent involuntary bankruptcy petition filed against certain of the Debtors and the petitioning creditors' unwillingness to cooperate with a voluntary filing process.

**Preliminary Statement**

8. These Chapter 11 Cases do not mark the beginning of the Debtors' restructuring efforts. Since May 2024, independent restructuring professionals have managed the Company through an extensive wind-down, conducted without a chapter 11 filing at the Debtor level (although, as described below, certain subsidiaries were placed into insolvency or administration proceedings in other jurisdictions), that has materially reduced the Company's operating footprint and headcount, disposed of or transitioned numerous businesses and investments, reduced or resolved significant secured indebtedness, and preserved assets that require additional time to monetize.

4911-5404-5636

9. Historically, 777 Partners and 600 Partners operated as diversified investment holding companies with businesses and investments across structured finance and private credit, insurance and reinsurance, financial technology, litigation finance, aviation, professional sports, media and entertainment, and sustainability. Those businesses were conducted through numerous operating subsidiaries, special-purpose entities and portfolio holding companies. Brickell Insurance Holdings LLC ("Brickell"), a non-Debtor affiliate, historically served as the principal holding company platform for the Company's insurance and reinsurance investments.

10. The Company's present financial condition is attributable to several intersecting causes. In 2022, the Company faced a combination of macroeconomic and business-specific pressures, including sharply higher interest rates and financing costs, continued disruption in aviation and professional sports businesses following the COVID-19 pandemic, and emerging disputes and mismanagement concerning the ownership, eligibility, valuation, and allocation of collateral supporting certain asset-backed credit facilities. Those pressures intensified during 2023 and early 2024 as regulatory developments negatively affected the Company's reinsurance business, and creditor disputes, and counterparty concerns increased, along with additional adverse publicity, all of which constrained liquidity and access to external capital.

11. By the spring of 2024, those issues had developed into a broader liquidity, governance, and creditor-management problem. As a result, the Debtors' former principals, Joshua Wander ("Wander") and Steven Pasko ("Pasko"), voluntarily resigned and were replaced by independent restructuring management in May 2024. Since that time, the Debtors have pursued sales, negotiated transitions, foreign insolvency processes, consensual surrenders, and monitored and where appropriate addressed the exercise of secured-creditor remedies across the Company's

4911-5404-5636

portfolio, all while maintaining the personnel and infrastructure necessary to preserve and administer remaining assets.

12. Certain of the Debtors' largest secured creditors have supported that process with additional liquidity. Those creditors include AAV2024 LLC ("AAV2024"), Advantage Capital Holdings LLC ("ACH"), Dacian Master Fund LP ("Dacian"), Haymarket Insurance Company ("Haymarket"), and National Founders LP ("National Founders"), all of whom are participating in the bridge and proposed debtor in possession financing for these cases. Their continued funding has allowed the Debtors to avoid a disorderly and value-destructive shutdown while restructuring professionals worked through a portfolio of assets that included long-duration receivables, foreign investments, litigation claims, and other assets that cannot be responsibly liquidated on a single timetable.

13. The Debtors had been planning for an eventual, coordinated chapter 11 process on a measured timeline. However, on July 16, 2026, Vida Longevity Fund LP, Vida Insurance Credit Opportunity Fund II, LP, and Vida Insurance Credit Opportunity Fund III, LP (collectively, "Vida") filed an involuntary chapter 7 petition ("Involuntary Petition") against 777 Partners in the U.S. Bankruptcy Court for the Southern District of Florida. The Involuntary Petition, and the petitioning creditors' unwillingness to work toward a consensual filing, forced the Debtors to commence these Chapter 11 Cases now to maximize the value of their remaining assets and to provide an orderly forum for administering creditor claims.

14. A number of the Debtors' businesses remain going concerns. Among other things, some of these businesses own special-purpose vehicles that hold structured-receivables assets that self-liquidate over time. Fully monetizing those assets for creditors will take years and will need

4911-5404-5636

the involvement of people who understand how these esoteric portfolios are structured, serviced, and realized.

15. The Debtors' objective in chapter 11 is straightforward: preserve remaining value, complete sales and other monetizations that should occur during the bankruptcy, establish an orderly process to resolve creditor claims and litigation, and transfer longer-duration assets and causes of action to a liquidating trust that can realize value over time. In my judgment, that process offers materially greater value than a chapter 7 liquidation conducted by a trustee who would have to recreate more than two years of institutional knowledge and liquidate complex or long-duration assets in the short term, before their value can be realized.

## Background and Operations

**A.   Overview of 777 Partners, 600 Partners, and Brickell**

16. 777 Partners was formed as a Delaware limited liability company in 2015 by Wander and Pasko. Its original business was underwriting and financing the purchase of structured-settlement portfolios and other non-traditional receivables, including medical-lien receivables, structured-settlement payment streams, and annuity-backed receivables. Beginning around 2018, and accelerating from 2021, 777 Partners expanded well beyond that base into consumer and commercial finance, insurance distribution, aviation and airlines, media and entertainment, and ownership interests in professional sports clubs and leagues across the United States, Europe, South America, Australia, and the Caribbean.

17. Pasko formed 600 Partners as a Delaware limited liability company in 2017 as an affiliated investment holding company. Its portfolio overlapped with a number of 777 Partners' business lines, including structured settlements, aviation, media and entertainment, and professional sports.

4911-5404-5636

18.    Brickell operated as a related, but separate, non-Debtor holding company for insurance and reinsurance investments.  Its historical insurance-related investments included Sutton National Group, Merit Life Insurance Company, and 777 Re, a Bermuda reinsurer. Although 777 Partners, 600 Partners, and Brickell were distinct holding company platforms, the broader enterprise was managed by Pasko and Wander.

**B.    Historical Business Verticals**

19.    The Company's operations were organized into several verticals that can be described generally as follows:

| Vertical | Business |
|---|---|
| Private Credit / Structured Finance | Acquisition, financing, servicing, and monetization of structured settlement payment streams, medical receivables, lottery receivables, and other specialty-finance assets. |
| Insurance / Reinsurance | Insurance distribution, insurance-company investments, reinsurance, and related asset-management activities. |
| Financial Technology | Consumer and specialty finance, servicing, and technology-enabled lending businesses. |
| Litigation Finance | Funding and management of litigation-related receivables and claims. |
| Aviation | Airline technology, airline investments, aircraft leasing, and related aviation assets. |
| Sports | Ownership and financing of interests in professional football and basketball clubs, leagues, and sports-related businesses. |
| Media & Entertainment | Film-completion guarantees, production and post-production services, media-rights and related entertainment investments. |
| Sustainability | Investments in businesses focused on sustainable products and related commercial opportunities. |

20.    The structured-finance and private-credit businesses were among the Company's earliest and most significant operations.  They generally used special-purpose entities to originate, purchase, finance, and service structured settlement payment streams, lottery receivables, medical and healthcare provider receivables, and insurance commission receivables. These portfolios were financed through asset-backed lending facilities and securitization vehicles, with borrowing bases tied to the value of eligible receivables.  The assets self-liquidate as the underlying payment

4911-5404-5636

streams are collected over a period of years.  This vertical comprises a significant amount of the Debtors' remaining going-concern value.

21.     Through Debtor F3EA Holdings LLC ("F3EA Holdings") and its subsidiaries, including Debtors F3EA Capital LLC, F3EA Servicing LLC, Employee Funding of America, LLC, and Tactical Marketing Partners LLC, the Company originated and serviced consumer and commercial finance receivables, including consumer installment loans and related lending products marketed through a network of merchant and lead-generation channels.

22.     Through Debtors Lex Capital Holdings LLC ("Lex Capital") and Scout Law Group Holdings LLC ("Scout Law"), the Company held interests in the litigation-finance and legal-services vertical, which originated and acquired litigation-related receivables and funded claims through platforms operated under the JusticeFunds business.

23.     Through Debtors Phoenicia LLC ("Phoenicia") and Daedalus I LLC ("Daedalus"), the Company held its aviation investments, comprising both aviation-technology platforms and airline investments, including a minority interest in Flair Airlines in Canada and the start-up Australian carrier Bonza.

24.     Through Debtors Lumiere Financing LLC ("Lumiere Financing") and Lumiere Acquisitions Company LLC ("Lumiere Acquisitions"), the Company held its interest in the Film Finances business, a film completion-guarantee and production-services enterprise.

25.     Through Debtor Thresher Acquisition LLC ("Thresher"), the Company held interests in entities related to an insurance-distribution and technology platform that marketed and administered life and annuity insurance products.

4911-5404-5636

## C.     Corporate Structure and Debtor Group

26.     The Debtors are part of a corporate structure comprising hundreds of direct and indirect subsidiaries, special-purpose entities, and holding companies organized under the laws of numerous U.S. and foreign jurisdictions. At its peak in 2023, the 777 Partners and 600 Partners enterprise had invested more than $10 billion in assets and was a major employer worldwide through its network of holding and portfolio companies. The corporate structure was complex, as was the scope of the wind-down that followed.[3]

27.     777 Partners is owned by Wander and Pasko through JARM Capital LLC and MTCP LLC, which hold interests in SuttonPark Acquisition LLC, the direct parent of 777 Partners. 600 Partners is owned by Pasko through MTCP LLC and SPA II LLC. A listing of the Debtors and their ultimate parent (777 Partners or 600 Partners) is attached as **Exhibit A** ("Organizational Chart").

28.     Chapter 11 has long been part of the Debtors' wind-down plan, and the Company had been preparing to file for several months. Because the Involuntary Petition accelerated the timing, the Company is filing bankruptcy in two waves. The Debtors commencing these Chapter 11 Cases in this first wave (the "First-Wave Debtors") are the parent holding companies and the affiliated entities whose assets, operations, or role in the DIP and wind-down structure require that they be in chapter 11 now. Several additional affiliates (the "Subsequent Debtors") require more time to prepare their filings and are expected to file their own chapter 11 petitions within approximately 60 days.

---

[3] The original May 2024 unabridged 777 organizational chart reflecting the Debtors and affiliated entities (when GlassRatner was first engaged) spanned more than 500 legal entities and 60 pages.

4911-5404-5636

29.     The First-Wave Debtors comprise 777 Partners, 600 Partners, and their direct and indirect subsidiaries listed on **Exhibit A**. In summary:

a.      *Administrative and DIP-borrower entities.* Signal National was formed as a Texas limited liability company in February 2026 to consolidate certain administrative functions for the Debtors, including payroll and employee benefits, and to facilitate the final stage of the restructuring from Texas, where GlassRatner and the Debtors' restructuring professionals have been directing much of the day-to-day restructuring work.  777 Asset Management LLC likewise supports the enterprise's asset-management functions.  These entities are filing to preserve the centralized administrative and cash-management operations on which the wind-down depends.

b.      *Parent holding companies.* 777 Partners and 600 Partners are the two parent holding companies. They are the primary obligors or guarantors under the principal prepetition facilities described in Section III and the borrowers under the DIP Credit Facility, and their estates are the focal point of the litigation and claims to be administered in these cases.

c.      *Structured-finance and receivables entities.* Debtors SuttonPark Capital LLC and SuttonPark Servicing LLC (structured-settlement purchasing and servicing), Singer Asset Finance Company, LLC, Sphinx Funding LLC, the Signal receivables entities (Signal Servicing LLC, Signal National LLC, Signal AHF Medical Receivables HoldCo LLC, Signal MLH Medical Receivables HoldCo LLC, Signal LF Portfolio Holdco LLC), and related holding and funding entities hold or service the self-liquidating receivables that constitute most of the Debtors' remaining going-concern value. They are filing to protect that value and to enable an orderly, centralized monetization under a chapter 11 plan.

d.      *Consumer/commercial finance and litigation-finance entities.* F3EA Holdings LLC, F3EA Capital LLC, F3EA Servicing LLC, Employee Funding of America, LLC,

4911-5404-5636

Tactical Marketing Partners LLC, and Lex Capital Holdings LLC hold residual assets, contracts, or claims from the consumer-finance and litigation-finance verticals that are best administered within these estates.

e. *Other holding and asset entities.* Daedalus I LLC, Ironman Capital LLC, Lumiere Acquisitions Company LLC, Lumiere Financing LLC, Phoenicia LLC, Thresher Acquisition LLC, and certain other holding entities are filing because they hold residual equity, contract rights, or claims, or because their inclusion is necessary to administer intercompany obligations and preserve the integrity of the cash-management and DIP structure.

D. **Current Operations and Employees**

30. As of the Petition Date, the Debtors have approximately 15 employees consisting of 14 full-time employees and one (1) part-time employee. Twelve (12) employees are salaried; three (3) are hourly. The employees fill the functioning roles of in-house legal, accounting, treasury, finance, human resources, and portfolio servicing. The employees fulfill their functional roles on behalf of all Debtors and are critical to the ongoing operations and preservation of value of the Debtors' estates. All employees work remotely.

31. As a result of the two-year wind-down and the sale of most of the Company's operating assets, the current workforce is far smaller than at its historical peak. It is concentrated in finance, legal, and functions that support the continued servicing and management of the remaining receivables, regulatory and financial reporting, the wind-down of remaining assets, and the prosecution and defense of litigation. The employees are employed by 777 Partners, and payroll is processed through Signal National.

32. The Debtors historically maintained principal offices in Miami, Florida at various locations. However, for the past two years, the majority of the workforce became predominantly

4911-5404-5636

remote and the Company's day-to-day operations and major business decisions have been directed from GlassRatner's offices at 3500 Maple Avenue, Suite 420, Dallas, Texas 75219, which is the Debtors' notice address in these cases.

## Prepetition Capital Structure

33. As of the Petition Date, the Debtors have at least $2,705,233,601.28 in prepetition funded-debt obligations. The principal facilities are summarized in the table below and described in the subsections that follow.[4]

| Loan | Outstanding Principal | Secured by Debtors' Assets |
|---|---|---|
| DIP Credit Facility | $8,632,000.00 | Yes |
| ACAP Holdco Facility | $891,235,612.59 | Yes |
| ACAP Unsecured Facility | $25,037,805.82 | No |
| Leadenhall Master Facility | N/A | No |
| EFOA Loan | $76,379,331.00 | Yes |
| SPS Secured Rated Loan | $56,654,579.70 | Yes |
| Vida Margin Loan | $26,000,000.00 | No |
| ING Capital Facility | $28,000,000.00 | Yes |
| 777 Revolver | $14,000,000.00 | Yes |
| Thresher Seller Note | $19,342,782.41 | No |
| 777 Condo Loan | $4,620,000.00 | Yes |
| Knightsbridge (National Founders) Facility | $1,187,113,090.59 | Yes |

## A. Senior Secured DIP Credit Facility

34. The Debtors and certain non-Debtors entered into a Super-priority Debtor-in-Possession Credit Agreement, dated as of June 9, 2026 (as amended to date and as may be further amended from time to time, the "DIP Credit Agreement") and related DIP Loan Documents pursuant to which ACM Delegate LLC ("ACM"), in its capacity as administrative agent, and

---

[4] This summary describes only the major debt obligations of the Debtors; it does not include the debt obligations of non-Debtor affiliates, nor does it include every debt obligation on which a Debtor is a guarantor. Amounts are estimated and still subject to reconciliation. Any such estimates should not be construed as an admission of the Debtors' balance of any amount owed.

4911-5404-5636

AAV2024, ACH, Dacian, Haymarket, and National Founders (collectively the "DIP Lenders"), in their capacity as DIP Lenders, agreed to provide a new credit facility (the "DIP Credit Facility"), including prepetition new money advances of up to $8,632,000.00 to fund the Debtors' working capital needs and prepare these chapter cases, as well as additional post-petition funding of up to $6,238,000.00for the costs of administering these cases.

35. The borrowings under the DIP Credit Facility are secured by substantially all of the Debtors' assets including: (i) senior first priority liens on the Debtors' assets which are not subject to valid, perfected, and non-avoidable liens (including proceeds or property recovered in connection with pursuit of chapter 5 causes of action), and (ii) junior liens on all assets of the Debtors subject only to valid, properly perfected, and nonavoidable liens that existed on the Debtors' assets as of the Petition Date. The DIP Lenders are also receiving Priming Liens (as defined in the DIP Credit Agreement), but each DIP Lender's Priming Liens attach only to collateral in which such DIP Lender already held first priority liens in their capacity as a pre-petition lender.

36. As of the Petition Date, the prepetition advances under the DIP Credit Facility total $8,632,000.00.

**B.      ACAP Holdco Facility[5]**

37. Certain of the Debtors are borrowers or guarantors under the Amended and Restated Loan and Security Agreement, dated as of November 2, 2023 by and among, 600 Partners, 777 Partners, and JARM Capital LLC as borrowers and other corporate guarantors, ACM, as administrative agent and collateral agent, and AAV2024 and Haymarket, as lenders

---

[5] The ACAP Holdco facility and ACAP Unsecured Facility are among a number of obligations owed by the Debtors or their affiliates to ACAP affiliates. A complete breakdown of those facilities and amounts owed is contained in Schedule 1.3 to the DIP Credit Agreement (Exhibit B to the DIP Motion).

4911-5404-5636

(collectively, with any other lenders party thereto from time to time, the "ACAP Holdco Lenders" and the foregoing, the "ACAP Holdco Facility"). The ACAP Holdco Facility amended and restated, without constituting a novation, an existing Loan and Security Agreement, dated as of February 27, 2020 by and among 777 Partners, as borrower, and Haymarket, as lender in an original principal amount of $46,000,000.

38.     Pursuant to the ACAP Holdco Facility, the ACAP Holdco Lenders made available a secured loan facility in a maximum principal amount of up to $891,235,612.59, the proceeds of which were used for working capital for the borrowers, corporate guarantors and their various portfolio investments and acquisition of portfolio investments. Borrowings under the ACAP Holdco Facility are secured by substantially all assets of 600 Partners, 777 Partners, and the guarantors thereto.

39.     The ACAP Holdco Facility matured on November 2, 2024 and is in default. As of June 30, 2026, principal and interest owed under the ACAP Holdco Facility (which is inclusive of the 777-600 Bridge Loan, TAMI Tranche, JARM Obligations, and the MCAG Tranche as set forth on Schedule 1.3 to the DIP Credit Agreement, Exhibit B to the DIP Motion) is approximately $1,259,454,011.76.

**C.      ACAP Unsecured Facility**

40.     On or about December 12, 2024, 777 Partners, as borrower, and Advantage Capital Holdings LLC ("ACH"), as lender, entered into an Unsecured Loan Agreement (the "ACAP Unsecured Facility") pursuant to which ACH made available to 777 Partners an unsecured loan facility in a maximum principal amount of up to $25 million for the purpose of funding operational costs and professional fees. As of June 30, 2026, the principal balance owed under the ACAP

4911-5404-5636

Unsecured Facility is $25,037,805.82 (the excess principal amount over $25 million being the result of PIK interest accruing and being added to the outstanding principal balance).

**D.    Leadenhall Master Facility**

41.    777 Partners and 600 Partners are unsecured guarantors under a Loan and Security Agreement dated as of May 7, 2021 (as amended, supplemented, or otherwise modified from time to time, the "Leadenhall Facility") by and among both Debtor and non-Debtor subsidiaries,[6] as borrowers, and the lenders, Leadenhall Capital Partners LLP, as administrative agent, and Leadenhall Life Insurance Linked Investments Fund PLC, as collateral agent (collectively, "Leadenhall").  Notably, the Leadenhall Facility is an obligation of special-purpose borrower entities; 777 Partners and 600 Partners are unsecured guarantors only, not secured borrowers, and Leadenhall holds no lien on their assets—a point the Second Circuit confirmed, as described in Section IV.

42.    The Leadenhall Facility is structured through separate borrower and lender groups and provided committed financing subject to borrowing base limitations and specified sub-facility limits, which originally totaled $300 million but were increased to $350 million.  Pursuant to the Leadenhall Facility, loans were funded based upon the value of eligible receivables comprising the applicable borrowing base and were secured by senior liens on substantially all of the borrowers' assets including structured settlement receivables, lottery receivables, medical-related receivables, health-care provider loan receivables, and insurance commission receivables. Leadenhall's aggressive posture in litigation and collateral disputes described below has driven a disproportionate share of the cost, delay, and disruption in the Company's wind-down.

---

[6] The non-Debtor subsidiary borrowers under the Leadenhall Facility are SPLCSS III LLC, Signal SML 4 LLC, Insurety Agency Services LLC, and Dorchester Receivables II LLC.  Leadenhall exercised certain rights under the Leadenhall Facility to appoint independent managers for each of the borrowers, including Insurety Agency Services in December 2024, and SPLCSS II, Signal SML 4 and Dorchester Receivables II in December 2025.

4911-5404-5636

43.     As described in Section IV below, Leadenhall alleges that the same collateral securing the Leadenhall Facility—reportedly more than 1,600 assets valued at approximately $185 million—was also pledged to other lenders, and that certain Debtors and their principals made material misrepresentations regarding the ownership and priority status of that collateral. Leadenhall asserts a claim of approximately $609 million under the Leadenhall Facility, including default interest, fees, and other charges.  The Debtors dispute the validity and amount of Leadenhall's claims.

**E.     National Founders**

44.     Certain of the Company's structured-finance special-purpose vehicles are borrowers under facilities provided by National Founders LP ("National Founders"), secured by the receivables held in those vehicles. SuttonPark Capital LLC is a guarantor on certain of those facilities. In addition, both 777 Partners and 600 Partners act as guarantors under these facilities. As of June 30, 2026, the principal amount owed under the National Founders facilities is $1,187,113,090.59. SuttonPark Capital LLC has pledged all of its right title and interest in one of the non-Debtor affiliates to secure the obligations under those facilities.

**F.     Other Material Secured Debt / Creditors**

45.     777 Partners is a borrower under an Amended and Restated Margin Loan Agreement dated as of July 14, 2020, with the Vida lenders, in an original principal amount of approximately $59.7 million (the "Vida Margin Loan"), secured by a pledge of collateral by non-Debtor affiliate Brickell PC Insurance Holdings LLC and guaranteed by SuttonPark Capital LLC and Signal Financial Holdings LLC.  Following an alleged default, Vida obtained a judgment of $26 million against 777 Partners, SuttonPark Capital LLC, Signal Financial Holdings LLC, and Brickell PC Insurance Holdings LLC in the Supreme Court of the State of New York, County of

4911-5404-5636

New York.  That judgment is the stated basis for the Involuntary Petition.  As described in Section V, the Company attempted to engage with Vida toward a consensual resolution; Vida instead elected to file the Involuntary Petition.

46.     Sierra 2016, LLC ("Sierra 2016"), a special-purpose entity, is a borrower under a credit agreement dated June 17, 2016, with ING Capital LLC ("ING Capital"), as sole lender and administrative agent, secured by a first-priority lien on substantially all of Sierra 2016's assets. ING Capital asserts that Sierra 2016 owes more than $28 million.  As described in Section IV, ING Capital has brought an action seeking to recover those loan proceeds on a fraud theory.  The Debtors dispute ING Capital's claims.

47.     777 Partners is also a borrower under that certain Second Amended and Restated Revolving Loan and Security Agreement dated as February 17, 2022 with Dacian, one of the DIP Lenders, as the sole lender, secured by, among other things, a brokerage account owned by 777 Partners ("Dacian Revolver Facility").  The Dacian Revolver Facility is among several other obligations owed by the Debtors or their affiliates to Dacian.[7]

## Significant Events Leading to Chapter 11

**A.     Events Precipitating the Company's Financial Distress.**

48.     The Debtors' financial distress resulted from the convergence of several developments over a period of years.

49.     Beginning in 2022, sharply rising interest rates increased the cost of financing and affected the valuation and economics of a number of rate-sensitive assets and financing structures across the Company.  At the same time, the Company's aviation and professional sports investments were operating through the extended effects of the COVID-19 pandemic, which had

---

[7] A complete breakdown of those facilities and amounts owed is contained in Schedule 1.3 to the DIP Credit Agreement (Exhibit B to the DIP Motion).

4911-5404-5636

materially disrupted both industries.  These pressures increased the amount of liquidity required to support certain portfolio companies and reduced the availability and attractiveness of external financing.

50.     Separate from those market pressures, issues emerged by 2022 concerning the ownership, eligibility, valuation, and allocation of receivables supporting certain specialty-finance facilities.  Those issues included instances in which assets were reported as collateral under more than one facility or were not available to the borrower in the manner reflected in lender reporting.  The Company's later forensic work has shown that these issues predated the 2024 management transition.  The existence of these collateral issues created disputes among 777-related entities and their lenders and materially complicated the Company's financing position.

51.     During late 2023 and early 2024, regulatory and ratings developments affecting 777 Re created additional liquidity and business pressure.  The Bermuda Monetary Authority took regulatory action with respect to 777 Re, and certain reinsurance counterparties subsequently recaptured or began recapturing business and related assets.  Those developments reduced the asset base and financial flexibility of 777 Re and affected businesses that had historically depended on capital or liquidity associated with the reinsurance platform.

52.     By late 2023, the combination of tightening credit, the reinsurance disruption, mounting creditor concerns, continued mismanagement, and significant adverse publicity surrounding Wander and the proposed Everton acquisition caused the Company's access to outside capital to contract sharply.  Investors and creditors lost confidence in Wander.  Leadenhall commenced litigation and the Company could no longer fund its expansion or, before long, its ordinary operations without lender forbearance and continued funding.

4911-5404-5636

53. In the spring of 2024, as the Company faced escalating creditor, liquidity, and governance issues, 777 Partners and 600 Partners transitioned to independent restructuring management. As discussed earlier, Wander and Pasko voluntarily resigned and, since May 2024, professionals from GlassRatner, including myself, have been in charge of the Debtors' day-to-day operations.

54. In May 2024, the Company retained GlassRatner to provide independent financial and operational leadership. Ian Ratner and Ronald Glass were appointed as independent managers and I was appointed COO to run day-to-day operations. I replaced Mr. Glass as a manager when he resigned on September 18, 2024. Michael Thatcher of GlassRatner became Chief Financial Officer of 777 Partners and 600 Partners effective December 19, 2025.

55. In preparation for these chapter 11 cases, GlassRatner determined it was in the best interests of the Debtors to seek new independent managers during the pendency of the Debtors' bankruptcy cases. As a result, Ian Ratner and I resigned as managers of 777 Partners and 600 Partners and on August 6, 2026, Anna Phillips was appointed as independent manager for 777 Partners and 600 Partners.

56. Since May 2024, neither Wander nor Pasko has had any role in managing the Company.

**B. Material and Pending Litigation**[8]

57. The Debtors are the subject of a number of pending civil and regulatory matters which have substantially impacted their operations, reputation, and access to capital as further described below.

---

[8] The summary in this Section of my Declaration highlights major ongoing litigation matters, and is not, nor is it intended to be, a complete list of all litigation matters to which the Debtors are parties. All litigation matters will be set forth in each Debtor's forthcoming Statement of Financial Affairs.

4911-5404-5636

58. ***SEC Enforcement Action.*** On October 16, 2025, the SEC filed a complaint against Wander, Pasko, 777 Partners, 600 Partners, and Damien Alfalla, the Company's former chief financial officer, alleging that the defendants misled investors about the Company's financial condition and fraudulently induced investments in the $237 million preferred-equity offering by falsely representing that the Company had, and would continue to have, net income sufficient to pay a 10% annual dividend. The complaint further alleges that Wander and Alfalla misused a credit facility, resulting in a $300 million overdraw. Alfalla resolved the SEC's claims by consent judgment entered December 16, 2025, and Pasko resolved the SEC's claims by consent judgment entered April 1, 2026. Wander's motion to dismiss remains pending, and civil discovery was stayed in full on May 11, 2026, pending the criminal case.

59. ***Criminal Prosecution of Wander.*** On October 16, 2025, the U.S. Attorney's Office for the Southern District of New York unsealed an indictment charging Wander with conspiracy to commit wire fraud, wire fraud, conspiracy to commit securities fraud, and securities fraud, arising from a scheme to defraud the Company's lenders and investors of more than $500 million, principally through the double-pledging of collateral and the digital alteration of bank statements.[9] Alfalla pleaded guilty to an information on October 14, 2025,[10] two days before the indictment was unsealed. On June 30, 2026, prosecutors filed a superseding indictment adding allegations that Wander diverted the majority of a $20 million loan into his personal brokerage account and directed employees to fabricate bank statements to conceal the diversion, together with a witness-tampering count alleging that Wander attempted to discourage a former Company analyst from testifying. Wander is contesting the charges, and trial is set for October 19, 2026.

---

[9] *United States v. Wander*, 25 Cr. 473 (JPO).

[10] *United States v. Alfalla*, 25 Cr. 468 (AS).

4911-5404-5636

60.    ***Leadenhall Litigation.*** On May 3, 2024, Leadenhall filed a complaint against Wander, Pasko, 777 Partners, 600 Partners, and certain Debtor and non-Debtor affiliates, among others, in the U.S. District Court for the Southern District of New York (the "SDNY Court"), asserting federal RICO claims, together with fraudulent-inducement and contract claims, and alleging that Wander and the Debtors defrauded Leadenhall by double-pledging certain collateral securing its SPE-level facilities.[11]  The Debtor-related defendants moved to dismiss the amended complaint, which motion was fully briefed as of December 19, 2024, and remains pending.  Most significantly, on March 23, 2026, the U.S. Court of Appeals for the Second Circuit vacated the preliminary injunction that had restrained the guarantors' assets, holding that the SDNY Court lacked authority to enjoin 777 Partners' and 600 Partners' assets because Leadenhall asserted no valid lien on, or equitable interest in, those assets.  777 Partners and 600 Partners intend to pursue the injunction bond to recover damages caused by the vacated injunction.

61.    ***Leadenhall Article 9 Foreclosures and the Company's Challenge.*** In May 2025, Leadenhall conducted Article 9 foreclosure auctions of the assets of three borrower entities—Signal SML 4 LLC, SPLCSS III LLC, and Dorchester Receivables II LLC.  The collateral consisted of structured-settlement and receivables portfolios whose value depends on specialized knowledge of the underlying payment streams.  Leadenhall acquired portfolios it had itself valued at more than $170 million for nominal credit bids of $1 each.  The Company contends these sales were not conducted in a commercially reasonable manner, stripped hundreds of millions of dollars of value from the estates at a fire-sale price, and were engineered to inflate Leadenhall's guaranty claims against 777 Partners and 600 Partners.  The Company challenged the sales, and on February 5, 2026, filed a verified amended complaint seeking, among other things, a declaration that the

---

[11] *See Leadenhall Capital Partners LLP v. Wander, et al.*, 24 Civ. 3453 (JGK)(BCM), ECF No. 1 (S.D.N.Y.).

4911-5404-5636

plaintiffs bear no deficiency liability because Leadenhall failed to conduct the sales in a commercially reasonable manner.[12]

62.     Following the auctions discussed above, Leadenhall asserted that certain of the foreclosed receivables had been transferred to DASIR 2 LLC and directed third-party obligors to remit collections to DASIR 2.  The Company further contends that, despite repeated requests, Leadenhall and DASIR 2 failed to provide the sale closing documents, written assignments, or other documentation sufficient to establish DASIR 2's ownership of the receivables or authority to redirect those collections.  This dispute exemplifies why the remaining receivables must be monetized by parties who understand them, and why a Court-supervised process is needed to prevent further value destruction and maintain transparency.

63.     ***Vida Litigation and the Involuntary Petition.*** As described in Section III, Vida obtained a $26 million judgment on the Vida Margin Loan.  The Company sought to engage Vida toward a consensual resolution consistent with the orderly wind-down, but Vida declined to cooperate.  On July 16, 2026, three Vida funds filed the Involuntary Petition against 777 Partners in the U.S. Bankruptcy Court for the Southern District of Florida, Case No. 26-19312-PDR.  777 Partners' deadline to respond to the Involuntary Petition is August 11, 2026.

64.     ***ING Capital Litigation.*** ING Capital initially sued 777 Partners, 600 Partners, Wander, Pasko, and others in the SDNY Court in October 2024, alleging that the Debtors defrauded ING Capital by pledging more than $28 million in assets that the borrower did not own.[13]  That action was voluntarily dismissed for lack of subject-matter jurisdiction. On January 27, 2025, ING Capital refiled a substantially similar complaint in the Circuit Court for Miami-Dade County,

---

[12] *See Signal SML 4 LLC, et al. v. Leadenhall Life Insurance Linked Investments Fund PLC*, Index No. 652929/2025.
[13] *See ING Capital LLC v. 777 Partners LLC, et al.*, 24 Civ. 7913 (JGK).

4911-5404-5636

Florida.[14] On May 20, 2026, the United States moved to intervene and stay that action pending the Wander criminal trial, and on June 1, 2026, the court granted the stay. On June 2, 2026, ING Capital moved for reconsideration of that order as it was entered before the deadline for opposition papers to be filed. The Florda State Court held a hearing on August 6, 2026, reconsidered its ruling, and is allowing expert discovery to proceed. No trial date has been set.

**C.      Pre-Petition Restructuring Efforts**

65.      For the last two years, the Debtors and their affiliates have pursued a wide range of voluntary transactions to reduce carrying costs, generate liquidity, transition viable businesses to new owners, and reduce secured debt, including sales, negotiated transitions, foreign insolvency processes, and consensual surrenders of collateral. In addition, certain of the Debtors' senior secured lenders foreclosed upon collateral, exercised remedies, or otherwise reclaimed assets, and other creditors and third parties pursued remedies including foreign winding-up and administration proceedings. A summary of these dispositions and creditor actions is attached hereto as **Exhibit B**.

66.      Throughout this period, the Debtors' ability to monetize assets was constrained by the nature of the funding available to them and, with respect to certain assets, by the preliminary injunction Leadenhall obtained restraining the guarantors' assets (since vacated, as described in Section IV.B above). The Debtors' senior secured lenders have made protective advances at GlassRatner's request to fund the wind-down on a basis sufficient to preserve going-concern operations and avoid an uncontrolled collapse, but that funding was not structured, and was not intended, to provide working capital for reinvestment in the underlying businesses. As a result, in a number of instances, assets that could have commanded a materially higher price if marketed and sold on a fully-funded, non-distress basis were instead disposed of on a distressed timeline

---

[14] *See ING Capital LLC v. 777 Partners LLC, et al.*, Case No. 2025-1552-CA-01, Filing #215435997 (Fl. Dade Cty.)

4911-5404-5636

dictated by the availability of funding, the pendency of litigation, and, in certain instances, the constraints imposed by and the continued negative publicity resulting from the Leadenhall complaint and preliminary injunction.

67. Of the dispositions reflected in **Exhibit B**, a number were negotiated sales that the Debtors actively directed and that generated cash proceeds or a reduction of the Debtors' secured or guaranty obligations. Others were consensual, non-cash resolutions that extinguished guaranty or other contingent exposure without generating cash proceeds. Still others—including certain dispositions of collateral securing the ACAP Holdco Facility—were conducted by the Debtors' senior secured lenders as collateral agent, exercising their own remedies with respect to already-pledged collateral; the Debtors' ability to actively direct or negotiate the terms of those dispositions was limited, including during the pendency of the Leadenhall preliminary injunction described above. The Debtors have sought to distinguish, in **Exhibit B**, between dispositions the Debtors negotiated directly and those effected through the exercise of secured creditor remedies.

**D. Remaining Assets and Operations**

68. After two years of dispositions and foreclosures, the Company's remaining value is concentrated in its self-liquidating structured-receivables portfolios and related servicing operations, together with residual equity interests, contract rights, litigation claims (including the Leadenhall commercial reasonableness and bond claims), and avoidance and other estate causes of action. These structured-receivables assets remain going concerns and will generate value as the underlying payment streams are collected over a period of years. Realizing that value requires continuity of knowledgeable management and servicing—precisely what the Debtors propose to preserve through these cases and the Liquidating Trust.

4911-5404-5636

69. Absent the Involuntary Petition, the Debtors would have continued their consensual wind-down without a chapter 11 filing at the Debtor level and, on a modestly longer timeline, commenced streamlined voluntary chapter 11 cases. The Involuntary Petition, and the Vida creditors' refusal to cooperate with a voluntary process, made it necessary to file now to preserve the value of the Debtors' remaining assets and to provide an orderly forum for administering creditor claims. Concurrently with these cases, the Debtors intend to ask the Florida bankruptcy court to (a) convert the involuntary case to chapter 11 and (b) transfer venue of that case to this Court. The Debtors do not intend to contest entry of an order for relief in the involuntary case.

<strong><u>The Chapter 11 Strategy</u></strong>

**A.     DIP Financing and Creditor Support**

70. The Debtors and certain non-Debtors entered into a Superpriority Debtor-in-Possession Credit Agreement dated as of June 9, 2026 (as amended to date and as may be further amended from time to time, the "<u>DIP Credit Agreement</u>"), under which ACM, as administrative agent, and AAV2024 LLC, ACH, Dacian Master Fund LP, National Founders LP, and Haymarket, as lenders (collectively, the "<u>DIP Lenders</u>"), agreed to provide a new credit facility (the "<u>DIP Credit Facility</u>"), including prepetition new-money advances of up to approximately $8,632,000 to fund working capital and the preparation of these cases, and additional postpetition funding of up to $6,238,000.00 to fund the administration of these cases. The DIP obligations are secured by senior priming and junior liens on substantially all of the Debtors' assets, subject to the priorities set forth in the DIP Credit Agreement and the proposed orders. As of the Petition Date, prepetition advances under the DIP Credit Facility total approximately $8,632,000.00. Additional facts concerning the DIP Credit Facility are set forth in my separate declaration filed in support of the DIP Financing Motion.

4911-5404-5636

71.     The DIP Lenders include the Company's senior secured prepetition lenders, who have made protective advances at GlassRatner's request to fund working capital and have agreed to continue funding through these cases.  Their support—and their willingness to provide post-petition financing on the terms proposed—reflects both their economic stake in maximizing the value of the collateral and their confidence in the Debtors' management and wind-down strategy. That support gives these cases a credible path to a value-maximizing conclusion.

**B.     Remaining Asset Sales**

72.     The Debtors intend to market and sell certain remaining assets during these cases where a sale will realize value more efficiently than holding the asset, and to do so through a Court-supervised process that protects against the kind of value-destructive, below-market disposition the Company experienced in the Leadenhall Article 9 auctions.  Assets not sold during the cases will be transferred to the Liquidating Trust for monetization over time.

**C.     Claims Resolution**

73.     These cases will establish an orderly, centralized, Court-supervised process for creditors to file and, where necessary, adjudicate claims by and against the Debtors' estates.  That process is particularly important here, where several of the largest asserted claims—including the Leadenhall guaranty claim and the ING Capital claim—are disputed and bound up with the fraud allegations and collateral disputes described above.  Resolving these claims in a single forum, under the Bankruptcy Code's claims procedures, will be more efficient and more equitable than continued litigation across multiple courts.

**D.     Chapter 11 Liquidating Plan**

74.     For the reasons above, the Debtors firmly believe that a chapter 11 wind-down under this Court's supervision will realize materially more value for creditors than a chapter 7

4911-5404-5636

liquidation. The Debtors' remaining assets are esoteric structured-receivables portfolios whose value depends on specialized knowledge, continuity of servicing, and patient realization over time. A chapter 7 trustee—new to these businesses, without the years of institutional knowledge the current management has developed and operating under a mandate to liquidate promptly—would face a substantial risk of a forced, premature fire sale that destroys value, as the Leadenhall $1 credit bids for portfolios valued in the hundreds of millions of dollars starkly illustrate. Chapter 11, by contrast, allows the Debtors to pause the surrounding litigation, run an orderly claims process, sell assets where advantageous, and transfer the balance to a liquidating trust for realization over time, all with the support and financing of the senior secured lenders. That is the path most likely to maximize creditor recoveries.

75. As such, the Debtors intend to propose a chapter 11 plan that establishes the Liquidating Trust to hold and monetize the Debtors' remaining self-liquidating receivables and other going-concern assets for the benefit of creditors following the plan's effective date. Because these portfolios realize value as their underlying payment streams are collected over a period of years, a liquidating trust administered by a knowledgeable trustee is the structure best suited to capturing that value. A liquidating trust also provides a stable, long-term vehicle for pursuing the estates' retained litigation and avoidance claims.

**First Day Motions**

76. Concurrently with their petitions, the Debtors have filed the First Day Motions, which include, among others, the following: (a) the DIP Financing Motion; (b) maintenance of the Debtors' cash management system; (c) extend the time to file schedules; (d) file a consolidated creditor matrix; (e) pay employee wages; and (f) retain Epiq as claims and noticing agent.

4911-5404-5636

77.     A description of the relief requested in, and the facts supporting each of, the First Day Motions is set forth in **Exhibit C** attached hereto and incorporated herein by reference.  I am familiar with the content and substance contained in each First Day Motion and believe that the relief sought in each motion (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity and value, (b) constitutes a critical element in the Debtors achieving a successful exit from these cases, (c) best serves the Debtors' estates and creditors' interests, and (d) should be approved on an emergency basis to avoid immediate and irreparable harm to the Debtors.

78.     I have reviewed each of the First Day Motions, including their attachments, and the facts stated in those motions are true and correct to the best of my knowledge, information, and belief.  I believe the relief requested in each is necessary to avoid immediate and irreparable harm to the Debtors' estates, to promote the efficient and economical administration of these cases and is otherwise in the best interests of the Debtors, their estates, and their creditors, particularly given the number of Debtors, the complexity of the Company's structure, and the expedited timing forced by the Involuntary Petition.  If asked to testify as to the facts supporting each of the First Day Motions, I would testify to the facts as set forth in such motions and **Exhibit C**.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: August 10, 2026

*/s/ Mark Shapiro*
Mark Shapiro
Interim COO and Authorized Signatory

4911-5404-5636

**Exhibit A**

**Organizational Chart**

| Ultimate Parent | Debtor |
| --- | --- |
| SuttonPark Acquisition LLC | 777 Partners LLC |
| 777 Partners LLC | 777 Asset Management LLC |
| 777 Partners LLC | Daedalus I LLC |
| 777 Partners LLC | Employee Funding of America, LLC |
| 777 Partners LLC | F3EA Capital LLC |
| 777 Partners LLC | F3EA Holdings LLC |
| 777 Partners LLC | F3EA Servicing LLC |
| 777 Partners, LLC | Ironman Capital LLC |
| 777 Partners LLC | Phoenicia LLC |
| 777 Partners LLC | Signal AHF Medical Receivables HoldCo LLC |
| 777 Partners LLC | Signal LF Portfolio Holdco LLC |
| 777 Partners LLC | Signal MLH Medical Receivables HoldCo LLC |
| 777 Partners LLC | Signal National LLC |
| 777 Partners LLC | Signal Servicing LLC |
| 777 Partners LLC | Tactical Marketing Partners LLC |
| 777 Partners LLC | Thresher Acquisition LLC |
| SPA II LLC | 600 Partners LLC |
| 600 Partners LLC | Lex Capital Holdings LLC |
| 600 Partners LLC | Lumiere Acquisitions Company LLC |
| 600 Partners LLC | Lumiere Financing LLC |
| 600 Partners LLC | Singer Asset Finance Company, L.L.C. |
| 600 Partners LLC | SuttonPark Capital LLC |
| 600 Partners LLC | SuttonPark Servicing LLC |

## **Exhibit B**

### **Combined Legal Entity Status and Schedule of Dispositions**

4911-5404-5636

**Signal National LLC** *et al.*

Schedule of Asset Dispositions

| Business Unit | Group | Description | Disposition | Consideration to Estate | Date |
|---|---|---|---|---|---|
| 777 Equipment Finance | 777 | Equipment financing | Sale to third party | Cash proceeds of $3.8 million | May-24 |
| Sutton National | Brickell | Property & casualty insurance carrier | Restructured ownership into a Trust | N/A – governance action, not a disposition for consideration | Jun-24 |
| BBL | 777 | British professional basketball league | License terminated, league shut down | N/A – license terminated, not a disposition for consideration | Jul-24 |
| Bonza | 777 | Ultra-low-cost airline Australian airline | Voluntary administration & liquidation proceedings in Australia | Insolvency proceeding, no cash proceeds to estate | Jul-24 |
| Merit Life | Brickell | Provider of fixed annuity products | Sale to third party | Cash proceeds of ~$25.0 million applied to reduction of senior debt | Jul-24 |
| Speed Leasing | 777 | Consumer leases for pre-owned motorcycles | Sale to third party | Cash proceeds of $1.2 million plus full satisfaction of senior debt | Jul-24 |
| Trans Atlantic Lifetime Mortgages Limited ("TAMI") | 600 | Equity release mortgages in the UK | Consensual sale of the equity interest of TAMI to an ACAP affiliate. | Satisfaction of up to $275 million of debt, subject to valuation and future performance | Jul-24 |
| Ensurem | 777 | Insurance technology | Consensual, non-cash foreclosure | Release of guarantor obligations and obligations under Capital Maintenance Agreement | Aug-24 |
| United Star | 777 | company | Sale to third party | Cash proceeds of ~$1.5 million | Aug-24 |
| London Lions | 777 | Professional UK basketball team | UK administration proceedings | Insolvency proceeding, no cash proceeds to estate | Aug-24 |
| 42 Bruton | 777 | Public relations agency | Sold to management | Nominal cash consideration | Sep-24 |
| Green Sports Mgt | 777 | Professional sports athlete management | Sale to management | Nominal cash consideration | Oct-24 |
| 777 Asset Mgt Ltd. | 777 | Alternative investments | UK administration proceedings & liquidation | Insolvency proceeding, no cash proceeds to estate | Oct-24 |
| Insurety Capital | 777 | Medicare commission receivables | Independent director appointed | N/A – governance action, not a disposition for consideration | Dec-24 |
| Triplet Global | 600 | Owner of private aircraft | Sale to third party | Cash proceeds of $23.5 million applied to reduction of senior debt | Dec-24 |
| Film Finances Inc. | 600 | Film completion guarantees | Filed Ch 11 in Delaware; assets sold in §363 sale | Insolvency proceeding, no cash proceeds to estate | Jan-25 |
| Uown | 777 | Consumer rent-to-own business | Sale to ACAP affiliate | Satisfaction of $61.0 million of debt, plus $1.0 million of cash proceeds | Jan-25 |
| EFOA | 777 | Litigation funding | Consensual surrender of certain assets to Dacian | Satisfaction of obligations under loan agreement | Jan-25 |
| F3EA Servicing | 777 | Consumer/commercial finance | Wind-down with sale of related finance businesses | N/A – wind-down, no sale | Jan-25 |
| 777 Asset Mgt | 777 | Alternative investments | Wind-down | N/A – wind-down, no sale | Mar-25 |
| Case Strategies Group, Principled Engineering Consultants, Global Claim Advisors | 777 | Litigation finance | Consensual surrender of the assets to Dacian | Satisfaction of Obligations under loan agreement | Mar-25 |
| MCAG | 777 | Class action settlement recovery | Article 9 sale by senior lender | Public disposition, no cash proceeds to estate | May-25 |
| 777 Stream | 600 | Holdco for global sports streaming services | Article 9 strict foreclosure by an ACAP affiliate to acquire the equity interest of 777 Stream LLC | $23.2 million in full satisfaction of debt | May-25 |
| Fz Sports/Fanatiz | 600 | Global sports streaming service | Article 9 foreclosure by ACM, as collateral agent, of a warrant to purchase shares in Fanatiz | Public disposition, no cash proceeds to estate | May-25 |
| STX | 777 | Movie and television studio | Article 9 foreclosure by ACM, as collateral agent, of the equity interests of England Holdings 3, Inc. | $6.5 million in full satisfaction of debt | May-25 |
| CBC Holdings | 600 | Private mortgage notes | Sale to third party | $3.0 million of cash proceeds | Jun-25 |
| Nutmeg Acquisitions | 600 | International football clubs | Article 9 public disposition by an ACM, as agent, of the equity interest of Nutmeg Acquisition LLC | Satisfaction of $157 million of debt | Jun-25 |
| England Holdings 3 | 777 | Holdco for Independent film and television studio | Article 9 strict foreclosure and Article 9 public disposition by ACAP affiliate to acquire shares of England Holdings 3, Inc. | Along with equity interests in Chiller Island and Flair, and promissory notes of Flair and other assets, satisfaction of $21.5 million of debt | Jul-25 |
| Chiller Island | 600 | Holder of residual notes | Article 9 public disposition by an ACAP affiliate of the equity interest of Chiller Island 1 LLC | Along with equity interests in Flair, and promissory notes of Flair and other assets, satisfaction of $21.5 million of debt | Jul-25 |
| Flair | 777 | Canadian airline | Article 9 public disposition by an ACAP affiliate of a convertible promissory note issued by Flair Airlines LTD | Along with equity interests in Chiller Island and Flair, and promissory notes of other assets, satisfaction of $21.5 million of debt | Jul-25 |
| Flair | 777 | Canadian airline | Article 9 public disposition whereby the preferred shares of Flair Airlines LTD were repurchased by Flair | Along with equity interests in Chiller Island, and promissory notes of Flair and other assets, satisfaction of $21.5 million of debt | Jul-25 |
| Fz Sports | 600 | Global sports streaming service | Article 9 public disposition by an ACAP affiliate of a loan to 1190 Sports Peru | No consideration to estate – lender-controlled Article 9 foreclosure | Jul-25 |
| SOUNDWaves | 777 | Early stage "Green" investments | Article 9 public disposition by an ACAP affiliate of the equity interest of Sustainable Supplies LLC | Satisfaction of $1.0 million of debt | Aug-25 |
| GO7 / Flexflight | 777 | Aviation technology | Sale to third party | Assumption of ~$45.0 million of liabilities plus $1.0 million of cash | Sep-25 |
| Scout Law | 600 | Plaintiff's law | Sale to management | Assumption of debt; nominal cash consideration | Feb-26 |
| ACH | 777 | N/A | Consensual redemption of 777 Partners' equity interest in Advantage Capital Holdings | Satisfaction of $12.7 million of debt | Apr-26 |
| ILFM | 777 | Investment vehicle | Article 9 public disposition by an ACAP affiliate of the equity interest of ILFM LLC | Satisfaction of $2.5 million of debt | Apr-26 |
| 777 | 777 | N/A | Article 9 public disposition of a secured promissory note and mortgage | Satisfaction of $20.0 million of debt | May-26 |
| MLH | 777 | Medical lien receivables | Sale to third party | Cash proceeds of $32.0 million applied to reduction of senior debt | May-26 |
| 777 Re Ltd. | BIA | Bermuda-based reinsurance company | License revoked by Bermuda regulators; wind-down | N/A – regulatory license revocation / wind-down | Jun-26 |
| Sphinx Funding | 777 | Litigation funding | Subject to litigation | Ongoing litigation management | Ongoing |
| 347 Green Leasing | 777 | Aircraft leasing | Wind-down | N/A – wind-down, no sale | Ongoing |
| Signal AHF | 777 | Medical lien receivables | Wind-down | N/A – wind-down, no sale | Ongoing |
| Signal Funding | 777 | Pre-settlement legal funding | Wind-down | N/A – wind-down, no sale | Ongoing |

## **Exhibit C**

## **Evidentiary Support for First Day Motions[1]**

---

[1] Capitalized terms used but not defined herein have the meanings given to them in the applicable First Day Motion.

**I.**     ***Debtors' Emergency Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* (the "<u>Joint Administration Motion</u>").**

1.       I believe that the joint administration of these 23 chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest.  Many, if not all, of the motions, hearings, and orders in these chapter 11 cases will affect each Debtor entity.  Therefore, I believe that an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections.  I also believe that joint administration will allow the Office of the U.S. Trustee for the Northern District of Texas (the "<u>U.S. Trustee</u>") and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency.  Moreover, because this motion seeks only administrative, not substantive, consolidation of the Debtors' estates, I do not believe that parties in interest will be harmed by the relief requested but instead will benefit from the cost reductions associated with the joint administration of these chapter 11 cases.

**II.**    ***Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Serve a Consolidated List of Creditors and a Consolidated List of the 30 Largest Unsecured Creditors, (II) Authorizing the Debtors to Redact Certain Personal Identification Information, (III) Approving the Form and Manner of Notifying Creditors of the Commencement of the Debtors' Chapter 11 Cases, (IV) Establishing a Master Service List, and (V) Granting Related Relief* (the "<u>Creditor Matrix Motion</u>").**

2.       Through the Creditor Matrix Motion, the Debtors request authority to file one consolidated Creditor Matrix for all the Debtors.  It is my understanding that a large number of creditors may be shared amongst the Debtors; thus, I believe that the preparation of separate lists of creditors for each Debtor would be expensive, time consuming, and administratively burdensome.  The Debtors also request authority to file a single, consolidated list of their 30 largest general unsecured creditors (the "<u>Top 30 List</u>").  Because a large number of creditors may be

shared amongst the Debtors, I believe that the Top 30 List will help alleviate administrative burdens, costs, and the possibility of duplicative service.

3.     The Debtors also request authority to redact certain personal identification information.  With potentially hundreds of creditors and other parties in interest, the Debtors cannot reasonably know with sufficient certainty whether a release of each creditor's personal information could potentially jeopardize their safety.  I believe that it is appropriate to redact from any documents filed or to be filed with the Court in these chapter 11 cases, including the Creditor Matrix, the home addresses of individuals, including those of the Debtors' creditors, employees, and former employees.  I believe that the redaction of the home addresses and personally identifiable information of individuals in the creditor matrix is necessary to protect such individuals' privacy and from the undue risk of identity theft or injury.

4.     Additionally, the Debtors request authority to establish notice procedures and a Master Service List.  The Debtors anticipate there will be thousands of notice parties in these cases. The cost of photocopying and mailing routine pleadings to all potential creditors would be substantial and unduly burdensome, particularly given that not all creditors and parties in interest need to be apprised of routine matters that do not affect their rights.  I believe that the proposed notice procedures will afford due and adequate notice to all parties in interest without burdening the Debtors' estates with substantial administrative costs.

**III.**     ***Debtors' Emergency Motion for Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities, and Statements of Financial Affairs, and (II) Granting Related Relief* (the "<u>Schedules and Statements Extension Motion</u>").**

5.     Through the Schedules and Statements Extension Motion, the Debtors seek an extension of the deadline by which the Debtors must file their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired

leases, and statements of financial affairs under the Bankruptcy Code (collectively, the "Schedules and Statements") by an additional eighteen (18) days, for a total of thirty-three (33) days from the Petition Date, through and including September 11, 2026. Completing the Schedules and Statements requires the Debtors and their advisors to spend considerable time and effort to collect, review, and assemble copious amounts of information in addition to attending to the daily demands of the chapter 11 process. In the days leading up to the Petition Date, the Debtors focused primarily on preparing for these chapter 11 cases, including negotiating with certain creditor constituencies, and thus the Debtors' management and professionals could not complete the Schedules and Statements as of the Petition Date. Postpetition, the substantial amount of work entailed in completing the Schedules and Statements will be directly competing with the demands upon the Debtors' personnel to address critical operational matters during the initial postpetition period. I believe that the Debtors' requested extension is in the best interests of the Debtors' estates and parties in interest, as focusing the attention of key personnel and advisors on critical operational and chapter 11 compliance issues during the early days of these chapter 11 cases will facilitate the Debtors' smooth transition into chapter 11 and will ensure the Debtors' personnel has sufficient time to complete the Schedules and Statements.

IV. ***Debtors' Emergency Application for Entry of an Order Authorizing the Retention and Employment of Epiq Corporate Restructuring, LLC as Claims, Noticing, and Solicitation Agent, Effective as of the Petition Date* (the "Claims Agent Retention Application")**

6. The Debtors request authority to employ Epiq Corporate Restructuring, LLC ("Epiq") as their claims, noticing, and solicitation agent (the "Claims and Noticing Agent") in their chapter 11 cases, effective as of the Petition Date, in accordance with the terms and conditions of the Standard Services Agreement entered into by and between the Debtors and Epiq. Epiq is a chapter 11 administrator comprised of leading industry professionals with significant experience

3

in both the legal and administrative aspects of large, complex chapter 11 cases. I believe that Epiq's employment is in the best interest of the estates because Epiq's rates are competitive and reasonable given its quality of services and expertise. Although the Debtors have not yet filed their schedules of assets and liabilities, the Debtors anticipate that there will be thousands of persons and entities to be noticed and that many of these parties will file claims. Given the anticipated number of claimants and the complexity of the Debtors' businesses, I believe that appointing Epiq as Claims and Noticing Agent will provide the most effective means of noticing, administering claims-related tasks, and soliciting and tabulating votes on a chapter 11 plan, while relieving the administrative burden on the Debtors and the Office of the Clerk of the Bankruptcy Court. Accordingly, I believe that the appointment of Epiq as the Claims and Noticing Agent is in the best interests of both the Debtors' estates and their stakeholders.

**V.** *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief* **(the "Wages Motion").**

7. Through the Wages Motion, the Debtors seek to pay prepetition wages, salaries, other compensation, including (a) paying standard wage compensation and paid time off, (b) maintaining reimbursement programs, and (c) maintaining certain benefits on account of their Workforce Programs.

8. The payment of the Workforce Obligations is vital to the Debtors' ability to effectuate these chapter 11 cases and preserve their estates for the benefit of all stakeholders. As of the Petition Date, the Debtors employ approximately 15 employees and 3 independent contractors. The Debtors' employees are employed on a full-time or part-time basis either by 777 Partners LLC, Suttonpark Capital LLC, or Sutton Park Servicing LLC. Of these Employees, approximately 3 employees are paid hourly (the "Hourly Employees") and approximately 12

4

employees are salaried (the "Salaried Employees" and together with the Hourly Employees, the "Employees").

9.      The Employees perform a wide variety of functions critical to the Debtors' business enterprise, to say nothing of the administration of these chapter 11 cases.  The Employees are skilled personnel intimately familiar with the Debtors' business enterprise.  Without the continued, uninterrupted services of the Employees, the Debtors' business and the administration of the estate will be materially impaired.

10.     Additionally, the Employees rely on compensation and benefits to pay their daily living expenses and other necessities.  These individuals could experience significant hardship if the Court does not permit the Debtors to continue paying their compensation and providing them with health and other benefits.  As of the Petition Date, the Debtors estimate the total amount outstanding on account of the Workforce Programs is approximately $97,106.15 (the "Workforce Obligations").  The Workforce Obligations consist of the following:

| Workforce Obligations | Estimated Prepetition Amount Outstanding |
|---|---|
| **Compensation Obligations** | |
| Unpaid Wages | $0.00 |
| PTO Obligations (accrued but unpaid for active Employees) | $97,106.15 |
| Withholding Taxes and Obligations (i.e., Deductions) | $0.00 |
| ADP Payroll Processing Fees | $0.00 |
| **Total** | **$97,106.15** |

| Workforce Obligations | Estimated Prepetition Amount Outstanding |
|---|---|
| **Benefit Obligations** | |
| Health Insurance (Medical, Vision, Dental Insurance) | $0.00 |
| Other Benefits (Life, AD&D, accident/critical illness, disability benefits) | $0.00 |
| Miscellaneous Employee Programs | $0.00 |
| Workers Compensation Obligations | $0.00 |
| **Total Benefits Obligations** | **$0.00** |
| **Total** | **$97,106.15** |

**I.     Compensation and Deductions.**

**A.     Wage Obligations.**

11.     Full time Employees are paid current bi-weekly, while part time Employees are paid bi-weekly in arrears.  The Debtors also employ 3 independent contractors (the "<u>Independent Contractors</u>").  The payroll for the Employees and the Independent Contractors is funded and paid at the same time on a bi-weekly basis.  Because certain of the Employees are paid in arrears, they often have wages and other compensation that has accrued, but is unpaid, at any given point in time.  As of the Petition Date, the Debtors estimate that they do not owe any amounts on account of accrued but unpaid wages to the Employees.

12.     The Independent Contractors are paid bi-weekly in arrears.  The Debtors do not believe that they owe any amounts on account of accrued but unpaid wages to the Independent Contractors as of the Petition Date.  However, the Debtors seek authority to pay any prepetition amounts owed to the Independent Contractors and to continue honoring their obligations to the Independent Contractors in the ordinary course of business.  The Debtors' payroll processing functions for Employees are managed by ADP.  The Debtors believe they will not owe any prepetition amounts to ADP for its payroll processing services.

**B.     Paid Time Off, Vacation, and Sick Days.**

13.     The Employees are entitled to paid time off, sick leave, and vacation time ("<u>PTO</u>").  The Employees receive 15 days of PTO per year, and Employees may carry over a maximum of 5 days to the next fiscal year.  The Debtors estimate that, as of the Petition Date, no amounts will be due and owing on account of accrued and unpaid PTO for the Employees.  However, the total amount of PTO for the Employees that the Debtors seek to roll over postpetition is $97,106.15.  The Debtors request authority, but not direction, to allow the Employees to use their accrued PTO

6

amounts in the ordinary course of business.  The Debtors do not seek authority to pay cash in satisfaction of any PTO obligations accrued before the Petition Date.

### C.    Deductions.

14.    In the ordinary course of business, ADP processes deductions from Employees' payroll in respect of federal, state, and local income taxes, FICA, court-ordered garnishments, child support, and other pretax deductions payable pursuant to certain of the health, welfare, and retirement savings programs detailed herein (collectively, the "Deductions"), and forwards those amounts to the various third-party entities on whose behalf the Deductions were made.  As of the Petition Date, the Debtors believe that there are no Deductions that have been taken but not yet paid to the appropriate recipient.

## II.    Insurance, Disability, and other Benefits.

15.    Prior to the Petition Date, Employees were offered various standard employee benefits, including, without limitation, (a) medical, dental, and vision insurance, (b) life insurance, (c) disability insurance, and (d) employee assistance programs provided to the workforce in the ordinary course of business (collectively, the "Benefits").

### A.  Medical, Dental, and Vision Insurance.

16.    The Debtors offer health, vision, and dental insurance through Cigna, EyeMed Vision Care, and MetLife (the "Health Insurance").  The premiums are paid by the Debtors on a monthly basis, and Employees share in the cost of their Health Insurance.  The total approximate annual amount paid by the Debtors for Health Insurance in 2026 is approximately $215,000.00.  As of the Petition Date, the Debtors believe that they do not owe any prepetition amounts on account of the Health Insurance.

**B.**    **Life, Accidental Death and Dismemberment, and Disability Insurance.**

17.    The Debtors provide voluntary, basic life insurance, accidental death and dismemberment, employee assistance program, voluntary critical illness, voluntary accident, and disability insurance to the Employees through MetLife (the "Other Benefits").  MetLife is paid monthly.  The approximate annual cost to the Debtors for these Other Benefits is approximately $17,000.00.  As of the Petition Date, the Debtors believe that they do not owe any amounts on account of the Other Benefits.

**C.**    **Workers Compensation.**

18.    In each state in which the Debtors operate, they maintain workers' compensation insurance for Employees at the statutorily required levels for claims arising from or related to their employment with the Debtors through Zurich (collectively, the "Workers' Compensation Program," and any obligations thereto, the "Workers' Compensation Obligations").  The total cost of the current Workers' Compensation Program for the current policy period is $3,560.00.  The Debtors pay the Workers Compensation Obligations on a monthly basis.  As of the Petition Date, the Debtors estimate that there is no amount owed in accrued but unpaid prepetition amounts in respect of the Workers' Compensation Program.

19.    The Debtors request authority to pay prepetition amounts owing with respect to the Workers' Compensation Obligations, and to continue honoring their obligations with respect to the Workers' Compensation Program in the ordinary course of business.  It is critical that the Debtors be permitted to continue their Workers' Compensation Program and to pay outstanding prepetition claims, taxes, charges, assessments, premiums, and third-party administrator fees in the ordinary course of business because alternative arrangements for workers' compensation coverage would

most certainly be more costly, and the failure to provide coverage may subject the Debtors and/or their officers to penalties.

20.     I believe that it is critical that the Debtors be permitted to continue their Workers' Compensation Program and to pay outstanding prepetition claims, taxes, charges, assessments, premiums, and third-party administrator fees in the ordinary course of business because alternative arrangements for workers' compensation coverage would most certainly be more costly, and the failure to provide coverage may subject the Debtors and/or their officers to penalties.

**D.     Other Miscellaneous Employee Programs.**

21.     The Debtors also offer Employees a number of miscellaneous benefits (the "Miscellaneous Employee Programs") through health savings accounts and flexible savings accounts.   The approximate annual cost to the Debtors for these Miscellaneous benefits is $42,000.00.  As of the Petition Date, the Debtors believe they do not owe any prepetition amounts for the Employees' Miscellaneous Employee Programs.

22.     I believe that payment of the Workforce Obligations represents a sound exercise of the Debtors' business judgment and is necessary to avoid immediate and irreparable harm to the Debtors' estates.  Paying prepetition wages, employee benefits, and similar obligations will benefit the Debtors' estates and their creditors by allowing the Debtors' business operations to continue without interruption.  Indeed, without payment of the Workforce Obligations, the Employees may seek alternative employment opportunities while their services are needed to carry out an orderly administration of these chapter 11 cases.  This would deplete the Debtors' workforce, hindering the Debtors' ability to operate their business and maximize value of their estates.  Such loss and the resulting need to recruit new personnel (and the costs attendant thereto) would be distracting at this crucial time when the Debtors need to focus on administering their estates.

23.     The majority of Debtors' workforce rely exclusively on the compensation and benefits to satisfy their daily living expenses.  Many members of the workforce expect and require their wages to arrive on a timely basis.  Consequently, the workforce would be exposed to financial difficulties if the Debtors are not permitted to honor obligations for unpaid Workforce Obligations.  Continuing ordinary course benefits will help maintain workforce morale and minimize the adverse effect of the commencement of these chapter 11 cases on the Debtors' ongoing business operations.

**VI.** ***Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Continue to Operate Their Cash Management System and Honor Certain Prepetition Obligations Related Thereto, and (II) Granting Related Relief*** **(the "Cash Management Motion").**

24.     Through the Cash Management Motion, the Debtors seek authorization to continue to operate their Cash Management System and Bank Accounts in the ordinary course of business.  In the ordinary course of business, the Debtors utilize a Cash Management System in operating the Company's remaining businesses as a going concern, to manage the cash of the Debtors in a cost-effective, efficient manner, account for intercompany transactions, and hold funds for the benefit of non-Debtor third parties.  The Cash Management System allows the Debtors to monitor cash flow and to centralize payments for general administrative and operating expenses and enable the Debtors to facilitate cash forecasting and reporting, monitor the collection and disbursement of funds, and maintain control over the administration of their bank accounts.

25.     The Cash Management System includes a total of 10 Bank Accounts.  The Bank Accounts are held at Axos Bank, City National Bank of Florida, Customers Bank, and East West Bank (collectively, the "Cash Management Banks").  As of the Petition Date, the Debtors have approximately $10.3 million total cash in the Bank Accounts, of which approximately $9.1 million is held for the benefit of non-Debtor third parties or is subject to reconciliation, and approximately

10

$1.2 million is available for operations and expenses.  The Bank Accounts are described in more

detail below:[1]

| Bank Account | Bank Account Description |
|---|---|
| **Suttonpark Capital LLC** <br> Axos Bank <br> Account ending -2943 | **Lockbox Account:** No activity account for a lockbox that receives and forwards checks received on behalf of SuttonPark Servicing, LLC to a third-party servicer taking over the servicing of structured settlements and similar assets. |
| **Suttonpark Capital LLC** <br> Axos Bank <br> Account ending -2950 | **Operating Account:** Operating account previously used to collect funds owed to Suttonpark Capital, LLC from the Suspense Account and third parties to transfer to Suttonpark Servicing LLC operating account ending in 2976 to cover expenses as necessary. |
| **Suttonpark Capital LLC** <br> Axos Bank <br> Account ending -6597 | **Settlement Proceeds Account:** Collects settlement payments pursuant to repurchase agreement with broker. Rights to settlement payments were assigned to a non-debtor third party, and the Debtors hold funds in this account for the benefit of such non-debtor third party. |
| **Suttonpark Servicing LLC** <br> Axos Bank <br> Account ending -2976 | **Operating Account:** Primary operating account used to pay operational expenses, payroll for Suttonpark Servicing, LLC, and professional fees associated with transitioning the servicing of structured settlements and related assets of various portfolios. <br><br> Funds in this account are primarily from: (1) funds from the Suspense account, once verified to belong to Sutton Park Servicing, LLC transferred through the operating account ending in 2950; and (2) National Founders LP a third party secured creditor of a non-Debtor affiliate. <br><br> Prepetition, National Founders LP provided funds through protective advances under a loan facility with a non-Debtor affiliate for the purpose of paying the expenses associated with transitioning servicing portfolios financed under such loan facility to new servicer(s). That non-Debtor affiliate has no employees, and the employees and other professionals of Suttonpark Servicing LLC, who have the institutional knowledge and skills necessary to transition all of the companies' (including certain non-Debtor affiliates') structured settlement servicing streams, are paid through these protective advances. |
| **Suttonpark Servicing LLC** <br> Axos Bank <br> Account ending -9869 | **Suspense Account:** Holds miscellaneous deposits from cash streams flowing from the company's various servicing portfolios, which are still subject to reconciliation and are pending application or disbursement to appropriate parties, whether Debtor or non-Debtor. When Debtors identify where the funds belong, they transfer such funds accordingly. |
| **Suttonpark Servicing LLC** <br> Axos Bank <br> Bank account ending -3795 | **Passthrough Account:** Holds funds belonging to third parties in connection with historical servicing operations. |
| **777 Asset Management LLC** <br> City National Bank of Florida <br> Account ending -6857 | **Operating Account:** Former operating account used for ad hoc operational expenses and healthcare benefit administration. |
| **777 Partners LLC** <br> Customers Bank <br> Account ending -6725 | **Operating Account:** Former operating account for payroll and accounts payable; activity currently suspended due to garnishment. |

---

[1] These descriptions of Bank Account types are for illustrative purposes only and are not exhaustive.  A single Bank Account may fall into more than one of the categories described herein.

| Bank Account | Bank Account Description |
|---|---|
| **Signal National LLC** <br> East West Bank <br> Account ending -6398 | **General Operating Account:** Primary account for general operating expenses for all Debtors and DIP credit facility deposits. Used to pay the Debtors' Credit Card. Suttonpark Debtors reimburse account for operating expenses on behalf of Suttonpark Debtors. |
| **Signal National LLC** <br> East West Bank <br> Account ending -6405 | **Payroll Account:** Primary operating account for payroll processing for all Debtors and receives payroll reimbursements. Suttonpark Debtors reimburse account for payroll expenses on behalf of Suttonpark Debtors. |

26.     The Debtors pay fees incurred in connection with the Bank Accounts (the "Bank Fees") to the Cash Management Banks on a monthly basis in arrears. The Bank Fees vary but are approximately $4,500.00 per month. As of the Petition Date, the Debtors believe they will owe approximately $4,500.00 in Bank Fees. The Debtors seek the authority, but not direction, to pay the prepetition Bank Fees and continue paying the Bank Fees in the ordinary course on a postpetition basis, consistent with historic practice.

27.     In the ordinary course of business, the Debtors provide corporate credit card access to certain of their senior-level employees through Ramp Visa (collectively, the "Corporate Credit Card"). These employees may use the Corporate Credit Card for a variety of necessary and reasonable corporate and operational expenses incurred within the scope of the employee's job duties. The Corporate Credit Card has a total limit of $30,000.00. As of the Petition Date, approximately four (4) employees have access to the Corporate Credit Card. As of the Petition Date, the Debtors believe that approximately $17,000.00 is owed on the Corporate Credit Card. The Debtors seek the authority, but not direction, to pay any amounts owed on the Corporate Credit Card and to continue paying the Corporate Credit Card in the ordinary course on a postpetition basis, consistent with historic practice.

28.     I believe that requiring the Debtors to adopt a new cash management system during these chapter 11 cases would be expensive, burdensome, and unnecessarily disruptive to the Debtors' operations. Importantly, the Cash Management System provides the Debtors with the

12

ability to quickly track and report the location and amount of funds, which, in turn, allows management to track and control such funds, ensure cash availability, and reduce administrative costs through monitoring the collection and movement of funds. Any disruption of the Cash Management System would have a negative effect on the Debtors' restructuring efforts. Indeed, absent the relief requested herein, requiring the Debtors to adopt a new cash management system could cause the Debtors' operations to grind to a halt, severely damaging the Debtors' business. By contrast, maintaining the current Cash Management System will facilitate the Debtors' transition into chapter 11 by, among other things, minimizing delays in paying postpetition debts and eliminating administrative inefficiencies. Maintaining the current Cash Management System will also allow the Debtors' accounting employees to focus on their daily responsibilities.

29.     I believe that parties in interest will not be harmed by the Debtors' continued use of the present Cash Management System, including maintenance of the Bank Accounts, because the Debtors have implemented appropriate mechanisms to ensure that unauthorized payments will not be made on account of prepetition obligations. Specifically, the Debtors have implemented internal control procedures that prohibit payments on account of prepetition debts without the prior approval of Debtors' personnel. The Debtors will continue to work closely with the Cash Management Banks to ensure that appropriate procedures are in place to prevent checks issued prepetition from being honored without the Court's approval.

30.     Additionally, the Debtors' funds move through the Cash Management System as described in the Cash Management Motion, and at any given time, there may be prepetition amounts outstanding on account of the Cash Management System. Any non-payment of prepetition amounts owed could cause disruptions to the Debtors' operations. The Debtors' continued use of the Cash Management System, including payment of Bank Fees and amounts

13

owing on the Corporate Credit Card, will facilitate the Debtors' transition into chapter 11 by, among other things, avoiding administrative inefficiencies and expenses and minimizing delays in the payment of postpetition amounts due. Accordingly, I believe that the Debtors have shown that a sound business purpose exists to continue use of the Cash Management System in the ordinary course postpetition and to authorize payment of prepetition amounts due in connection with the Cash Management System, including Bank Fees and the Corporate Credit Card.

**VII.** ***Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue Their Insurance Policies and Honor All Obligations in Respect Thereof, (B) Renew, Supplement, and Enter into New Insurance Policies, and (C) Pay Premiums Thereunder, and (II) Granting Related Relief* (the "<u>Insurance Motion</u>").**

31.    By the Motion, the Debtors seek authority to continue insurance coverage entered into prepetition and satisfy obligations related thereto, renew, supplement, or purchase insurance coverage as needed postpetition, and pay premiums thereunder. In the ordinary course of business, the Debtors maintain approximately four (4) insurance policies, including one expired director and officer liability policy that has remaining policy limits during the policy period, plus additional expired excess policies that amend such director and officer policy, (collectively, the "<u>Insurance Polices</u>"). The Insurance Policies are administered collectively as part of a program by various third-party insurance carriers and provide coverage for, among other things, commercial general liability (CGL), employee benefits liability, and director and officer liability. The Insurance Policies are essential to the ongoing operation of the Debtors' business enterprise. The aggregate annual premium for the current Insurance Policies is approximately $103,800.00.

32.    The Insurance Policies are generally one year in length and typically renew in November every year. The insurance premiums for the policies are paid annually in advance pursuant to the payment terms set forth in each applicable Insurance Policy. As of the Petition

14

Date, the Debtors do not believe there are any prepetition amounts due or outstanding on account of insurance premiums.

33.     I believe the continuation of the Insurance Program, maintenance of the Insurance Policies, and entry into new insurance policies is essential to the preservation of the value of the Debtors' business enterprise.  Moreover, in many instances, insurance coverage is required by the regulations, laws, credit agreements, and contracts that govern the Debtors' commercial activities, including the requirement by the U.S. Trustee for the Northern District of Texas that a debtor maintain adequate coverage given the circumstances of its chapter 11 case.  Accordingly, I believe the Debtor should be authorized to maintain and/or modify its existing Insurance Policies, honor obligations related thereto and enter into new insurance policies in the ordinary course of business and consistent with prepetition practices.

# EXHIBIT C

## DIP Credit Agreement

*EXECUTION VERSION*

**FIRST AMENDED PRIMING SUPERPRIORITY**

**DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

**BY AND AMONG THE DEBTORS:**

**777 PARTNERS LLC, 600 PARTNERS LLC, AND SIGNAL NATIONAL LLC, AS BORROWERS, THE "INITIAL GUARANTORS", ANY "ADDITIONAL GUARANTORS" (EACH AS DEFINED AND DESCRIBED HEREIN), AND EACH OTHER DIRECT AND/OR INDIRECT SUBSIDIARY THEREOF THAT FILES A CHAPTER 11 CASE AS GUARANTOR**

**ACM DELEGATE LLC,**

**AS AGENT,**

**AND**

**AAV2024 LLC, ADVANTAGE CAPITAL HOLDINGS LLC, DACIAN MASTER FUND LP, HAYMARKET INSURANCE COMPANY, NATIONAL FOUNDERS LP, AND SUCH OTHER LENDERS WHO MAY BE PARTY HERETO FROM TIME TO TIME,**

**AS DIP LENDERS**

**DATED AS OF AUGUST 9, 2026**

**TABLE OF CONTENTS**

<u>Page</u>

ARTICLE I DEFINED TERMS ....................................................................................................3

    Section 1.1        Definitions. ....................................................................................3

ARTICLE II LOANS.....................................................................................................................19

    Section 2.1        New Money Loan (New Pre-Petition Advances)....................................19
    Section 2.2        New Money Loan (Post-Petition Advances); Roll-Up Loan ...................21
    Section 2.3        Borrowing Mechanics. ...........................................................................22
    Section 2.4        Use of Proceeds.....................................................................................23
    Section 2.5        Evidence of Debt....................................................................................23
    Section 2.6        Interest and Fees on Loans.....................................................................23
    Section 2.7        Repayment.. ...........................................................................................24
    Section 2.8        Prepayments. ..........................................................................................24
    Section 2.9        Application of Payments and Proceeds....................................................25
    Section 2.10      Application of Proceeds of Asset Sales ..................................................25
    Section 2.11      Guaranty..................................................................................................25
    Section 2.12      Joint and Several Liability. .....................................................................27
    Section 2.13      General Provisions Regarding Payments. ................................................27
    Section 2.14      Termination of DIP Commitments.. .......................................................28

ARTICLE III CONDITIONS PRECEDENT; CONDITIONS SUBSEQUENT..........................28

    Section 3.1        Conditions Precedent to New Pre-Petition Advances; Amendment
                           Date. ......................................................................................................28
    Section 3.2        Conditions Precedent to Post-Petition Advances....................................29
    Section 3.3        Conditions to Each Borrowing. ...............................................................30
    Section 3.4        Conditions Subsequent. ..........................................................................31

ARTICLE IV REPRESENTATIONS AND WARRANTIES .......................................................31

    Section 4.1        Representations and Warranties..............................................................31

ARTICLE V AFFIRMATIVE COVENANTS...............................................................................35

    Section 5.1        Affirmative Covenants of the Debtors. ...................................................35
    Section 5.2        Affirmative Covenants of the DIP Lenders ............................................39

ARTICLE VI NEGATIVE COVENANTS/BUDGET COMPLIANCE........................................40

    Section 6.1        Negative Covenants.  ..............................................................................40
    Section 6.2        Budget Compliance.................................................................................42

ARTICLE VII INCREASED COSTS; TAXES; SET OFF; ETC. .................................................43

    Section 7.1        Taxes; Withholdings. ..............................................................................43
    Section 7.2        Right of Set Off.......................................................................................44

ARTICLE VIII EVENTS OF DEFAULT .....................................................................................44

    Section 8.1        Events of Default.....................................................................................44

Section 8.2     Notice and Opportunity to Cure. ...........................................................48
Section 8.3     Remedies. ..................................................................................................50
Section 8.4     Remedies Cumulative.. ............................................................................50
Section 8.5     Application of Proceeds.. .........................................................................50

ARTICLE IX MISCELLANEOUS ....................................................................................51

Section 9.1     Amendments and Waivers. .......................................................................51
Section 9.2     Notices. .....................................................................................................51
Section 9.3     Voting. .......................................................................................................54
Section 9.4     Enforceability; Successors and Assigns....................................................54
Section 9.5     Participations.............................................................................................55
Section 9.6     Financing of DIP Commitments. ..............................................................55
Section 9.7     Integration. ................................................................................................55
Section 9.8     No Waiver; Remedies. ..............................................................................56
Section 9.9     Setoff.........................................................................................................56
Section 9.10    Execution in Counterparts.........................................................................56
Section 9.11    Governing Law; Submission To Jurisdiction; Venue. ..............................57
Section 9.12    Waiver of Jury Trial. ................................................................................58
Section 9.13    Severability. ..............................................................................................58
Section 9.14    Survival. ....................................................................................................58
Section 9.15    Maximum Lawful Interest.........................................................................58
Section 9.16    No Marshalling.. .......................................................................................59
Section 9.17    Interpretation.............................................................................................59
Section 9.18    Ambiguities. ..............................................................................................59
Section 9.19    The Patriot Act. .........................................................................................59
Section 9.20    Conflicting Provisions in DIP Loan Documents.......................................59
Section 9.21    Conflicting Provisions in the Financing Orders........................................60
Section 9.22    Modifications. ...........................................................................................60
Section 9.23    Release. .....................................................................................................60
Section 9.24    Electronic Transactions.............................................................................62

**SCHEDULES & EXHIBITS**

SCHEDULE 1.1        List of Initial/Subsequent Debtors

SCHEDULE 1.2        List of Initial/Additional Guarantors

SCHEDULE 1.3        List of Pre-Petition Loans/Pre-Petition Indebtedness

SCHEDULE 2.1        DIP Commitment

SCHEDULE 5.1(f)     Controlled Accounts

EXHIBIT A           Budget

EXHIBIT B           Form of Borrowing Certificate

EXHIBIT C           [Reserved]

EXHIBIT D           Form of Guarantor Joinder

EXHIBIT E           Security Agreement

*EXECUTION VERSION*

THIS FIRST AMENDED PRIMING SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT (as it may be amended, restated, supplemented, or otherwise modified from time to time, the "DIP Credit Agreement" or "Agreement") is made as of August 9, 2026 by and among 777 Partners LLC ("777"), 600 Partners LLC ("600"), and Signal National LLC ("Signal National"), as borrowers (the "Borrowers"), the "Initial Guarantors", (as defined and described below), any "Additional Guarantors" (as defined and described below) as may be party hereto from time to time, and each other direct and/or indirect subsidiary of the foregoing that files a Chapter 11 Case (collectively with the Initial Guarantors and any Additional Guarantors, the "Guarantors" and, together with the Borrowers, the "Debtors"), ACM Delegate LLC ("ACM"), in its capacity as administrative agent hereunder (the "Agent"), AAV2024 LLC ("AAV2024"), Advantage Capital Holdings LLC ("ACH"), Dacian Master Fund LP ("Dacian"), Haymarket Insurance Company ("Haymarket"), and National Founders LP ("National Founders") each in its capacity as a DIP Lender hereunder (and together with such other lenders as may be party hereto from time to time, collectively, the "DIP Lenders").

## RECITALS

WHEREAS, it was anticipated that in or around September 2026 (the date each Debtor was anticipated to file for bankruptcy protection, the "Contemplated Petition Date"), some or all of the Debtors would file voluntary petitions for relief (the "Chapter 11 Cases") under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court") and would continue to operate their businesses and manage their properties as debtors and debtors-in-possession under Sections 1107 and 1109 of the Bankruptcy Code;

WHEREAS, the Debtors own, manage, and operate, directly or through other entities, a variety of businesses and assets (collectively, the "Operations");

WHEREAS, prior to the Contemplated Petition Date, ACH, the ACAP Holdco Lenders (as defined below), ACM (in its capacity as administrative agent for the ACAP Holdco Lenders), Dacian, National Founders, and certain of their respective Affiliates (each a "Pre-Petition Lender" and, collectively, the "Pre-Petition Lenders") were lenders under various loan and/or security agreements (including all associated documents and agreements delivered as security for, or in respect of, or evidencing the Pre-Petition Loans, the "Pre-Petition Loan Documents" and the loans thereunder the "Pre-Petition Loans"), including, but not limited to, those generally described below and as set forth and described in further detail in Schedule 1.3 hereof:

1. That certain Amended and Restated Loan and Security Agreement, dated as of November 2, 2023 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified) by and among, *inter alia*, 600, 777, and JARM Capital LLC (solely with respect to the JARM Obligations, as defined therein) as borrowers, the corporate guarantors party thereto, ACM, as administrative agent and collateral agent, and Haymarket and AAV2024, as lenders (collectively, with any other lenders party thereto from time to time, the "ACAP Holdco Lenders" and the foregoing, the "ACAP Holdco Facility").

2. That certain Unsecured Loan Agreement, dated as of December 12, 2024 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified) by and between 777, as borrower, and ACH, as lender (the "ACH Facility").

3. That certain Promissory Note (the "ACH Note"), effective as of May 28, 2025, by and between ACH, as lender, and 777, as borrower, having a stated principal amount of $4,725,000, of which $4,620,000 was advanced by ACH to 777.

4. Those certain Dacian Pre-Petition Loan Documents (as defined below).

5. Those certain National Founders Pre-Petition Loan Documents (as defined below).

WHEREAS, all obligations of the Debtors under the Pre-Petition Loan Documents and the Pre-Petition Loans shall be referred to herein as the "Pre-Petition Indebtedness" (as set forth and described in further detail in Schedule 1.3 hereof) and the Collateral and any other tangible or intangible assets upon which the Debtors have granted security interests in or liens on or for the benefit of the Pre-Petition Lenders (or one or more of them) are referred to collectively herein as the "Pre-Petition Collateral";

WHEREAS, since GlassRatner Advisory & Capital Group LLC (f/k/a GlassRatner Advisory & Capital Group, LLC dba B. Riley Advisory Services) ("GR") was engaged to provide financial advisory services to 777 and 600 and their Affiliates on May 3, 2024, certain of the Pre-Petition Lenders or their Affiliates have, at GR's request, made protective advances (the "Existing Pre-Petition Advances") to fund the working capital needs of the Debtors and to allow GR to effectuate its engagement and maximize the value of the Debtors' assets, including the advances made pursuant to the ACH Facility and the ACH Note;

WHEREAS, the Debtors requested, and the DIP Lenders agreed (pursuant to the terms and conditions hereof), to provide to the Debtors a new credit facility (the "DIP Credit Facility") which included a new money loan (the "New Money Loan") to fund the Debtors' pre- and post-petition working capital needs, which New Money Loan shall be comprised of: (i) additional advances prior to the Contemplated Petition Date (the "New Pre-Petition Advances" and, together with the Existing Pre-Petition Advances, the "Pre-Petition Advances") upon the terms hereof and as reflected in the Budget (as defined below) up to the amount set forth in Schedule 2.1 (the "New Pre-Petition Advance Commitment"), which New Pre-Petition Advances will be evidenced by the secured promissory note (the "New Pre-Petition Advance Note"); and (ii) advances on or after the Contemplated Petition Date (the "Post-Petition Advances") upon the terms hereof and as reflected in the Budget up to the amount set forth in Schedule 2.1 (the "Post-Petition Advance Commitment"; which amount, together with the New Pre-Petition Advance Commitment, shall be, in the aggregate, the "DIP Commitment"), which DIP Commitment shall not be reduced by, and shall be in addition to, interest and fees that are paid in kind and added to the outstanding amount of the DIP Obligations hereunder;

WHEREAS, the DIP Lenders in fact made the New Pre-Petition Advances to the Borrowers for the specific purposes and in the specific amounts set forth in the Budget (defined below), the DIP Lenders would not have made such New Pre-Petition Advances for any other purpose, and the Borrowers were prohibited from using such funds for any other purposes;

2

WHEREAS, the Debtors, in order to consummate their restructuring efforts on an expedited basis, have determined that it is necessary to accelerate the filing of voluntary petitions for relief with respect to certain Debtors approximately a month before the Contemplated Petition Date (the "Initial Debtors" and the "Initial Petition Date", respectively) and to subsequently prepare and file additional voluntary petitions concerning certain of their affiliated entities (the "Subsequent Debtors") closer to the Contemplated Petition Date, but before the Final Order Entry Date (the "Subsequent Petition Date"); and

WHEREAS, the DIP Lenders were and remain only willing to provide the New Money Loan pursuant to the terms and conditions hereunder, including, with respect to the Post-Petition Advances, that the Roll-Up Loan (as defined below) is approved and that the Debtors grant DIP Liens on the DIP Collateral (as set forth herein) to each of the DIP Lenders and superpriority administrative expense claims, subject only to the Carve-Out and the Financing Orders (each as defined below).

NOW THEREFORE, in consideration of the premises and the mutual covenants and the agreements herein set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

ARTICLE I
DEFINED TERMS

Section 1.1    Definitions.

(a)    As used in this Agreement, including, without limitation, the above Preamble and Recitals, and all exhibits and schedules hereto, the following terms shall have the following meanings and definitions:

"600" has the meaning set forth in the Preamble to this Agreement.

"777" has the meaning set forth in the Preamble to this Agreement.

"AAV2024" has the meaning set forth in the Preamble to this Agreement.

"ACAP Holdco Facility" has the meaning set forth in the recitals to this Agreement.

"ACAP Holdco Lenders" has the meaning set forth in the recitals to this Agreement.

"Account" has the meaning set forth in Section 9-102(a)(2) of the UCC.

"ACH" has the meaning set forth in the Preamble to this Agreement.

"ACH Facility" has the meaning set forth in the recitals to this Agreement.

"ACH Note" has the meaning set forth in the recitals to this Agreement.

"ACM" has the meaning set forth in the Preamble to this Agreement.

3

"Action" means, as against a Person, an action, suit, litigation, arbitration, investigation, complaint, contest, hearing, inquiry, inquest, audit, examination, or other proceeding threatened or pending against or affecting such Person or its property, whether civil, criminal, administrative, investigative, or appellate, in law or equity, before any arbitrator or Governmental Body.

"Additional Guarantor" shall mean any Guarantor(s) listed on Schedule 1.2 who has/have become party hereto after the Amendment Date pursuant to its/their execution of a Guarantor Joinder properly delivered to and accepted by the Agent.

"Affiliate" means, with respect to a Person, any other Person which directly or indirectly, through one or more intermediaries, controls or is controlled by or is under common control with such Person, and without limiting the generality of the foregoing, includes (i) any Person which beneficially owns or holds ten percent (10%) or more of any class of the Capital Stock of such Person or other equity interests in such Person, (ii) any Person of which such Person beneficially owns or holds ten percent (10%) or more of any class of the Capital Stock or in which such Person beneficially owns or holds ten percent (10%) or more of the equity interests, and (iii) any director or executive officer of such Person. For the purposes of this definition, the term "control" (including with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of Capital Stock, by agreement or otherwise.

"Agent" has the meaning set forth in the Preamble to this Agreement.

"Agreement" has the meaning set forth in the Preamble to this Agreement.

"Amendment Date" means August 9, 2026.

"Asset Sale" means a sale, lease or sublease (as lessor or sublessor), license or sub-license (as licensor or sub-licensor), sale and leaseback, assignment, conveyance, transfer or other disposition to, or any exchange of property with, any Person, in one or more transactions or a series of related transactions, of all or any part of the businesses of the Debtors, and/or of all or any part of the assets or properties of any kind of the Debtors, whether real, personal, or mixed and whether tangible or intangible, whether now owned or hereafter acquired, other than (i) inventory (or other assets) sold or leased in the ordinary course of business, (ii) sales or dispositions of obsolete, worn-out or excess furniture, fixtures, equipment or other property in the ordinary course of business and (iii) the actual or constructive loss of any property or the use thereof.

"Assignee" has the meaning set forth in Section 9.4(c) of this Agreement.

"Assignment" has the meaning set forth in Section 9.4(c) of this Agreement.

"Authorized Officer" means, as applied to any Person, any individual holding the position of chairman of the board, executive director (or the equivalent thereof), chief executive officer, chief financial officer, chief operating officer, any other executive or officer, any

4

president or vice president or treasurer, chief restructuring officer or restructuring officer or the Person or entity acting in such capacity.

"Bankruptcy Code" has the meaning set forth in the Recitals to this Agreement.

"Bankruptcy Court" has the meaning set forth in the Recitals to this Agreement.

"Bankruptcy Milestones" has the meaning set forth in Section 8.1 of this Agreement.

"Bi-Weekly Budget Report" means, a bi-weekly report certified by an Authorized Officer for the Debtors, substantially in the same form as the Budget, setting forth, on a consolidated basis, (i) an updated Budget on a weekly basis; provided that such updated budget shall not constitute the Budget until the Agent, acting at the direction of the Required Lenders, confirms in writing that such updated budget is in form and substance acceptable to the Required Lenders, and (ii) a variance report, setting forth, on a consolidated basis, actual cumulative aggregate cash receipts, disbursements (excluding professional fees and expenses) and cash flows (excluding professional fees and expenses) of the Debtors for the most recent four-week period (and for the first three test periods following the Closing, tested on a rolling 2-week, 3-week, and 4-week basis, respectively) covered by such variance report and setting forth all variances, on a line item and aggregate basis, from the amount set forth for such period as compared to the most recent Budget for which the variance report relates on a weekly and cumulative basis for the period from the first full week commencing after the Closing Date through the end of the applicable week in regard to which such variance report is being delivered, and each such variance report shall include explanations for all variances in excess of 10%, on an aggregate basis, or in excess of $50,000, on a line item basis, for the most recent period in regard to which such variance report is being delivered and shall be certified by an Authorized Officer of the Debtors; provided that, for the avoidance of doubt, proceeds from any DIP Loans shall be excluded from determining any such variances. For the avoidance of doubt, as it relates to receipts and disbursements of SuttonPark Capital LLC, SuttonPark Servicing LLC, and any of their Subsidiaries, which are not reflected in the Budget, the Debtors shall also provide to the DIP Lenders such reporting as is generated in the ordinary course of business in form and substance generally maintained and produced to any other lenders of such companies.

"Borrowers" has the meaning set forth in the Preamble to this Agreement.

"Borrowing" means an advance of funds under this Agreement, the New Pre-Petition Advance Note, the Financing Orders and/or any related DIP Loan Documents.

"Borrowing Certificate" has the meaning set forth in Section 2.3(b) of this Agreement.

"Borrowing Date" means the date of a Borrowing.

"Budget" means, initially, the budget attached hereto as **Exhibit A**, and, upon entry of the Final Order(s), the budget attached thereto, in each case itemizing on a weekly basis all uses, and anticipated uses, of the DIP Credit Facility, revenues projected to be received and

all expenditures proposed to be made during such period, which Budget may be amended with the written consent of the Agent, at the direction of the Required Lenders.

"Business Day" means a day other than Saturday or Sunday or other day on which commercial banks in New York, New York are authorized or required by law or other governmental action to close.

"Capital Lease" means, as applied to any Person, any lease of any property (whether real, personal or mixed) by that Person as lessee that, in conformity with GAAP, is or should be accounted for as a capital lease on the balance sheet of that Person.

"Capital Stock" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), including, without limitation, partnership interests and membership interests, and any and all warrants, rights or options to purchase or other arrangements or rights to acquire any of the foregoing.

"Carve-Out" has the meaning set forth in, before the entry of the Final Order, the Interim Order and, after the entry of the Final Order, the Final Order.

"Cash" means a credit balance in any Deposit Account, money or currency.

"Chapter 11 Cases" has the meaning set forth in the Recitals to this Agreement.

"Chapter V DIP Collateral" means any proceeds or property recovered in connection with the pursuit of claims or causes of action arising under chapter 5 of the Bankruptcy Code, if any.

"Closing Date" means June 9, 2026.

"Committee" means any committee of unsecured creditors appointed by the United States Trustee in the Chapter 11 Cases.

"Controlled Account" has the meaning set forth in Section 5.1(f) of this Agreement and includes, without limitation, the Operating Account.

"Controlled Account Agreement" has the meaning set forth in Section 5.1(f) of this Agreement.

"Consents" means any approval, consent, authorization, or order of, notice to, or registration or filing with, or any other action by, any Governmental Body or other Person.

"Credit Bid" means the submission by (a) the Agent (on behalf of the DIP Lenders) and/or (b) any Pre-Petition Lender or any of its Affiliates (in their individual capacities) of a bid in connection with a public or private sale to purchase all or any portion of the DIP Collateral or the Pre-Petition Collateral, as applicable, in which any of the DIP Obligations or Pre-Petition Indebtedness, as applicable, are used and applied as a credit against the purchase price in accordance with Section 363(k) of the Bankruptcy Code.

"Cure Period" has the meaning set forth in Section 8.2(b) of this Agreement.

"Dacian" has the meaning set forth in the Preamble to this Agreement.

"Dacian Claims" means any and all claims, loans, notes, advances, reimbursement obligations, indemnity obligations, guaranties, pledges, liens, security interests, rights, remedies, and causes of action held by Dacian or any of its Affiliates against any Debtor arising before the Petition Date as set forth and described in further detail in Schedule 1.3.

"Dacian Pre-Petition Loan Documents" means all agreements, notes, guaranties, pledges, security agreements, collateral documents, side letters, fee letters, amendments, supplements, waivers, instruments, and other documents evidencing, securing, guaranteeing, or otherwise relating to any Dacian Claim.

"Dacian Pre-Petition Collateral" means, collectively, all tangible and intangible assets upon which any Debtor has granted security interests in or liens on for the benefit of Dacian or any of its Affiliates pursuant to any Dacian Pre-Petition Loan Documents.

"Debtor Assets" means, with respect to each Debtor, all currently owned or hereafter acquired property and assets of the Debtors of any kind or nature, whether real or personal, tangible or intangible, wherever located, now owned or hereafter acquired or arising and all proceeds, products, rents and profits thereof, including, without limitation, accounts, revenues, inventory, equipment, capital stock in subsidiaries, investment property, instruments, chattel paper, real estate, leasehold interests, contracts, general intangibles, patents, copyrights, trademarks, deposit accounts, intercompany claims, claims against affiliates, Actions, tax refund claims, commercial tort claims, insurance proceeds and insurance premium refunds.

"Debtors" has the meaning set forth in the Preamble to this Agreement; provided that "Debtors" shall include any of the Debtors' successors and assigns (including, without limitation, any trustee or other fiduciary hereafter appointed as legal representative or with respect to the property of the estates of the Debtors, whether under chapter 11 of the Bankruptcy Code or any subsequent chapter 7 case and the Debtors' successors upon conclusion of the Chapter 11 Cases).

"Debtor Default Period Rights" has the meaning ascribed to such term in the Financing Orders.

"Default" means a condition or event that, after notice or lapse of time or both, would constitute an Event of Default.

"Deposit Account" means any deposit account (as such term is defined in Section 9-102(a)(29) of the UCC), including, without limitation, a demand, time, savings, passbook or like account with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a negotiable certificate of deposit.

"DIP Collateral" shall have the meaning set forth in Section 2.2 of this Agreement:

"<u>DIP Collateral Documents</u>" means the New Pre-Petition Advance Note, the Controlled Account Agreements, the Security Agreement, the DIP Loan Intercreditor Agreement, and all other instruments, documents, and agreements delivered by the Debtors pursuant to this Agreement or any of the other DIP Loan Documents pursuant to which the Debtors grant a DIP Lien, or any other Lien, mortgage, or encumbrance, to the DIP Lenders, as any of the foregoing may be amended, restated, supplemented, modified, or replaced from time to time. For the avoidance of doubt, the DIP Collateral Documents do not include the Financing Orders.

"<u>DIP Commitment</u>" has the meaning set forth in the Recitals to this Agreement.

"<u>DIP Commitment Period</u>" means (i) with respect to the Pre-Petition Advances, the period beginning on the date of execution of this Agreement and ending on the Petition Date; (ii) with respect to Initial Post-Petition Advances, the period commencing on the Interim Order Entry Date and ending upon the Final Order Entry Date; and (iii) with respect to all Post-Petition Advances other than the Initial Post-Petition Advances, the period commencing on the Final Order Entry Date and ending on the Maturity Date.

"<u>DIP Credit Agreement</u>" has the meaning set forth in the Preamble to this Agreement.

"<u>DIP Credit Facility</u>" has the meaning set forth in the Recitals to this Agreement.

"<u>DIP Lenders</u>" has the meaning set forth in the Preamble to this Agreement.

"<u>DIP Liens</u>" means any and all Liens granted under or pursuant to any DIP Collateral Document or the Financing Orders, including, without limitation, pursuant to the Security Agreement, Section 364(c)(2) of the Bankruptcy Code or otherwise, including, without limitation, the Liens described in Sections 2.2(d) and 2.2(e).

"<u>DIP Loans</u>" has the meaning set forth in <u>Section 2.2(c)(ii)</u> of this Agreement.

"<u>DIP Loan Document</u>" means any of this Agreement, the New Pre-Petition Advance Note, the DIP Collateral Documents, and/or all other documents, instruments, or agreements executed and delivered by the Debtors for the benefit of the DIP Lenders in connection herewith.

"<u>DIP Loan Intercreditor Agreement</u>" means the intercreditor agreement to be entered into by the Agent and the DIP Lenders and other participant lenders, which would thereafter become "DIP Lenders," contemporaneously with or prior to the Petition Date.

"<u>DIP Percentage Interest</u>" means, for each DIP Lender, (i) the aggregate amount of Post-Petition Advances funded by such DIP Lender plus the aggregate amount of such Lender's Pre-Petition Advances rolled-up as of such time, divided by (ii) the aggregate amount of Post-Petition Advances funded as of such time plus the aggregate amount of roll-up approved as of such time.

"<u>DIP Obligations</u>" means all indebtedness, obligations, covenants, duties of payment, or performance of every kind and all other liabilities of the Debtors from time to time owed

to the DIP Lenders, whether direct or indirect, joint or several, absolute or contingent, matured or unmatured, liquidated or unliquidated, secured or unsecured, arising by contract, operation of law or otherwise, owing, arising, due, or incurred under this Agreement, the New Pre-Petition Advance Note, the Financing Orders, or any DIP Loan Document or in respect of any of the New Pre-Petition Advances and/or the DIP Loans, or any other instruments at any time evidencing any of the foregoing or otherwise, including, without limitation, all obligations to repay principal of and interest on the New Money Loan, the DIP Loan, the Roll-Up Loan, and to pay interest, costs, charges, expenses, fees, and all sums chargeable to the Debtors under the DIP Loan Documents, the New Pre-Petition Advance Note, and/or the Financing Orders and the Debtors' obligation to provide the DIP Lenders with adequate protection of their interests in the DIP Collateral and other property to be used, sold, leased, or otherwise disposed of by the Debtors under the terms of the New Pre-Petition Advance Note and/or the Financing Orders.

"Dollars" and the sign "$" mean the lawful money of the United States of America.

"Employee Benefit Plan" means any "employee benefit plan" as defined in Section 3(3) of ERISA that is sponsored, maintained, or contributed to by, or required to be contributed to by, the Debtors.

"Environmental Laws" means all federal, state, local and foreign laws (including without limitation common law), treaties, statutes, regulations and rules whether now or hereinafter in effect relating in any way to the environment, the preservation or reclamation of natural resources, the management, release or threatened release of any Hazardous Material or health and safety matters, including, without limitation, the Resource Conservation and Recovery Act, the Comprehensive Environmental Response Compensation and Liability Act of 1980, the Superfund Amendments and Reauthorization Act of 1986, the Federal Clean Water Act, the Federal Clean Air Act, the Toxic Substances Control Act, in each case as amended, and all rules, regulations, judgments, decrees, orders and licenses arising under all such laws.

"Environmental Liability" means any actual, alleged or contingent liability or obligations of the Debtors directly or indirectly resulting from or based on (i) violations or alleged violations of any Environmental Law, (ii) the generation, use, handling, transportation, management, storage, treatment or disposal of any Hazardous Material, (iii) exposure to any Hazardous Material, (iv) the release or threatened release of any Hazardous Material into the environment, or (v) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with any of the foregoing.

"Environmental Permits" means all permits, licenses, authorizations, registrations, and other governmental consents required by applicable Environmental Laws for the use, storage, treatment, transportation, release, emission and disposal of raw materials, by-products, wastes and other substances used or produced by or otherwise relating to Debtors' Operations.

"EOD Notice" has the meaning set forth in Section 8.2(a) of this Agreement.

9

"Equipment" means, as to the Debtors, all of the Debtors' now owned and hereafter acquired equipment, wherever located, including machinery, data processing and computer equipment (whether owned or licensed and including embedded software), vehicles, tools, furniture, fixtures, all attachments, accessions and property now or hereafter affixed thereto or used in connection therewith, and substitutions and replacements thereof, wherever located.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any successor thereto.

"ERISA Affiliate" means, as applied to any Person, (i) any corporation that is a member of a controlled group of corporations within the meaning of Section 414(b) of the Internal Revenue Code of which that Person is a member, (ii) any trade or business (whether or not incorporated) that is a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Internal Revenue Code of which that Person is a member, and (iii) any member of an affiliated service group within the meaning of Section 414(m) or (o) of the Internal Revenue Code of which that Person, any corporation described in clause (i) above or any trade or business described in clause (ii) above is a member. Any former ERISA Affiliate of the Debtors shall continue to be considered an ERISA Affiliate of the Debtor within the meaning of this definition with respect to the period such entity was an ERISA Affiliate of the Debtors and with respect to liabilities arising after such period for which the Debtors could be liable under the Internal Revenue Code or ERISA.

"Event of Default" means each of the conditions or events set forth in Section 8.1 of this Agreement.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to any of the DIP Lenders or required to be withheld or deducted from a payment to such DIP Lender, (i) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (a) imposed as a result of such DIP Lender being organized under the laws of, or having its principal office or, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (b) that are imposed as a result of a present or former connection between such DIP Lender and the jurisdiction imposing such Tax (other than connections arising from such DIP Lenders having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced this Agreement, or sold or assigned an interest in any DIP Loan or any DIP Loan Document), (ii) U.S. federal withholding Taxes imposed on amounts payable to or for the account of such DIP Lender with respect to an applicable interest in a DIP Loan pursuant to a law in effect on the date on which the DIP Lender acquires such interest in the DIP Loan, (iii) Taxes attributable to such DIP Lender's failure to comply with Section 7.1(c), and (iv) any U.S. federal withholding Taxes imposed under FATCA.

"Existing First-Priority DIP Collateral" means, for each DIP Lender, all Pre-Petition Collateral of such DIP Lender (including, in the case of Dacian, all Dacian Pre-Petition

10

Collateral) in which such DIP Lender held a first priority security interest as of the Petition Date.

"Existing Pre-Petition Advances" has the meaning set forth in the Recitals to this Agreement.

"Expected Insurance Refund" means the portion of certain insurance proceeds that 777 is expecting to receive to reimburse it for legal fees and expenses that were previously paid by 777 or other Debtors.

"FATCA" means Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code.

"Final Order" means a final order (which must be acceptable in form and substance to the DIP Lenders in their sole discretion) entered or to be entered by the Bankruptcy Court authorizing the secured financing under the DIP Loan Documents.

"Final Order Entry Date" means the date on which the Bankruptcy Court enters the Final Order.

"Financing Orders" means, collectively, the Interim Order, the Final Order and such other orders relating thereto or authorizing the granting of credit by the DIP Lenders to the Debtors on an emergency, interim or permanent basis, pursuant to Section 364 of the Bankruptcy Code as may be issued or entered by the Bankruptcy Court in the Chapter 11 Case.

"GAAP" means generally accepted accounting principles in the United States as in effect from time to time, consistently applied throughout the periods to which reference is made.

"Governmental Body" means any agency, bureau, commission, court, department, official, political subdivision, tribunal, or other instrumentality of any administrative, judicial, legislative, executive, regulatory, police or taxing authority of any government, whether supranational, national, federal, state, regional, provincial, local, domestic or foreign, and includes, without limitation, the European Union and its agencies and instrumentalities.

"GR" has the meaning set forth in the Recitals to this Agreement.

"Guarantors" has the meaning set forth in the Preamble to this Agreement.

"Haymarket" has the meaning set forth in the Preamble to this Agreement.

"Hazardous Materials" means any hazardous or toxic substance, waste, contaminant, pollutant, gas or material, including, without limitation, radioactive materials, oil, petroleum and petroleum products and constituents thereof, which are regulated under any Environmental Law, including, without limitation, any substance, waste or material which

11

is (i) designated a "pollutant," "hazardous substance," "extremely hazardous substance" or "toxic chemical" under any Environmental Law, or (ii) regulated in any way under the Regulations of any state or other jurisdiction where any of the Debtors conducts its business or owns any real property or has any leasehold or in which any Relevant Property is located.

"Indebtedness" means, with respect to any Person, without duplication, the following: (i) all indebtedness of such Person for borrowed money, (ii) all obligations of such Person for the deferred purchase price of property or services (other than accounts payable and accrued liabilities that would be classified as current liabilities under GAAP if and only for so long as such item of such accounts payable and accrued liabilities is no more than ninety (90) days past due), (iii) all obligations of such Person evidenced by notes, bonds, debentures or similar borrowing or securities instruments, (iv) all obligations of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person, (v) all obligations of such Person as lessee under Capital Leases, (vi) all obligations of such Person in respect of banker's acceptances and letters of credit, (vii) all obligations of such Person secured by Liens on the assets and property of such Person, (viii) all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Capital Stock or other ownership or profit interest in such Person or any other Person or any warrants, rights or options to acquire such Capital Stock, (ix) net liabilities in respect of such Person's hedge agreements as determined in accordance with GAAP, (x) all obligations of such Person in respect of any guaranty by such Person of any obligation of another Person of the type described in clauses (i) through (ix) of this definition, and (xi) all obligations of another Person of the type described in clauses (i) through (x) secured by Liens on the property or assets of such Person (whether or not such Person is otherwise liable for such obligations of such other Person).

"Indemnified Taxes" means Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Debtors under any DIP Loan Document.

"Initial Debtors" means those Debtors contemporaneously filing voluntary petitions for relief on the Amendment Date.

"Initial Guarantors" means those Guarantors listed on Schedule 1.2 hereof that have executed this Agreement as of the Closing Date.

"Initial Petition Date" means the date upon which the Initial Debtors commencing their Chapter 11 Cases contemporaneously with the Amendment Date.

"Initial Post-Petition Advances" means the Post-Petition Advances made during the period commencing on the Interim Order Entry Date and ending upon the Final Order Entry Date as set forth on Schedule 2.1 of this Agreement or such lesser amount as set forth in the Interim Order and the Budget.

"Intellectual Property" means, collectively, all copyrights, all patents and all trademarks, together with: (i) all inventions, processes, production methods, proprietary information,

12

know-how and trade secrets; (ii) all licenses or user or other agreements granted to the Debtors with respect to any of the foregoing, in each case whether now or hereafter owned or used including the licenses or other agreements with respect to any DIP Collateral; (iii) all customer lists, identification of suppliers, data, plans, blueprints, specifications, designs, drawings, recorded knowledge, surveys, engineering reports, test reports, manuals, materials standards, processing standards, performance standards, catalogs, computer and automatic machinery software and programs; (iv) all sales data and other information relating to sales or service of products now or hereafter manufactured; (v) all accounting information and all media in which or on which any information or knowledge or data or records may be recorded or stored and all computer programs used for the compilation or printout of such information, knowledge, records or data; and (vi) all causes of action, claims and warranties, in each case, now or hereafter owned or acquired by the Debtors in respect of any of the items listed above.

"Interim Order" means an interim order, in form and substance satisfactory to the DIP Lenders, in their sole discretion, entered or to be entered by the Bankruptcy Court authorizing the Debtors to borrow the Initial Post-Petition Advances under the DIP Loan Documents.

"Interim Order Entry Date" means the date on which the Bankruptcy Court issues the Interim Order.

"Internal Revenue Code" means the Internal Revenue Code of 1986, as amended to the date hereof and from time to time hereafter, and any successor statute.

"Interim Roll-Up Loan" has the meaning set forth in Section 2.2(c)(ii) of this Agreement.

"Investment" means (i) any direct or indirect purchase or other acquisition by the Debtors of, or of a beneficial interest in, any Indebtedness or Capital Stock of any other Person, (ii) any direct or indirect redemption, retirement, purchase or other acquisition for value, by the Debtors from any Person, of any Indebtedness or Capital Stock of such Person, and (iii) any direct or indirect loan, advance or capital contribution by the Debtors to any other Person, including all indebtedness and accounts receivable from that other Person that are not current assets or did not arise from sales of inventory to that other Person in the ordinary course of business and/or constitute ordinary trade credit extended in the ordinary course of business. The amount of any Investment shall be the original cost of such Investment plus the cost of all additional Investments, without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect to such Investment.

"Joinder" has the meaning set forth in Section 9.1(b) of this Agreement.

"Knowledge" means, with respect to the Debtors, the actual knowledge of the Debtors' Authorized Officers, following reasonable due diligence.

"Lien" means any mortgage, deed of trust, security interest, charge, pledge, hypothecation, assignment, attachment, deposit arrangement, encumbrance, lien (statutory, judgment or otherwise, but excluding any right of set off arising by operation of law or pursuant to agreements entered into in the ordinary course of business), or other security agreement or

13

preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any Capital Lease, any Synthetic Lease, any financing lease involving substantially the same economic effect as any of the foregoing and the filing of any financing statement under the UCC or comparable law of any jurisdiction in respect of the foregoing).

"Margin Stock" means "margin stock" as defined in Regulation U of the Board of Governors of the Federal Reserve System as in effect from time to time.

"Material Adverse Effect" means any material adverse effect on or material adverse change, taken as a whole, (but excluding the filing of the Chapter 11 Cases) in: (i) the business or assets of the Debtors taken as a whole; (ii) the ability of the Debtors to materially perform their respective obligations hereunder or under any of the DIP Loan Documents taken as a whole; (iii) the legality, validity, or enforceability of any DIP Loan Document; or (iv) the DIP Collateral or the perfection or priority of any DIP Liens granted to the DIP Lenders under any of the DIP Collateral Documents.

"Maturity Date" means the earliest to occur of (i) the date that is 195 days after the Initial Petition Date, (ii) the date that a Chapter 11 plan becomes effective in any Chapter 11 Case, (iii) the date that any sale of all or substantially all assets of the Debtors occurs pursuant to Section 363 of the Bankruptcy Code, (iv) entry of an order by the Bankruptcy Court in any Chapter 11 Case either dismissing or converting to one or more cases under chapter 7 of the Bankruptcy Code, in each case, unless otherwise consented to by the Required Lenders, (v) the date that a chapter 11 trustee or an examiner with expanded powers is appointed, unless otherwise consented to by the Required Lenders, (vi) the date the DIP Credit Facility is accelerated as directed by the Agent (at the direction of the Required Lenders) or Required Lenders during the existence of an Event of Default, and (vii) the date that is 35 days after the Initial Petition Date if the Final Order has not been entered, unless such period is extended in writing by the Agent (at the direction of the Required Lenders).

"MLH" means ML Healthcare Services, LLC, a Georgia limited liability company.

"MLH APA" means that certain Asset Purchase Agreement between and among the MLH Seller Parties, and ML Healthcare Services, LLC, a Delaware limited liability company as purchaser, dated as of May 29, 2026 pursuant to which the Purchaser has agreed to purchase certain Acquired Assets (as defined therein) on the terms and conditions set forth therein.

"MLH Proceeds" means $3,565,000 in proceeds generated from the sale contemplated by the MLH APA.

"MLH Seller Parties" means ML Healthcare Services, LLC, a Georgia limited liability company, Signal MLH LLC, a Delaware limited liability company, and 777 Partners LLC, a Delaware limited liability company.

"Multiemployer Plan" means any Employee Benefit Plan that is a "multi-employer plan" as defined in Section 3(37) of ERISA.

14

"National Founders" has the meaning set forth in the Preamble to this Agreement.

"National Founders Claims" means any and all claims, loans, notes, advances, reimbursement obligations, indemnity obligations, guaranties, pledges, liens, security interests, rights, remedies, and causes of action held by National Founders or any of its Affiliates against any Debtor arising before the Petition Date as set forth and described in further detail in Schedule 1.3.

"National Founders Pre-Petition Loan Documents" means all agreements, notes, guaranties, pledges, security agreements, collateral documents, side letters, fee letters, amendments, supplements, waivers, instruments, and other documents evidencing, securing, guaranteeing, or otherwise relating to any National Founders Claim.

"National Founders Pre-Petition Collateral" means, collectively, all tangible and intangible assets upon which any Debtor has granted security interests in or liens on for the benefit of National Founders or any of its Affiliates pursuant to any Dacian Pre-Petition Loan Documents.

"Net Asset Sale Proceeds" means, for the Debtors, with respect to any Asset Sale, an amount equal to: (i) Cash payments (including any Cash received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) received by the Debtors from such Asset Sale, minus (ii) the sum of (a) reasonable, customary and documented brokerage, consultant and other reasonable customary and documented fees and expenses actually incurred in connection with such Asset Sale, and (b) Taxes paid or reasonably estimated to be payable as a result of such Asset Sale.

"Net Indebtedness Proceeds" means the proceeds of any Indebtedness incurred by the Debtors after the Petition Date (other than pursuant to this Agreement) minus, if at the time of payment thereof and after giving effect thereto, (i) the Debtors are in pro forma compliance with the provisions of Section 6.2, (ii) any such payment is permitted to be made at such time in accordance with the Budget, and (iii) no Default or Event of Default shall have occurred and be continuing or would result therefrom, reasonable, customary and documented out-of-pocket attorneys' fees, accountants' fees, and other reasonable customary and documented fees and expenses actually incurred in connection with the issuance of such Indebtedness.

"Net Insurance/Condemnation Proceeds" means, for the Debtors, an amount equal to: (i) any Cash payments or proceeds received by or owed to the Debtors (a) under any casualty insurance policy in respect of a covered loss thereunder or (b) as a result of the taking of any assets of the Debtors by any Person pursuant to the power of eminent domain, condemnation or otherwise, or pursuant to a sale of any such assets to a purchaser with such power under threat of such a taking minus (ii) the sum of (a) any actual and reasonable documented costs and expenses (including reasonable out-of-pocket attorney's fees) incurred by the Debtors in connection with the adjustment or settlement of any claims of the Debtors in respect thereof, and (b) any bona fide, reasonable, customary and documented costs actually incurred in connection with any sale of such assets as referred

15

to in clause (i)(b) of this definition, including Taxes paid or reasonably estimated to be payable as a result of any gain recognized in connection therewith.

"Net Proceeds" means, as of any time, the aggregate of Net Asset Sale Proceeds, Net Insurance/Condemnation Proceeds and Net Indebtedness Proceeds.

"New Money Loan" has the meaning set forth in the Recitals to this Agreement.

"New Pre-Petition Advance Commitment" has the meaning set forth in the Recitals to this Agreement.

"New Pre-Petition Advance Note" has the meaning set forth in the Recitals to this Agreement.

"New Pre-Petition Advances" has the meaning set forth in the Recitals to this Agreement.

"Notices" has the meaning set forth in Section 9.2 of this Agreement.

"Operating Account" means (i) for the first $3,565,000 in New Pre-Petition Advances hereunder, that certain deposit account in the name of SMR LLC, located at East West Bank, account number ending 6762, which operating account may only be changed with the written consent of the Agent (acting at the direction of the Required Lenders), and (ii) for all subsequent Pre- and Post-Petition Advances, that certain deposit account in the name of Signal National, located at East West Bank, account number ending 6398, which operating account may only be changed with the written consent of the Agent (acting at the direction of the Required Lenders).

"Payroll Account" means that certain deposit account in the name of Signal National, located at East West Bank, account number ending 6405, which payroll account shall be limited to the use and upon the terms set forth in Section 5.1(f)(ii) hereof and shall only be changed with the written consent of the Agent (acting at the direction of the Required Lenders).

"PATRIOT Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56).

"Pension Plan" means any Employee Benefit Plan, other than a Multiemployer Plan, that is subject to Section 412 of the Internal Revenue Code or Section 302 of ERISA.

"Permit" means any permit, license, approval, consent, permission, notice, franchise, confirmation, endorsement, waiver, certification, registration, qualification, clearance or other authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any federal, state, local or foreign Regulation.

"Permitted Indebtedness" means the Indebtedness permitted pursuant to Section 6.1(a) of this Agreement.

16

"Permitted Investment" has the meaning set forth in Section 6.1(c) of this Agreement.

"Permitted Liens" has the meaning set forth in Section 6.1(b) of this Agreement.

"Person" means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, other legal entities and Governmental Bodies.

"Petition Date" has the meaning set forth in the Recitals to this Agreement.

"Post-Petition" means following the Petition Date.

"Post-Petition Advance Commitment" has the meaning set forth in the Recitals to this Agreement.

"Post-Petition Advances" has the meaning set forth in the Recitals to this Agreement.

"Pre-Petition" means prior to the Petition Date.

"Pre-Petition Advances" has the meaning set forth in the Recitals to this Agreement.

"Pre-Petition Collateral" has the meaning set forth in the Recitals to this Agreement.

"Pre-Petition Loan Documents" has the meaning set forth in the Recitals to this Agreement.

"Pre-Petition Indebtedness" has the meaning set forth in the Recitals to this Agreement and set forth and described in further detail in Schedule 1.3 hereof.

"Pre-Petition Lenders" has the meaning set forth in the Recitals to this Agreement.

"Pre-Petition Obligations" means all obligations of the Debtors owed to each respective Pre-Petition Lender arising prior to the Petition Date.

"Pre-Petition Payment" means a payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of Pre-Petition Obligations or other pre-petition claims against the Debtors.

"Priming Liens" shall have the meaning set forth in Section 2.2 of this Agreement.

"Regulation" means each applicable law, rule, regulation, or order, by any Governmental Body, central bank or comparable agency and any request or directive (if having the force of law) of any of those Persons and each judgment, injunction, order, writ, decree or award of any Governmental Body, arbitrator, or other Person.

"Released Parties" has the meaning set forth in Section 9.23 of this Agreement.

17

"Relevant Property" means, for the Debtors, all sites, facilities, locations, real property and leaseholds (i) presently or formerly owned, leased, used or operated by the Debtors (whether or not such properties are currently owned, leased, used or operated by the Debtors) or (ii) at which any Hazardous Material has been transported, disposed, treated, stored or released by the Debtors.

"Representatives" means, with respect to any Person, each of its respective subsidiaries, Affiliates, officers, directors, managers, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof, in each case in their respective capacity as such.

"Required Lenders" means those DIP Lenders holding an aggregate amount of 66.6% or more of the 'Percentage Interests' issued under Section 1.02 of the DIP Loan Intercreditor Agreement (as further defined and described therein). For the avoidance of doubt, Dacian shall be a Required Lender notwithstanding its Percentage Interests at any time, and Dacian's written consent shall be required for any action requiring the consent, approval, direction, or instruction of the Required Lenders.

"Roll-Up Loan" has the meaning set forth in Section 2.2(c)(iii) of this Agreement.

"SD Fla. Case" has the meanings set forth in Section 8.1(o)(i) of this Agreement.

"Securities Act" means the United States Securities Act of 1933, as now in effect or as hereafter amended from time to time, and any successor statute, and the rules and regulations promulgated thereunder.

"Security Agreement" means that certain First Amended Security Agreement dated as of August 9, 2026 by and among the Borrowers, the Guarantors, the Agent, and the DIP Lenders attached hereto as **Exhibit E**.

"Signal National" has the meaning set forth in the Preamble to this Agreement.

"SMR LLC" means Signal Medical Receivables LLC.

"Subsequent Debtors" means those Debtors which shall be listed on Schedule 1.1 hereof concurrently with their execution of a Guarantor Joinder and the filing of voluntary petitions in their respective Chapter 11 Cases in the Northern District of Texas on the Subsequent Petition Date.

"Subsidiary" means, with respect to any Person, any corporation, partnership, limited liability company, association, joint venture or other business entity of which more than fifty percent (50%) of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, managers, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof.

18

"Synthetic Lease" means any lease of goods or other property, whether real or personal, which is treated as an operating lease under GAAP and as a loan or financing for United States income tax purposes.

"Tax" or "Taxes" mean any present or future tax, levy, impost, duty, assessment, charge, fee, deduction or withholding of any nature and whatever called, by whomsoever, on whomsoever and wherever imposed, levied, collected, withheld, or assessed.

"UCC" means the Uniform Commercial Code (or any similar or equivalent legislation) as in effect in the State of New York; provided that if by reason of mandatory provisions of law, the perfection, the effect of perfection or non-perfection or the priority of the DIP Liens is governed by the Uniform Commercial Code as in effect in a United States jurisdiction other than New York, then "UCC" shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

"Unencumbered DIP Collateral" means Debtor Assets that are not subject to valid, perfected, and non-avoidable Liens (other than Liens granted hereunder) as of the Closing Date.

"United States Trustee" means the Office of the United States Trustee for the Northern District of Texas.

(b)      Capitalized terms used but not defined above or elsewhere herein shall have the meanings given to such terms in the New Pre-Petition Advance Note and/or the Financing Orders, as applicable.

ARTICLE II
LOANS

Section 2.1      New Money Loan (New Pre-Petition Advances).

(a)      Subject to the terms and conditions set forth herein and in the Security Agreement, and pursuant to the New Pre-Petition Advance Note, upon the Debtors' request for New Pre-Petition Advances in accordance with Section 2.3(b) and in accordance with the Budget, the DIP Lenders agree to make the New Pre-Petition Advances during the DIP Commitment Period.

(b)      ACM, as administrative agent on behalf of the ACAP Holdco Lenders, and the Debtors agree that upon SMR LLC's receipt of the MLH Proceeds, the MLH Proceeds shall be immediately deemed: (i) paid to ACM on account of its prepetition liens under the ACAP Holdco Facility and applied thereunder in partial satisfaction of the obligations under the ACAP Holdco Facility; and (ii) re-loaned by ACM as Agent hereunder on behalf of the DIP Lenders, to SMR LLC upon receipt of a properly-delivered Borrowing Certificate, it being understood that such re-lent amount shall be treated pro rata as part of the AAV2024, ACH, Dacian, and Haymarket's portions of the New Pre-Petition Advances. The Debtors shall promptly provide a Borrowing Certificate covering the MLH Proceeds and the cash portion of the initial Pre-Petition

19

Advances hereunder, the cash portion of which shall be funded within two (2) Business Days of receiving same.

(c)     The Debtors expressly acknowledge that the Expected Insurance Refund is collateral of ACM in its capacity as administrative agent on behalf of the ACAP Holdco Lenders. As the Debtors receive funds from the Expected Insurance Refund, such amounts shall be immediately deemed: (i) paid to ACM on account of its pre-petition liens under the ACAP Holdco Facility and applied thereunder in partial satisfaction of the obligations under the ACAP Holdco Facility; and (ii) at the discretion of ACM, fully or partly re-loaned by ACM as Agent on behalf of the DIP Lenders to Signal National as part of the ACAP Share (as defined and described in the DIP Loan Intercreditor Agreement), *it being understood that* such re-lent amount shall be treated *pro rata* as part of the Haymarket and AAV2024's portion of the New Money Loan funding.

(d)     Notwithstanding anything to the contrary herein or in the Budget, until SMR LLC receives the MLH Proceeds, any New Pre-Petition Advances will be at the discretion of each DIP Lender and limited to amounts needed to cover the Debtors' payroll, rent, and other critical operating expenses.

(e)     Each such New Pre-Petition Advance shall be for purposes consistent with the Budget and otherwise consistent with this Agreement. For the avoidance of doubt, both before and after giving effect to any New Pre-Petition Advance (or any portion thereof), the aggregate amount of all New Pre-Petition Advances shall not exceed the New Pre-Petition Advance Commitment.  Once repaid, any New Pre-Petition Advances borrowed hereunder may not be reborrowed.

(f)     Prior to the Petition Date, all New Pre-Petition Advances (including accrued and unpaid costs and expenses), shall be secured solely by the liens and security interests granted pursuant to the terms of the First Amended Security Agreement executed contemporaneously herewith and limited to the amounts of the undisbursed New Pre-Petition Advances in the Operating Account and perfected pursuant to the Controlled Account Agreement related thereto.

20

Section 2.2    New Money Loan (Post-Petition Advances); Roll-Up Loan

(a)    Subject to the terms and conditions set forth herein and in the Financing Orders, upon Debtors' request for Post-Petition Advances in accordance with Section 2.3(b) and in accordance with the Budget, the DIP Lenders agree to make the Post-Petition Advances during the DIP Commitment Period.

(b)    Each such Post-Petition Advance shall be for purposes consistent with the Budget and otherwise consistent with this Agreement and the Financing Orders. For the avoidance of doubt, both before and after giving effect to any Post-Petition Advance (or any portion thereof), the aggregate amount of all Post-Petition Advances shall not exceed the Post-Petition Advance Commitment. Once repaid, Post-Petition Advances borrowed hereunder may not be reborrowed.

(c)    The DIP Lenders' willingness to make the New Money Loan is expressly conditioned on the Debtors' agreement to herein and, for the Post-Petition Advances, Court approval via the Financing Orders of, the Roll-Up Loan (as defined below). Accordingly, the DIP Loans (as defined below) shall consist of:

(i)    The aggregate of all Post-Petition Advances; and

(ii)    a roll-up (the "Roll-Up Loan"; and together with the aggregate of all Post-Petition Advances, the "DIP Loans") of Pre-Petition Advances in an aggregate amount equal to three times (3x) the Post-Petition Advances actually funded by the DIP Lenders at any time (*i.e.*, upon entry of the Interim Order, an amount of the Roll-Up Loan equal to three times (3x) the Initial Post-Petition Advances actually funded pursuant to an Interim Order (the "Interim Roll-Up Loan") shall be approved, subject to a "Challenge" (as such term is defined in the Interim Order) and the balance of the Roll-Up Loan shall be approved upon entry of the Final Order). As the Roll-Up Loan is approved and funds are advanced it shall be deemed used to satisfy and discharge a corresponding amount of Pre-Petition Advances made by each DIP Lender, *pari passu*, which amounts shall be applied against their respective Pre-Petition Advances in the following order: (a) *first*, in satisfaction of such DIP Lender's then-outstanding New Pre-Petition Advances and (b) *second,* after all eligible New Pre-Petition Advances made by such DIP Lender have been rolled-up, *only then*, in satisfaction of such DIP Lender's Existing Pre-Petition Advances (subject in all respects to the terms of the DIP Loan Intercreditor Agreement). For the avoidance of doubt, to the extent that additional amounts of the Roll-Up Loan exist after a DIP Lender has had all of its eligible Pre-Petition Advances rolled-up, such amounts will be applied, *pari passu* (subject to the terms of the DIP Loan Intercreditor Agreement), to outstanding Pre-Petition Advances made by the remaining DIP Lenders that have not been rolled-up until the earlier of (a) all outstanding eligible Pre-Petition Advances have been rolled-up or (b) the exhaustion of any remaining amounts available under the Roll-Up Loan (*i.e.*, a full 3:1 roll-up has been effectuated)

(iii)    Notwithstanding the foregoing, in the event that any amount of the Roll-Up Loan shall remain available after all eligible Pre-Petition Advances made

by each of the DIP Lenders have been rolled-up pursuant to the above Section 2.2(c)(ii), the remainder of the Roll-Up Loan shall be applied, *pari passu* (subject to the terms of the DIP Loan Intercreditor Agreement), to the then-outstanding Pre-Petition Indebtedness of the DIP Lenders until the entirety of the Roll-Up Loan has been exhausted.

(d)      Any and all portions of the DIP Loans borrowed under this Section 2.2 (including accrued and unpaid costs and expenses), shall be secured by, valid, automatically perfected, and non-avoidable DIP Liens, in each case subject solely to the Carve-Out, as follows: (i) senior first priority DIP Liens on the Unencumbered DIP Collateral and the Chapter V DIP Collateral and (ii) junior DIP Liens on all assets of the Debtors subject only to valid, properly perfected, and nonavoidable Liens that existed on the Debtors' assets as of the Petition Date (all of the foregoing, the "DIP Collateral"). Each DIP Lender shall also receive and benefit from all other rights and benefits provided pursuant to the Financing Orders, this Agreement, and the other DIP Loan Documents.

(e)      In addition, each DIP Lender shall individually receive first priority priming DIP Liens to secure an amount equal to the DIP Loan multiplied by such DIP Lender's DIP Percentage Interest, with such priming DIP Liens attaching only to Existing First-Priority DIP Collateral of such DIP Lender in their capacity as a Pre-Petition Lender (the foregoing, the "Priming Liens"). To the extent proceeds are realized on account of its Pre-Petition Collateral that is also subject to a Priming Lien, such DIP Lender may elect (by informing the Agent and the Debtors) to not have such proceeds applied against the Priming Liens and its portion of the DIP Loan, and to instead apply such proceeds against the applicable Pre-Petition Indebtedness (including, in the case of Dacian, the Dacian Claims and, in the case of National Founders, the National Founders Claims) held by such DIP Lender or the Affiliates of such DIP Lender (each in their capacity as a Pre-Petition Lender).

Section 2.3     Borrowing Mechanics.

(a)      Unless otherwise agreed in writing between the Agent and the Borrowers, the New Pre-Petition Advances and all Post-Petition Advances under the DIP Credit Facility shall be funded by the DIP Lenders into the appropriate Operating Account (each of which must be a Controlled Account), and anything herein to the contrary notwithstanding, shall be disbursed solely in accordance with this Agreement and the Budget and, in the case of: (i) with respect to any New Pre-Petition Advances, the New Pre-Petition Advance Note and (ii) with respect to any Post-Petition Advances, the Financing Orders (both as to the timing and amount of any such requests), subject to Article III hereof.

(b)      All Borrowings hereunder shall be made pursuant to a Borrowing Certificate, substantially in the form attached hereto as **Exhibit B** (each a "Borrowing Certificate"). Except for those New Pre-Petition Advances to be made on or immediately after the Closing Date (for which a Borrowing Certificate shall be executed and delivered contemporaneously herewith), the Debtors shall deliver to the Agent a fully executed Borrowing Certificate no later than two (2) Business Days prior to any Borrowing Date by 10:00 a.m. (prevailing Eastern time). Such Borrowing Certificate shall specify the amount of the proposed New Pre-Petition Advance or Post-Petition Advance and the Borrowing Date thereof, and shall

certify that the amount of the proposed New Pre-Petition Advance or Post-Petition Advance is contemplated in and consistent with the Budget. On the Borrowing Date specified in any Borrowing Certificate, the Agent shall disburse such funds to the appropriate Operating Account and shall use reasonable efforts to make the funds available to the Debtors no later than 2:00 p.m. (prevailing Eastern time) on the requested Borrowing Date.

Section 2.4    Use of Proceeds. The proceeds of the DIP Credit Facility shall be used by the Debtors, subject to and in accordance with the Budget, the New Pre-Petition Advance Note and/or the Financing Orders, solely for (i) working capital and general corporate purposes of the Debtors, and (ii) bankruptcy-related costs and expenses including, without limitation, professional fees and expenses in connection with preparing and filing the Chapter 11 Cases. Subject to the Budget, the New Pre-Petition Advance Note and/or the Financing Orders, none of the proceeds of the Pre-Petition Advances or the DIP Loans shall be used in connection with the investigation (including discovery proceedings), initiation or prosecution of any claims, causes of action, adversary proceedings, or other litigation against ACH, ACM, Haymarket, AAV2024, Dacian, National Founders, or any other DIP Lender, ACAP Holdco Lender and/or Pre-Petition Lender who may become party hereto from time to time, in any capacity whatsoever (to include, without limitation, whether in their respective capacities as DIP Lender, Agent, or, with respect to the Pre-Petition Loan Documents, as lender, agent, administrative agent, collateral agent or in any other capacity hereunder or thereunder), or any of their respective Representatives, including in connection with the validity of the liens and DIP Liens granted to the DIP Lenders in the DIP Collateral, or the Liens granted to the Pre-Petition Lenders in the Pre-Petition Collateral arising under the Pre-Petition Loan Documents.

Section 2.5    Evidence of Debt. The Agent, on behalf of the DIP Lenders, shall maintain in its internal records an account or accounts evidencing the DIP Obligations owed to the DIP Lenders, including the amounts of the New Pre-Petition Advances and the DIP Loans and each repayment and prepayment in respect thereof. Any such recordation shall be conclusive and binding on the Debtors, absent manifest error; provided, failure to make any such recordation, or any error in such recordation, shall not affect the New Pre-Petition Advance Commitment, the Post-Petition Advance Commitment, the DIP Loans, or any of the DIP Obligations.

Section 2.6    Interest and Fees on Loans.

(a)    Applicable Rate; Payment of Interest

(i)    Interest shall accrue on the full amount of the Pre-Petition Advances, as follows:

(x)    with respect to Existing Pre-Petition Advances, at the rate(s) presently applicable to such Existing Pre-Petition Advance under the respective Pre-Petition Loan Document or other document under which it was made; and

(y)    with respect to any New Pre-Petition Advance, at a fixed rate per annum equal to eleven and a half percent (11.5%).

23

(ii)      From and after entry of the Interim Order, the DIP Loans shall bear interest at a fixed rate per annum equal to eleven and a half percent (11.5%).

(iii)     all accrued interest, whether in respect to any Pre-Petition Advances and/or Post-Petition Advances hereunder, shall be paid-in-kind and due and payable on the Maturity Date.

(b)      Calculation of Interest Rates.  Interest payable pursuant to this Section 2.6 shall be computed on a 30/360 basis.

(c)      Default Interest.  Upon the occurrence and during the continuation of an Event of Default, the DIP Obligations and any accrued interest, fees and other amounts owed hereunder shall bear interest at a simple rate of fourteen and a half percent (14.5%) per annum.

(d)      Upfront Fee.  An upfront fee on the New Money Loan equal to 1% payable to each DIP Lender according to its *pro rata* share of its DIP Commitment hereunder shall be paid-in-kind and due and payable on the Maturity Date.

(e)      Arrangement Fee.  An arrangement fee on the New Money Loan equal to 1% payable to each DIP Lender according to its *pro rata* share of its DIP Commitment hereunder shall be paid-in-kind and due and payable on the Maturity Date.

(f)      Unused Line Fee.  An unused line fee equal to 0.50% of the unused portion of the DIP Commitment shall accrue on any unused portion thereof and shall be payable to each DIP Lender according to its *pro rata* share of its DIP Commitment hereunder shall be paid-in-kind and due and payable on the Maturity Date.

Section 2.7    Repayment.  Subject to Sections 2.9 and 2.10, the DIP Loans shall be due and payable, and the Debtors shall be required to repay all of the DIP Obligations (including, without limitation, all accrued and unpaid principal, interest, fees, costs, and expenses on the New Pre-Petition Advances and/or the DIP Loans) on the Maturity Date.

Section 2.8    Prepayments.

(a)      Mandatory Prepayments of Net Proceeds.  No later than the first Business Day following the date of receipt by the Debtors of any Net Proceeds, the Debtors shall prepay the DIP Obligations (including the applicable portion of the accrued costs and expenses) as set forth in Section 2.9 in an aggregate amount equal to such Net Proceeds.

(b)      Mandatory Prepayment Certificate.  Concurrently with any prepayment of the DIP Obligations pursuant to Section 2.8(a), the Debtors shall deliver to the Agent a certificate of an Authorized Officer demonstrating the calculation in reasonable detail of the amount of the applicable Net Proceeds.  In the event that the Debtors shall subsequently determine that the actual amount received exceeded the amount set forth in such certificate, the Debtors shall promptly make an additional prepayment of the DIP Obligations in accordance with Section 2.9 in an amount equal to such excess, and the Debtors shall concurrently therewith deliver to the Agent a certificate of an Authorized Officer demonstrating the derivation of such excess.

24

(c)     Voluntary Prepayment.  The Debtors may prepay the DIP Obligations (including the applicable portion of the accrued costs and expenses) in whole or in part at any time upon three (3) Business Days' prior notice to the Agent; provided that any partial prepayment will be in a minimum amount of $100,000.

Section 2.9     Application of Payments and Proceeds.  Subject in all respects to Section 2.10 hereof, any amount required to be paid pursuant to Section 2.7(a) or any other provision of this Agreement, and all proceeds of the DIP Collateral (whether before or after an Event of Default) shall be applied (i) first, to repay the full amount of the New Money Loan; (ii) second, to repay all remaining principal, accrued and unpaid interest, costs, expenses, and all other outstanding DIP Obligations in connection with the DIP Credit Facility, and (iii) third, to the Debtors, in each case of the foregoing clauses (i) through (ii), on a *pro rata* basis among the DIP Lenders as set forth in the DIP Loan Intercreditor Agreement.

Section 2.10     Application of Proceeds of Asset Sales.  In the event that the Debtors dispose of any Debtor Assets or other Existing First-Priority DIP Collateral presently encumbered by the Liens of one or more of the DIP Lenders:

(a)     the proceeds thereof shall be applied as follows: (i) first, to pay any amounts owed to that DIP Lender, to include any and all amounts payable under any other section of this Agreement, until such amounts are paid in full and (ii) second, to pay any accrued and unpaid interest, cost, expenses, and other outstanding DIP Obligations owed to such DIP Lender.

(b)     to the extent that the proceeds of such property sold is encumbered by more than one DIP Lender and the affected DIP Lenders are unable to stipulate to the amount payable to each of them, the full amount of the proceeds thereof shall be escrowed until further order of the Bankruptcy Court or stipulation between such DIP Lenders.

Section 2.11     Guaranty.

(a)     Guaranty of Payment.

(i)     Each of the Guarantors unconditionally and irrevocably guarantees the due and punctual payment by the Borrowers of the DIP Obligations. Each of the Guarantors further agrees that the DIP Obligations may be extended or renewed, in whole or in part, without notice to or further assent from it, and it will remain bound upon this guaranty notwithstanding any extension or renewal of any of the DIP Obligations. The obligations of the Guarantors with respect thereto shall be joint and several.

(ii)     Each of the Guarantors waives presentation to, demand for payment from and protest to any Borrower(s) or any other Guarantor, and also waives notice of protest for nonpayment. The DIP Obligations of the Guarantors hereunder shall not be affected by (i) the failure of the Agent or a DIP Lender to assert any claim or demand or to enforce any right or remedy against any Borrower(s) or any other Guarantor under the provisions of this Agreement or any other DIP Loan Document or otherwise; (ii) any extension or renewal of any provision hereof or thereof; (iii) any rescission, waiver, compromise, acceleration, amendment or modification of

25

any of the terms or provisions of any of the DIP Loan Documents; (iv) the release, exchange, waiver or foreclosure of any security held by the Agent for the DIP Obligations or any of them; (v) the failure of the Agent or a DIP Lender to exercise any right or remedy against any other Guarantor; or (vi) the release or substitution of any Guarantor or any other Guarantor

(iii)    Each of the Guarantors further agrees that this guaranty constitutes a guaranty of payment when due and not just of collection, and waives any right to require that any resort be had by the Agent or a DIP Lender to any security held for payment of the DIP Obligations or to any balance of any deposit, account or credit on the books of the Agent or a DIP Lender in favor of any Borrower(s) or any other Guarantor, or to any other Person.

(iv)    Each Guarantor's guaranty shall not be affected by the genuineness, validity, regularity or enforceability of the DIP Obligations or any other instrument evidencing any DIP Obligations, or by the existence, validity, enforceability, perfection, or extent of any collateral therefor or by any other circumstance relating to the DIP Obligations which might otherwise constitute a defense to this Guaranty. Neither of the Agent, nor any of the DIP Lenders makes any representation or warranty in respect to any such circumstances or shall have any duty or responsibility whatsoever to any Guarantor in respect of the management and maintenance of the DIP Obligations.

(v)    Each of the Guarantors hereby waives any defense that it might have based on a failure to remain informed of the financial condition of any Borrower(s) and of any other Guarantor and any circumstances affecting the ability of any Borrower(s) to perform under this Agreement.

(vi)    Subject to the provisions of Section 8.2 and the Financing Orders, upon the DIP Obligations becoming due and payable (by acceleration or otherwise), the Agent, on behalf of the DIP Lenders, shall be entitled to immediate payment of such DIP Obligations by the Guarantors upon written demand by the Agent (acting at the direction of the Required Lenders) (and, in the case of any DIP Obligations which may become due and payable after the Petition Date, without further application to or order of the Bankruptcy Court).

(b)    No Impairment of Guaranty. The obligations of the Guarantors hereunder shall not be subject to any reduction, limitation, impairment or termination for any reason, including, without limitation, any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to any defense or set-off, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of the DIP Obligations. Without limiting the generality of the foregoing, the obligations of the Guarantors hereunder shall not be discharged or impaired or otherwise affected by the failure of the Agent or any DIP Lender to assert any claim or demand or to enforce any remedy under this Agreement or any other agreement, by any waiver or modification of any provision thereof, by any default, failure or delay, willful or otherwise, in the performance of the DIP Obligations, or by any other act or thing or omission or delay to do any other act or thing which may or might in any manner or to any extent

26

vary the risk of the Guarantors or would otherwise operate as a discharge of the Guarantors as a matter of law, unless and until the DIP Obligations are paid in full.

(c)     Subrogation. Upon payment by any Guarantor of any sums to the Agent or any DIP Lender hereunder, all rights of such Guarantor against any such Borrower arising as a result thereof by way of right of subrogation or otherwise, shall in all respects be subordinate and junior in right of payment to the prior final and indefeasible payment in full of all the DIP Obligations. If any amount shall be paid to such Guarantor for the account of such Borrower, such amount shall be held in trust for the benefit of the Agent and the DIP Lenders and shall forthwith be paid to the Agent (on behalf of the DIP Lenders) to be credited and applied to the DIP Obligations, whether matured or unmatured.

Section 2.12    Joint and Several Liability.  Each Debtor hereby agrees that it is jointly and severally liable for the full and punctual payment and performance of all DIP Obligations hereunder and under the other DIP Loan Documents, regardless of which Debtor actually receives the proceeds of any DIP Loan or the benefit of any such DIP Obligation. The obligations of each Debtor hereunder are independent of the obligations of each other Debtor, and a separate action or actions may be brought and prosecuted against any Debtor whether or not action is brought against any other Debtor and whether or not any other Debtor is joined in any such action or actions.  Each Debtor hereby waives any defense based upon the failure of the Agent or any DIP Lender to proceed against any other Debtor or any other Person or to pursue any other remedy in the Agent's or any DIP Lender's power.

Section 2.13    General Provisions Regarding Payments.

(a)     Payments.  All payments by the Debtors of principal, interest, and any other DIP Obligations shall be made by the Debtors to the Agent in Dollars in same day funds, without defense, setoff, or counterclaim, free of any restriction or condition, and delivered to the Agent not later than 4:00 p.m. (prevailing Eastern time) on the date due at the Agent's office for receipt of notices hereunder (or as otherwise instructed by the Agent to the Debtors) without presentment, demand, protest, or notice of any kind, all of which are expressly waived by the Debtors.

(b)     Late Payments.  The Agent shall be permitted to consider any payment made by or on behalf of the Debtors that is not made in same-day funds prior to 4:00 p.m. (prevailing Eastern time) as a late payment, and any such late payment shall be deemed received on the next Business Day.  The Agent shall give prompt telephonic notice to the Debtors (confirmed in writing) if any payment is considered late hereunder.  To the extent any late payment is received, the Agent shall be permitted to declare by notice to the Debtors (confirmed in writing) a Default or Event of Default to the extent so provided under the terms of Section 8.1.  Interest shall continue to accrue on any late payment until the Business Day following receipt thereof.

(c)     Payments to Include Accrued Interest.  All payments in respect of the principal amount of any DIP Loan shall include payment of accrued interest on the principal amount being repaid or prepaid calculated in accordance with Section 2.6, and all such payments shall be applied to the payment of interest before application to principal.

27

(d)    <u>Business Days</u>.  Whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in the computation of the payment of interest hereunder.

Section 2.14    <u>Termination of DIP Commitments</u>.  Unless previously terminated, the DIP Commitment shall automatically terminate at the end of the DIP Commitment Period.  Upon the making of any New Pre-Petition Advance or Post-Petition Advance, the DIP Commitment (and the corresponding New Pre-Petition Advance Commitment or Post-Petition Advance Commitment, as the case may be) shall be permanently reduced by an amount equal to the principal amount thereof.

ARTICLE III
<u>CONDITIONS PRECEDENT; CONDITIONS SUBSEQUENT</u>

Section 3.1    <u>Conditions Precedent to New Pre-Petition Advances; Amendment Date</u>.  The obligation of the DIP Lenders to make an advance of funds with respect to any New Pre-Petition Advances on any date on which the Debtors request a Borrowing, is subject to the satisfaction, or waiver in accordance with <u>Section 9.1</u>, of the following conditions on or before the Amendment Date:

(a)    <u>DIP Loan Documents</u>.  Each DIP Lender shall have received duly executed copies of this Agreement, the New Pre-Petition Advance Note, and each DIP Loan Document, with originals to promptly follow (other than any DIP Loan Document which the Agent, with the consent of the Required Lenders, has allowed to be executed at a later date).  The financing statements and other DIP Loan Documents related to perfection of the security interest and Liens of the Agent (for the benefit of the DIP Lenders) in the DIP Collateral shall, at the Agent's option, have been filed in all appropriate jurisdictions (or arrangements for such filings acceptable to the Agent shall have been made).

(b)    [Reserved]

(c)    [Reserved]

(d)    <u>Use of Proceeds and Information</u>.  The proceeds of the DIP Loans shall be used by the Debtors solely in accordance with the Budget and the DIP Lenders shall receive such information (financial or otherwise) as may be reasonably requested by the DIP Lenders.

(e)    [Reserved]

(f)    <u>Cash Management</u>.    Cash management arrangements reasonably satisfactory to the DIP Lenders in form and substance shall be in place.  The DIP Lenders or their advisors shall have completed a review of the Debtors' cash management systems and determined that all material amounts of cash and cash equivalents of the Debtors are subject to DIP Liens in favor of the Agent, and, as appropriate, pursuant to Controlled Account Agreements.

28

(g)  <u>No Default</u>.  No Default or Event of Default shall exist at the time of, or after giving effect to, the transactions contemplated on the Amendment Date, including the advancing of any DIP Loans.

(h)  <u>Representations and Warranties</u>.  All representations and warranties in the DIP Loan Documents shall be true and correct as of the Amendment Date in all material respects.

(i)  <u>UCC Financing Statements</u>.  Upon request of the Agent, the Debtors shall promptly provide UCC financing statements covering all DIP Collateral that is personal property of the Debtors, for filing in all jurisdictions as may be necessary or, in the opinion of the Agent, desirable, to perfect the security interests created in such DIP Collateral pursuant to the DIP Collateral Documents.  The Debtors hereby authorize the Agent to file such UCC financing statements, whether or not actually provided by the Debtors.

(j)  <u>Other Actions to Perfect Security Interests</u>.  Each DIP Lender shall have received evidence that Debtors shall have taken or caused to be taken any other action, executed and delivered or caused to be executed and delivered any other agreement, document and instrument, and made or caused to be made any other filing and recording (other than as set forth herein), reasonably required by the Agent to perfect, and to ensure the perfection of, its security interests in the DIP Collateral with the priority required by the DIP Loan Documents.

(k)  <u>Other Information</u>.  Each DIP Lender shall have received any other financial or non-financial information regarding the Debtors that such DIP Lenders reasonably requested at least five (5) Business Days prior to the Amendment Date.

(l)  <u>No Material Adverse Change</u>.  The Debtors shall have continued to materially operate their businesses in the ordinary course through the Amendment Date.

Section 3.2  <u>Conditions Precedent to Post-Petition Advances</u>.  The obligation of the DIP Lenders to make an advance of funds with respect to any Post-Petition Advance on any date on which the Debtors request a Borrowing after the Petition Date is subject to the satisfaction, or waiver in accordance with <u>Section 9.1</u>, of the following conditions on or before such Borrowing date:

(a)  <u>Financing Orders</u>.  The Financing Orders, and all motions relating thereto, approving and authorizing the DIP Loans, all provisions thereof, and the priorities and DIP Liens granted under Bankruptcy Code Section 364(c) and (d), as applicable, shall be in form and substance satisfactory to each DIP Lender and its counsel in their sole discretion. The Interim Order shall have been entered by the Bankruptcy Court within three (3) business days of the Petition Date, unless waived by the Agent at the direction of the Required Lenders. Unless otherwise waived by the Agent at the direction of the Required Lenders, the Final Order shall be scheduled to be issued no later than thirty-five (35) days after the Petition Date, and shall include, without limitation, provisions (i) modifying the automatic stay to permit the creation and perfection of the DIP Liens, (ii) providing for the vacation of such stay to permit the enforcement of the Agent's and the DIP Lenders' rights and remedies under the DIP Loan Documents, (iii) stating that the Agent, DIP Lenders, the Pre-Petition Lenders, and all of their respective counsel, advisors, and consultants, shall each be entitled to the benefit of a "good faith" finding pursuant to

29

Section 364(e) of the Bankruptcy Code, (iv) prohibiting the assertion of claims arising under Sections 506(c) or 552(b) of the Bankruptcy Code against the Agent or the DIP Lenders or the commencement of other actions adverse to the Agent or the DIP Lenders or their respective rights and remedies under the DIP Loan Documents, the Financing Orders, or any other order, (v) prohibiting the incurrence of Indebtedness by Debtors, other than Permitted Indebtedness, with priority equal to or greater than the DIP Loans, (vi) prohibiting any granting or imposition of Liens other than DIP Liens and Permitted Liens, (vii) authorizing and approving the Debtors to execute and deliver the DIP Loan Documents to which each shall be a party and the transactions contemplated therein, including, without limitation, the granting of the super priority status, the first-priority and priming security interests and DIP Liens upon the DIP Collateral, (viii) authorizing and approving the 'roll-up' of the Pre-Petition Advances on a 3:1 basis and the securing of such roll-up obligations equally and ratably with the Debtors' obligations with respect to the DIP Credit Facility and under the DIP Loan Documents, which roll-up obligations shall constitute DIP Obligations, subject to a Challenge as that term is defined in the Financing Orders, (ix) confirming that (a) the Agent (on behalf of the DIP Lenders) and/or (b) the Pre-Petition Lenders and/or their Affiliates (each in their individual capacities) are each permitted in all respects to Credit Bid the DIP Obligations (subject to a Challenge as that term is defined in the Financing Orders) and/or the Pre-Petition Indebtedness (including the Dacian Claims and/or the National Founders Claims), as applicable, in whole or in part, in connection with any sale or disposition of assets in the Chapter 11 Cases and (x) releases in favor of the DIP Lenders and the Pre-Petition Lenders (and each of their Affiliates) substantially in the same form as set forth in <u>Section 9.23</u> herein.

(b)     <u>Compliance with Financing Orders</u>.  No Financing Order shall have been reversed, modified, amended, stayed, or vacated, in the case of any modification or amendment, in a manner, or relating to a matter, without the consent of the Agent at the direction of the DIP Lenders.  The Debtors shall be in compliance in all material respects with the Financing Orders and all other orders of the Bankruptcy Court binding on it.

(c)     <u>Debtor-in-Possession</u>.  No trustee or examiner with expanded powers shall have been appointed with respect to the Debtors or their properties.

(d)     <u>First Day Motions</u>.  All "first day" motions and related orders entered by the Bankruptcy Court in the Chapter 11 Cases shall be in form and substance satisfactory to the DIP Lenders and their counsel.

(e)     <u>No Material Adverse Change</u>.  The Debtors, as debtors-in-possession, shall have continued to materially operate their businesses in the ordinary course through the Amendment Date, and since the Petition Date there shall have been no Material Adverse Effect taken as a whole.

Section 3.3     <u>Conditions to Each Borrowing</u>.  The obligations of the DIP Lenders to make any Pre-Petition Advance or Post-Petition Advance on any Borrowing Date, including the Closing Date, are subject to the satisfaction, or waiver in accordance with <u>Section 9.1</u>, of the following conditions precedent:

(a)     Borrowing Certificate.  The DIP Lenders shall have received a fully executed and delivered Borrowing Certificate, in accordance with Section 2.3.  Each Borrowing Certificate shall be executed by an Authorized Officer of the Debtors and delivered to the Agent on a Business Day.

(b)     Representations and Warranties.  As of such Borrowing Date (both before and after giving effect to the advance of the New Pre-Petition Advance or Post-Petition Advance and application of its proceeds), the representations and warranties of the Debtors contained in the DIP Loan Documents shall be true and correct in all material respects on and as of that Borrowing Date, as if made on and as of that Borrowing Date (except to the extent such representations and warranties specifically relate to an earlier date, such representations and warranties were true and correct on and as of such earlier date).

(c)     No Event of Default.  As of such Borrowing Date, no Default or Event of Default shall have occurred and be continuing or would result from the consummation of the applicable Borrowing (or the application of its proceeds).

(d)     Consents.  Each DIP Lender shall have received such Consents and other information, approvals, opinions, or documents reasonably requested by such DIP Lender in connection with such Borrowing.

(e)     Available Commitments.  After making the New Pre-Petition Advance or Post-Petition Advance requested on such Borrowing Date, the aggregate outstanding principal amount of all amounts advanced under the DIP Credit Facility shall not exceed the amount of the DIP Commitment.

(f)     No Material Adverse Effect.  Since the Interim Order Entry Date, no Material Adverse Effect as to the Debtors taken as a whole shall have occurred after giving effect to the making of the DIP Loans.

(g)     Other Information.  Each DIP Lender shall have received any other financial or non-financial information regarding the Debtors that such DIP Lender reasonably requested within a reasonable time after a request is made for such information.

Section 3.4     Conditions Subsequent.  The Debtors shall timely perform all obligations and commitments in any post-closing agreement between the Agent, the DIP Lenders, and the Debtors with respect to any requirement of this Article III that the Agent has, with the written consent of the Required Lenders, agreed must be satisfied at a later date.

ARTICLE IV
REPRESENTATIONS AND WARRANTIES

Section 4.1     Representations and Warranties.  To induce the Agent and the DIP Lenders to enter into this Agreement and for the DIP Lenders to make each DIP Loan to be made hereby, each Debtor hereby represents and warrants to the Agent and the DIP Lenders as to itself that, on the Amendment Date and on each Borrowing Date as follows:

31

(a)     Status; Authorization.  Such Debtor is duly organized, validly existing, and in good standing under the laws of its jurisdiction of formation and is duly qualified and in good standing in every other jurisdiction where it is doing business except where the failure to so qualify could not reasonably be expected to have a Material Adverse Effect, and, subject to the entry by the Bankruptcy Court of the Financing Orders, the execution, delivery and performance by such Debtor of the DIP Loan Documents (i) are within its respective authority, (ii) have been duly authorized, and (iii) do not conflict with or contravene its constitutive documents.  Subject to the entry by the Bankruptcy Court of the Financing Orders, the execution, delivery, performance of its obligations, and exercise of its rights under the DIP Loan Documents by such Debtor, including, without limitation, the making of the DIP Loans under this Agreement, (y) do not require any Consents that have not been obtained or notices to third parties that have not been provided except to the extent such failure would not result in a Material Adverse Effect, and (z) are not and will not be in conflict with or be prohibited or prevented by (A) any Regulation, (B) any corporate or entity governance document, corporate or entity minute or resolution of such Debtor or (C) any instrument, agreement or provision thereof, in each case binding on it or affecting any of its property.

(b)     Execution and Binding Effect.  With respect to the Pre-Petition Advances, as of the time of the execution and delivery of each DIP Loan Document and, with respect to the Post-Petition Advances, subject to the entry by the Bankruptcy Court of the Financing Orders, upon execution and delivery thereof, each DIP Loan Document shall constitute the legal, valid, and binding obligation of such Debtor, enforceable in accordance with its terms.

(c)     Title to Debtor Assets.

(i)     Such Debtor has good and marketable title to all Debtor Assets purported to be owned by it, in each case free of all Liens other than the Permitted Liens.

(ii)     Such Debtor enjoys, and will enjoy, peaceful and undisturbed possession of, or a lease or license to use, all Debtor Assets (subject only to the Permitted Liens) that are necessary for the conduct of its business.

(d)     Governmental Approvals and Filings.  Other than the Bankruptcy Court's entry of the Financing Orders and the filings and recordings contemplated by the DIP Collateral Documents, no approval, order, consent, authorization, certificate, license, permit or validation of, or exemption or other action by, or filing, recording or registration with, or notice to, any Governmental Body is or will be necessary in connection with the execution and delivery of this Agreement or any other DIP Loan Document, consummation by such Debtor of the transactions herein or therein contemplated, or performance of or compliance with the terms and conditions hereof or thereof.  Such Debtor is not an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended.

(e)     Absence of Conflicts.  Subject to the Bankruptcy Court's entry of the Financing Orders, the execution and delivery by such Debtor of this Agreement and each other DIP Loan Document to which it is a party and performance by it hereunder and thereunder will not violate any law (including, without limitation, Regulations T, U and X of the Federal Reserve

Board) and will not conflict with or result in a breach of any order, writ, injunction, resolution, decree or other similar document or instrument of any court or Governmental Body or its certificate of incorporation or by-laws or similar constituent documents or create (with or without the giving of notice or lapse of time, or both) a default under or breach of any material agreement, bond, note or indenture, in each case to which it is a party (by successor in interest or otherwise), or by which it is bound or any material portion of its properties or assets is affected, in each case, the effect of which could reasonably be expected to be, have or reflect in a Material Adverse Effect or, except under the DIP Collateral Documents, result in the imposition of any Liens (other than Permitted Liens) of any nature whatsoever upon any of the properties or assets owned by or used in connection with the business of such Debtor.

(f)     DIP Collateral.  From and after the Interim Order Entry Date, the Agent, on behalf of the DIP Lenders, shall have first-priority perfected security interests and DIP Liens in and to all of the DIP Collateral, free and clear of any Liens, and entitled to priority under applicable law, with no financing statements, hypothecations, chattel mortgages, real estate mortgages or similar filings on record with respect to such Debtor or the DIP Collateral anywhere other than such filings in connection with this Agreement, the DIP Collateral Documents or the Permitted Liens.  Each of the representations and warranties made by such Debtor in each DIP Collateral Document to which it is a party is true and correct in all material respects as of each date made or deemed made.

(g)     Material Misstatements and Omissions.  Any projections and pro forma financial information contained in or delivered pursuant to any DIP Loan Document (including the Budget and each Bi-Weekly Budget Report) or any other document, certificate or written statement furnished to the Agent and the DIP Lenders pursuant to any DIP Loan Document are based upon good faith estimates and assumptions believed by such Debtor to be reasonable at the time made.

(h)     Budgets.  All facts in the Budget and each Bi-Weekly Budget Report (when delivered) are accurate in all material respects and such Debtor has disclosed to the Agent and the DIP Lenders all material assumptions in the Budget and each Bi-Weekly Budget Report.  After giving effect to the DIP Loans projected to be made under the Budget, such Debtor believes, in good faith and in the exercise of its commercially reasonable judgment, that it has or will have sufficient capital and funds to pay and satisfy the expenses, obligations and liabilities of such Debtor as set forth, as and when provided to be paid or satisfied, in the Budget.

(i)     Labor Practices.  To the Knowledge of such Debtor, such Debtor is not engaged in any unfair labor practice that could reasonably be expected to have a Material Adverse Effect.

(j)     Employee Benefits.  Each of the Employee Benefit Plans intended to qualify under Section 401 of the Internal Revenue Code so qualifies, and nothing has occurred with respect to the operation of such plan which would cause the loss of such qualification or the imposition of any material liability, penalty or tax under ERISA or the Internal Revenue Code.  All contributions and premiums required by law or by the terms of each Employee Benefit Plan have been timely made.  Neither such Debtor nor its ERISA Affiliates bear any liability for any Pension Plan or Multiemployer Plan and have not had any liability under any Pension Plan or Multiemployer Plan for the last 6 years.

(k)     Environmental Matters.

(i)     There are no Environmental Liabilities at any Relevant Property, which individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(ii)     Such Debtor: (A) has operated its business in compliance with all applicable Environmental Laws; (B) has obtained all Environmental Permits required by applicable Environmental Laws for the ownership and operation of its properties, and all such Environmental Permits are in full force and effect or such Person has made all appropriate filings for issuance or renewal of such Environmental Permits; (C) to its Knowledge, is not aware of any acts, omissions, events or circumstances that may interfere with or prevent continued compliance with the Environmental Laws and Environmental Permits referred to in the preceding clauses (A) and (B); (D) has not received written notice of any asserted or threatened claim, action, suit, proceeding, hearing, investigation or request for information relating to any environmental matter; and (E) has not received notice from any Governmental Body that such Debtor is a potentially responsible party under any Environmental Law at any disposal site containing Hazardous Materials, nor has such Debtor received any notice that any lien under any Environmental Law against any property of such Debtor exists, except for matters in each case of (A) through (E) above, which individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(l)     Insurance.  The policies, binders or self-insurance programs for fire, liability, product liability, workmen's compensation, vehicular and other insurance currently held by or on behalf of such Debtor insure its material properties and business activities against such losses and risks as are reasonably believed to be adequate to protect its properties in accordance with applicable law and customary industry practice.  As of the date hereof, all such policies, binders and self-insurance programs are in full force and effect.  As of the date hereof, such Debtor has not received notice from any insurer or agent of such insurer that substantial capital improvements or other expenditures are required.  As of the date hereof, such Debtor has not received notice of cancellation of any material insurance policy or binder.

(m)     Absence of Events of Default and Material Adverse Effect.  No Default, Event of Default, or Material Adverse Effect exists as of the date of this Agreement.

(n)     Compliance with Laws.  Except as otherwise excused by the Bankruptcy Code, such Debtor has complied, and is in compliance in all respects, with all laws, except for such instances of non-compliance that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(o)     Margin Regulations.  No part of the proceeds of the DIP Loans issued hereunder will be used for the purpose of buying or carrying any Margin Stock or to extend credit to others for the purpose of buying or carrying any Margin Stock, in either case in a manner which would violate or conflict with Regulations T, U or X of the Board of Governors of the Federal Reserve System.  Such Debtor is not engaged in the business of extending credit to others for the

34

purpose of buying or carrying Margin Stock.  Neither the making of the DIP Loans nor any use of proceeds of any such Loans will violate or conflict with the provisions of Regulations T, U or X of the Board of Governors of the Federal Reserve System, as amended from time to time.

(p)     Taxes.  Such Debtor has filed all federal and other material Post-Petition Tax returns required to be filed by it and has not failed to pay any material Post-Petition Taxes, or interest and penalties relating thereto, except for Post-Petition Taxes not yet due and except for those the amount or validity of which is currently being contested in good faith by appropriate proceedings diligently pursued and available to such Debtor and with respect to which adequate reserves have been set aside on its books in accordance with GAAP.

ARTICLE V
AFFIRMATIVE COVENANTS

Section 5.1     Affirmative Covenants of the Debtors.  The Debtors covenant and agree that until payment in full of all DIP Obligations (other than indemnification obligations for which no claim has been made as of the applicable date of determination, which indemnity obligations shall continue in full after payment of all DIP Obligations), the Debtors shall perform all the covenants in this Article V applicable to it:

(a)     Reporting Requirements.  Beginning on the Closing Date, the Debtors shall furnish to the Agent and the DIP Lenders:

(i)     no later than 5:00 p.m. (prevailing Eastern time) on the second Wednesday following the Closing Date and every other week thereafter on Wednesday (or if such Wednesday is not a Business Day), then the immediate succeeding Business Day, the Bi-Weekly Budget Report;

(ii)     at any time the Debtors receive any material written notice from any Governmental Body, the Debtors shall promptly provide a copy of such notice to the Agent and the DIP Lenders upon receipt, and the Debtors shall promptly provide to the Agent and the DIP Lenders copies of all material reports, certificates and notices that the Debtors may provide to any Governmental Body upon receipt;

(iii)     prior written notice of any assumption or rejection of any material contracts pursuant to Section 365 of the Bankruptcy Code;

(iv)     substantially contemporaneously with the filing or distribution thereof, copies of all financial information and other information distributed by or on behalf of any Debtor to the United States Trustee or any creditors' committee; provided the Debtors shall not be required to provide any information relating to the DIP Credit Facility if doing so would violate any applicable legal rule or such information contains privileged information that remains privileged after disclosure to the United States Trustee or the creditors' committee, as applicable;

(v)     as promptly as reasonably practicable from time to time following the Agent's or any DIP Lender's reasonable request therefor, such other information (including historical information) regarding the operations, business

35

affairs and financial condition of the Debtors, the progress of the Chapter 11 Cases or compliance with the terms of any DIP Loan Document.

In addition to the foregoing, the Debtors agree to cooperate with, and to instruct their advisors to cooperate with the Agent and the DIP Lenders and their advisors in connection with the marketing of Debtors' assets. Without limiting the generality of the foregoing, the Debtors shall cause its advisors to participate in calls with the Agent, the DIP Lenders and/or their advisors from time to time and upon request.

(b)     Verification; Site Inspections. The Debtors shall keep true and accurate (in all material respects) books of account in accordance with past practices and shall permit the Agent and the DIP Lenders, or any of their designated representatives, upon reasonable notice and at the expense of the Debtors, during normal business hours to examine the books of account of the Debtors (and to make copies and/or extracts therefrom) and to discuss the affairs, finances, and accounts of the Debtors with, and to be advised as to the same by, the managers, executives, and officers of the Debtors and to be advised as to such or other business records upon the reasonable request of the Agent and the DIP Lenders. The Debtors authorize the Agent, the DIP Lenders, and their agents or representatives to, during normal business hours and with reasonable prior notice, perform inspections of the Operations. Management, advisors, consultants, and senior personnel of the Debtors shall be available upon reasonable advance notice from the Agent and DIP Lenders (or their agents or representatives) for meetings with the Agent, the DIP Lenders, and their agents or representatives during normal business hours with reasonable prior notice and at such reasonable locations.

(c)     Existence; Maintenance of Properties; Compliance with Regulations. The Debtors shall maintain their corporate/entity/legal existence and business, maintain their assets in good operating conditions and repair (subject to ordinary wear and tear and casualty damage and to all provisions of this Agreement permitting sales of certain of the Debtors' assets), keep their businesses and assets insured in accordance herewith, maintain their chief executive offices in the United States, continue to engage in the same or substantially similar lines of business as of the Petition Date, and comply in all respects with all Regulations, including without limitation, ERISA and Environmental Laws, except where a failure to do so could not individually or in the aggregate reasonably be expected to have a Material Adverse Effect.

(d)     Notice of Material Events. The Debtors shall notify the Agent and the DIP Lenders promptly in writing upon an Authorized Officer becoming aware of any of the following: (i) the occurrence of any Default or Event of Default; (ii) any noncompliance with any Environmental Law or proceeding in respect thereof which could reasonably be expected to have a Material Adverse Effect; (iii) any change of chief executive office address of the Debtors; (iv) any pending or, to the Knowledge of the Debtors, threatened litigation or similar proceeding affecting the Debtors not subject to the automatic stay under Section 362 involving claims in excess of $1,000,000 in the aggregate or any material change in any such litigation or proceeding previously reported; (v) claims or liens in excess of $1,000,000 in the aggregate against any assets or properties of the Debtors encumbered in favor of the Agent; and (vi) any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect.

(e)  <u>Further Assurances</u>.

(i)  The Debtors shall cooperate with the Agent and the DIP Lenders, take such action, execute such documents, and provide such information as the Agent or the DIP Lenders may from time to time reasonably request in order to effect the transactions contemplated by and the purposes and intent of the DIP Loan Documents.

(ii)  The Debtors shall promptly, upon request by the Agent or the DIP Lenders, correct, and cause each of the other parties to the DIP Loan Documents to promptly correct, any defect or error that may be discovered in any DIP Loan Document or in the execution, acknowledgment, or recordation of the DIP Loan Document.  Promptly upon request by the Agent or the DIP Lenders, the Debtors shall execute, authorize, acknowledge, deliver, record, file and register, any and all such further acts, deeds, conveyances, documents, security agreements, pledge agreements, mortgages, deeds of trust, trust deeds, assignments, financing statements and continuations, notices of assignment, transfers, certificates, assurances and other instruments as the Agent or the DIP Lenders may require from time to time in order to carry out more effectively the purposes and intent of each DIP Loan Document.  Without limiting the foregoing, the Debtors shall (A) authorize the filing by the Agent of UCC-1 financing statements for all jurisdictions deemed necessary or desirable by the Agent, and (B) take such action from time to time (including, without limitation, authorizing, filing, executing and/or delivering such assignments, security agreements and other instruments) as shall be reasonably requested by the Agent to create, in favor of the Agent, to the extent required under the respective DIP Collateral Documents and to the maximum extent permitted under applicable law, a first-priority perfected Lien in all of the DIP Collateral.

(f)  <u>Controlled Account Agreements</u>.

(i)  The Debtors shall use their commercially reasonable efforts within two (2) weeks after the Closing Date, as may be extended by the Agent in writing, to enter into an account control agreement in form and substance reasonably acceptable to the Agent (each, a "Controlled Account Agreement") as necessary to provide the Agent, to the extent not prohibited by applicable law, with "control" over, except as set forth below, the Deposit Accounts of the Debtors identified on Schedule 5.1(f) to this Agreement (each, a "Controlled Account") as provided for under Section 9-104 of Article 9 of the UCC (or other applicable law) for the purpose of perfecting the security interest which the Agent has in such Deposit Account pursuant to the DIP Collateral Documents.  The Debtors further agree to promptly enter into Controlled Account Agreements for any new Deposit Accounts opened during the DIP Commitment Period, which new Deposit Accounts shall only be opened following notice to, and written consent from, the Agent (acting at the direction of the Required Lenders).  No arrangement contemplated hereby or by any Controlled Account Agreement in respect of any such Deposit Account of the Debtors, shall be modified by the Debtors without the prior written consent of

37

the Agent (acting at the direction of the Required Lenders). For the avoidance of doubt, to the extent that any Deposit Account is subject to an existing Controlled Account Agreement in favor of the Agent as of the Petition Date, the Debtors shall not be required under this Section 5.1(f) to enter into additional Controlled Account Agreements in favor of the Agent with respect to any such Deposit Accounts.

(ii)     Notwithstanding the foregoing, the Debtors shall not be obligated to provide a Controlled Account Agreement solely with respect to the Payroll Account subject to the Debtors' agreement that any amounts to be transferred into the Payroll Account from the Operating Account shall (a) be limited solely to the amounts set forth on the Budget for such payroll period and (b) be funded not more than 48 hours prior to their disbursement on account of such budgeted payroll expenditure.

(iii)    Upon the occurrence and during the continuance of an uncured Event of Default, but subject to the Debtor Default Period Rights, any disbursements of proceeds in any Controlled Account will only be made at the direction of the Agent, provided that authority to make budgeted payments to professionals may not be unreasonably withheld; prior to the occurrence of an Event of Default, the Debtors will have access to any funds on deposit in the Controlled Accounts for use solely in accordance with this Agreement and the other DIP Loan Documents. The Agent assumes no responsibility for the Controlled Accounts, including, without limitation, any claim of accord and satisfaction or release with respect to deposits which any banks accept thereunder. Upon the occurrence and during the continuance of an Event of Default, all remittances which the Debtors receive in payment of any Accounts, and the proceeds of any other DIP Collateral, shall be: (A) kept separate and apart from the Debtors' own funds so that they are capable of identification as the Agent's property; (B) held by the Debtors as trustee of an express trust for the Agent's benefit; and (C) immediately deposited in such accounts designated by the Agent. Upon the occurrence and during the continuance of an Event of Default, but subject to the Debtor Default Period Rights, all proceeds received or collected by the Agent with respect to the Controlled Accounts, and reserves and other property of the Debtors at any time or times hereafter, may be held by the Agent, as the case may be, without interest to the Debtors until all DIP Obligations are paid in full or applied by the Agent on account of the DIP Obligations. The Agent may release to the Debtors such portions of such reserves and proceeds as the Agent may determine, subject to the consent of the Required Lenders. The Agent shall not have any duty to protect, insure, collect or realize upon the Controlled Accounts or to preserve rights in them.

(g)     Insurance. The Debtors shall maintain, at their own expense, and keep in effect with responsible insurance companies, such liability insurance for bodily injury and third-party property damage as the Debtors had in place as of the Closing Date. The Debtors shall keep and maintain, at their own expense, the Debtors' material real and personal property insured against loss or damage by fire, theft, explosion, spoilage, and all other risks, each in the same amount as the Debtors had in place as of the Closing Date. The Agent shall be named as an additional insured and/or loss payee, as applicable, on each such insurance policy.

38

(h)    Information Regarding DIP Collateral.  Each Debtor will furnish to the Agent and the DIP Lenders prompt written notice of any change in (i) any of such Debtor's corporate or entity name or any trade name used to identify it in the conduct of its business or such Debtor's chief executive office, its principal place of business or its jurisdiction of organization, or (ii) such Debtor's federal Taxpayer Identification Number.  Such Debtor will not effect or permit any change referred to in the preceding sentence unless arrangements satisfactory to the Agent have been made to ensure that all necessary filings will be (or have been) made under the UCC and all other actions have been taken that are required so that such change will not at any time adversely affect the validity, perfection or priority of any Liens established under any DIP Loan Document on the DIP Collateral.

(i)    Existence; Conduct of Business.  The Debtors will do or cause to be done all things reasonably necessary to preserve, renew and keep in full force and effect their legal existence and the rights, licenses, permits (including, without limitation, Environmental Permits) privileges, franchises, patents, copyrights, trademarks and trade names material to the conduct of its business, except to the extent that failure to so act, which either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.  The Debtors shall maintain their credit and risk policies substantially as in effect on the Closing Date.

(j)    Payment of Obligations.  Proceeds of the DIP Credit Facility shall be used solely as provided in Section 2.4 of this Agreement.

(k)    Compliance with Laws.  Except as otherwise excused by the Bankruptcy Code, the Debtors will comply with all laws (including, without limitation, all Environmental Laws), rules, licenses, permits, Regulations and orders of any Governmental Body applicable to it or its property, except where failures to do so, in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(l)    Subsidiaries.  Without limitation of the prohibition against forming Subsidiaries under Section 6.1(f) or waiving any Event of Default arising therefrom, if any operating Subsidiary is nonetheless formed or acquired by the Debtors after the Closing Date, the Debtors will, prior to the date upon which such Subsidiary is formed or acquired, notify the Agent and the DIP Lenders thereof and promptly following such formation or acquisition, cause any equity interest in, assets owned or leased by, or Indebtedness owned by or on behalf, of such Subsidiary to be added to the DIP Collateral.  The Agent may require that any such Subsidiary be joined to this Agreement or the DIP Collateral Documents as a borrower or debtor hereunder or thereunder pursuant to joinder agreements in form and substance reasonably satisfactory to the Agent.

(m)    Milestones.  The Debtors shall comply with the Bankruptcy Milestones.

Section 5.2    Affirmative Covenants of the DIP Lenders. The DIP Lenders covenant and agree that within three (3) days of the Amendment Date, they shall deliver to the Debtors a final schedule identifying, in reasonable detail, the Pre-Petition Loan Documents that the DIP Lenders contend evidence or otherwise constitute the Pre-Petition Indebtedness. The DIP Lenders and the Debtors shall thereafter reasonably cooperate in good faith to review and finalize such schedule and, once finalized, such schedule shall be added to this Agreement as Schedule 1.3 and shall

constitute the final, agreed schedule of Pre-Petition Loan Documents reflecting the Pre-Petition Indebtedness. Upon finalization of Schedule 1.3, the Debtors shall be deemed to have represented and warranted that Schedule 1.3 is complete and accurately reflects all Pre-Petition Loan Documents evidencing or otherwise constituting the Pre-Petition Indebtedness. Notwithstanding the foregoing, in the event that any Pre-Petition Loan Document not included in Schedule 1.3 is subsequently identified, the DIP Lenders shall promptly amend Schedule 1.3 to include such Pre-Petition Loan Document, subject to the Debtors' approval, not to be unreasonably withheld. Any amendment shall relate back to the date of this Agreement for all purposes hereunder. The Debtors shall not assert any claim, challenge, or defense against the DIP Lenders based on the omission of any Pre-Petition Loan Document from Schedule 1.3 prior to its amendment.

## ARTICLE VI
### NEGATIVE COVENANTS/BUDGET COMPLIANCE

Section 6.1    Negative Covenants.  The Debtors covenant and agree that until all of the DIP Obligations (other than indemnification obligations for which no claim has been made as of the applicable date of determination, which indemnity obligations shall continue in full after payment of all DIP Obligations) have been paid or satisfied in full, the Debtors shall perform all covenants in this Section 6.1 applicable to them:

(a)    Indebtedness.  The Debtors shall not incur, create, assume, become or be liable in any manner with respect to, or permit to exist, any Indebtedness, or guarantee, assume, endorse, or otherwise become responsible for (directly or indirectly), any Indebtedness, performance, obligations or dividends of any other Person, except (the Indebtedness described in the following clauses, the "Permitted Indebtedness"):

(i)    the DIP Obligations;

(ii)    the Pre-Petition Indebtedness, including the Dacian Claims and/or the National Founders Claims;

(iii)    the Pre-Petition Advances;

(iv)    Indebtedness, including Post-Petition administrative expenses, incurred in the ordinary course of the Debtors' Operations and in compliance with the Budget; provided that such Indebtedness remains at all times unsecured except as provided in Section 6.1(b); and

(v)    Indebtedness related to any litigation which was filed prior to the date of this Agreement.

(b)    Liens.  The Debtors shall not create or incur any Liens on any of the property or assets of the Debtors, except (the Liens described in the following clauses, the "Permitted Liens"):

(i)    the DIP Liens of the Agent securing the DIP Obligations;

(ii)     Liens securing the Pre-Petition Indebtedness (including the Dacian Claims and/or the National Founders Claims), including the Liens granted pursuant to the New Pre-Petition Advance Note, the Dacian Pre-Petition Loan Documents, the National Founders Pre-Petition Loan Documents, and/or the Financing Orders and other Liens existing on the date hereof;

(iii)     Liens securing the payment of Taxes, assessments, or other governmental charges or levies either not yet overdue or the validity of which are being contested in good faith by appropriate proceedings diligently pursued and available to the Debtors and with respect to which adequate reserves have been set aside on its books;

(iv)     non-consensual statutory Liens (other than Liens securing the payment of Taxes) arising in the ordinary course of the Debtors' businesses to the extent:  (A) such Liens secure Indebtedness which is not overdue; or (B) such Liens secure Indebtedness relating to claims or liabilities which are fully insured and being defended at the sole cost and expense and at the sole risk of the insurer or being contested in good faith by appropriate proceedings diligently pursued by the Debtors, in each case prior to the commencement of foreclosure or other similar proceedings and with respect to which adequate reserves have been set aside on its books;

(v)     zoning and land use restrictions, easements, encumbrances, licenses, covenants, and other restrictions affecting the use of real property which do not interfere in any material respect with the use of such real property or ordinary conduct of the business of the Debtors as presently conducted thereon or materially impair the value of the real property which may be subject thereto;

(vi)     purchase money security interests in Equipment (including Capital Leases) to secure Indebtedness permitted under Section 6.1(a) hereof;

(vii)     pledges and deposits of cash by the Debtors after the date hereof in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security benefits consistent with the current practices of the Debtors as of the date hereof; and

(viii)     liens arising from (A) operating leases and the precautionary UCC financing statement filings in respect thereof, and (B) Equipment or other materials which are not owned by the Debtors located on the premises of the Debtor (but not in connection with, or as part of, the financing thereof) from time to time in the ordinary course of business and consistent with current practices of the Debtors and the precautionary UCC financing statement filings in respect thereof.

(c)     Investments. The Debtors shall not make any Investments other than Investments in: (i) marketable obligations of the United States maturing within one (1) year; (ii) certificates of deposit, bankers' acceptances and time and demand deposits of United States banks having total assets in excess of $1,000,000,000 or other similar cash equivalents; and (iii) existing

Investments on the Closing Date shown on the Budget or financial statements (each of (i) through (iii) above, a "Permitted Investment.

(d)    Mergers; Asset Sales.  Other than any disposals of obsolete, worn out or surplus property and the license or sublicense of intellectual property, the Debtors shall not, without the written consent of the Agent and the Required Lenders, (i) consummate a merger, amalgamation or consolidation, (ii) enter into any asset purchase agreement, (iii) purchase, sell, lease or otherwise dispose of assets other than inventory in the ordinary course, (iv) make any changes in the corporate structure or identity of the Debtors which could reasonably be expected to have a Material Adverse Effect or adversely impair in any material respect the guarantee and collateral provisions hereof and in the Security Agreement, or (v) enter into any binding agreement to do any of the foregoing, provided, however, the Debtors may seek Bankruptcy Court authority to enter into asset purchase agreements so long as the sale(s) contemplated thereby will be subject to Bankruptcy Court approved bidding procedures (which bidding procedures shall be subject to the prior written consent of the Required Lenders, which consent shall not be unreasonably withheld), and upon approval by the Bankruptcy Court, the Debtors may enter into asset purchase agreements and consummate Asset Sales in accordance with such bidding procedures and subject to Bankruptcy Court approval.

(e)    Restricted Payments.  The Debtors shall not directly or indirectly, declare, order, pay, make, or set apart any sum for any Indebtedness other than the DIP Obligations or the Pre-Petition Indebtedness or any other payments permitted by the Bankruptcy Court subject to the Budget.

(f)    Subsidiaries.  The Debtors shall not form, or cause to be formed, any Subsidiary without the written consent of the Agent and the Required Lenders.

(g)    Chapter 11 Claims.  Except as provided in the Financing Orders, the Debtors will not incur, create, assume, suffer to exist, or permit any other superpriority expense claim under Section 364 of the Bankruptcy Code or any Liens which are senior to or *pari passu* with, the Liens securing the DIP Obligations.

Section 6.2    Budget Compliance.  The Debtors shall comply with the Budget (subject to the permitted variances provided in the next immediate sentence), and shall not make any payments, or incur any obligations or liabilities, that are not projected and provided for in the Budget; provided, however, that the cash receipts and disbursements of SuttonPark Capital LLC, SuttonPark Servicing LLC, and its Subsidiaries, which are not otherwise captured in the Budget and who are not recipients of New Pre-Petition Advances, may use such receipts to fund operations in the ordinary course of their businesses.  The Debtors (i) shall not permit payments for any Measuring Period (as defined below) to exceed one hundred ten percent (110%) of the respective amounts, measured on an aggregate basis, as set forth for such Measuring Period; provided that the Debtors shall not permit expenditures for estate professional fees to exceed one hundred percent (100%) of the amount allocated for such expenditures in the Budget for such Measuring Period (but notwithstanding anything to the contrary set forth in the Interim Order or this Agreement, the Debtors may incur estate professional fees and expenses that exceed the amount in the Budget and any favorable variance from a Measuring Period may be used to pay professional fees and expenses incurred in a different Measuring Period), and (ii) shall not permit receipts for

such Measuring Period to be less than ninety percent (90%) of the amounts, on an aggregate basis, set forth for such Measuring Period. These variances (the "Variances") shall be measured and tested every other week based on a rolling four-week period (the "Measuring Period"); provided, however, that the first Measuring Period shall be for the period from the Petition Date to the date that is approximately two weeks thereafter. The Debtors may, at any time, amend or reforecast the Budget, either for the period covered by the Budget or for any period thereafter, and the Agent and the DIP Lenders may approve or not approve such amendment in their sole and absolute discretion. If the Debtors exceed any line item in the Budget by at least $50,000, they shall include an explanation for such variance in the Bi-Weekly Budget Report.

ARTICLE VII
INCREASED COSTS; TAXES; SET OFF; ETC.

Section 7.1    Taxes; Withholdings.

(a)    Payments to be Free and Clear. Except as otherwise required under this Section 7.1, all sums payable by the Debtors hereunder and under the other DIP Loan Documents shall (except to the extent required by law) be paid free and clear of, and without any deduction or withholding on account of, any Tax (other than an Excluded Tax) imposed, levied, collected, withheld or assessed by or within the United States of America or any political subdivision in or of the United States of America or any other jurisdiction from or to which a payment is made by or on behalf of the Debtors or by any federation or organization of which the United States of America or any such jurisdiction is a member at the time of payment.

(b)    Withholding of Taxes. If the Debtors are required by law to make any deduction or withholding on account of any such Tax from any sum paid or payable by the Debtors to the DIP Lenders in the ordinary or general conduct of business: (i) the Debtors shall notify the Agent and the DIP Lenders of any such requirement or any change in any such requirement as soon as the Debtors become aware of it; (ii) the Debtors shall pay any such Tax before the date on which penalties attach thereto, such payment to be made (if the liability to pay is imposed on Debtors) for their own account or (if that liability is imposed on the DIP Lenders) on behalf of and in the name of the DIP Lenders, (iii) if such Tax is an Indemnified Tax, the sum payable by the Debtors in respect of which the relevant deduction, withholding or payment is required shall be increased to the extent necessary to ensure that, after the making of that deduction, withholding or payment, the DIP Lenders, as the case may be, receive an amount equal to what they would have received had no such deduction, withholding or payment been required or made, and (iv) within thirty (30) days after paying any sum from which they are required by law to make any deduction or withholding, and within thirty (30) days after the due date of payment of any Tax which they are required by clause (ii) above to pay, the Debtors shall deliver to the Agent and the DIP Lenders evidence satisfactory to the other affected parties of such deduction, withholding or payment and of the remittance thereof to the relevant taxing or other authority.

(c)    Taxpayer Identification. Upon the reasonable request of the Debtors, the DIP Lenders shall deliver to the Debtors two (2) properly completed and duly executed copies of United States Internal Revenue Service Form W-9 (certifying that the DIP Lenders are entitled to an exemption from U.S. backup withholding tax) or any successor form on or before the date the DIP Lenders become parties hereto. Upon the reasonable request of the Debtors, the DIP Lenders

43

also agree to deliver to the Debtors two (2) further copies of said Form W-9, properly completed and duly executed, on or before the date that any such form expires or becomes obsolete or after the occurrence of any event requiring a change in the most recent form previously delivered by them to the Debtors, and such extensions or renewals thereof as may reasonably be requested by the Debtors, unless in any such case an event (including, without limitation, any change in treaty, law or regulation) has occurred prior to the date on which any such delivery would otherwise be required that renders all such forms inapplicable or that would prevent the DIP Lenders from duly completing and delivering any such form with respect to them and the DIP Lenders so advise the Debtors.

Section 7.2 Right of Set Off. In addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, upon the occurrence and during the continuance of any Event of Default, the Agent, at the direction of the Required Lenders, is hereby authorized by the Debtors at any time or from time to time, without notice to the Debtors (except as expressly set forth in the Financing Orders) or to any other Person, any such notice being hereby expressly waived, to set off and to appropriate and to apply any and all deposits (general or special, including Indebtedness evidenced by certificates of deposit, whether matured or unmatured, but not including trust accounts) and any other Indebtedness at any time held or owing by the DIP Lenders are to or for the credit or the account of the Debtors against and on account of the DIP Obligations of the Debtors to the DIP Lenders hereunder, irrespective of whether or not (i) the DIP Lenders shall have made any demand hereunder, or (ii) the principal of or the interest on the DIP Loans or any other amounts due hereunder or the other DIP Loan Documents shall have become due and payable and although such obligations and liabilities, or any of them, may be contingent or unmatured; provided that the Agent shall notify the Debtors promptly upon the exercise of any set-off and the appropriation and application made by the DIP Lenders, but the failure to give such notice shall not affect the validity of such set-off and application.

ARTICLE VIII
EVENTS OF DEFAULT

Section 8.1 Events of Default. Any one or more of the following events which shall occur and be continuing, subject to the Debtors' right to cure as set forth in Section 8.2, shall constitute an "Event of Default":

(a) Failure to Make Payments When Due. Failure by the Debtors to pay any of the DIP Obligations, including failure by the Debtors to pay any principal thereof or interest thereon, as and when due, whether at stated maturity, by acceleration, by mandatory prepayment or otherwise, or any other amount due hereunder and set forth in the Budget;

(b) Failure to Make Adequate Protection Payments. Failure by the Debtors to timely pay to the Pre-Petition Lenders any and all adequate protection payments in accordance with the Financing Orders;

(c) Breach of Certain Covenants. Failure by the Debtors to perform or comply with any material term or condition contained in Section 2.3, Article V, or Article VI, including, without limitation, failure to meet or comply with the terms of the Budget (including permitted variances) or to timely achieve the Bankruptcy Milestones, and such Default shall not have been

44

remedied by the Debtors (to the extent possible) or waived by the Required Lenders within seven (7) days after the earlier of (i) the date upon which an Authorized Officer of the Debtors had Knowledge of such default, and (ii) the date upon which notice thereof is given to the Debtors by the Agent;

(d)     Breach of Representations.  Any representation, warranty, certification, or other written statement made or deemed made by the Debtors in any DIP Loan Document or in any statement or certificate given by the Debtors in writing in connection with any DIP Loan Document shall be false in any material respect as of the date made or deemed made;

(e)     Other Defaults Under DIP Loan Documents.  The Debtors shall default in the performance of or compliance with any term contained in any of the DIP Loan Documents, other than any such term referred to in any other section of this Section 8.1, and such default shall not have been remedied or waived within seven (7) days after the earlier of (i) the date upon which an Authorized Officer of the Debtors had Knowledge of such default, and (ii) the date upon which notice thereof is given to the Debtors by the Agent;

(f)     Conversion or Dismissal of Case.  (i) The entry of a final order dismissing the Chapter 11 Cases which does not contain a provision for termination of this Agreement, and payment in full in cash of all Obligations upon entry of such order dismissing the Chapter 11 Cases (other than contingent indemnification obligations for which no claim has been made) or converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or the Debtors file a motion or other pleading seeking entry of such an order or support or fail to timely oppose such dismissal or conversion; or (ii) the entry of a final order whereby a trustee, responsible officer or an examiner having expanded powers under Bankruptcy Code Section 1104 (other than (a) a fee examiner or (b) for purposes of an investigation pursuant to Sections 1106(a)(3) and (4) of the Bankruptcy Code) is appointed or elected in the Chapter 11 Cases, or the Debtors apply for, consent to, support, acquiesce in or fail to promptly oppose, any such appointment, or the Bankruptcy Court shall have entered an order providing for such appointment, in the case of each of clauses (i) and (ii), without the prior written consent of the Agent (acting at the direction of the Required Lenders);

(g)     Challenges.  Provided that there is sufficient professional fee and expense funding under the Budget, the Debtors take any action to or fail to take all reasonable actions necessary to oppose any action by any other Person (including but not limited to): (i) challenging the standing of such party to bring any such action, (ii) filing pleadings, providing evidentiary support, and appearing in court to support and present the same in opposition of such party's action, and (iii) timely prosecuting all available appeals of any order or decision authorizing such party's actions or approving relief granted to such party or timely opposing all appeals of (or attempts to appeal) any decision denying standing or relief to such party to (a) impair any of the material rights and remedies of the Agent and the DIP Lenders under the DIP Loan Documents, (b) avoid, subordinate, disallow, or require disgorgement by the Agent and the DIP Lenders of any amount received in respect of the DIP Obligations (including the Dacian Claims and/or the National Founders Claims), or (c) challenge the rights, liens or claims of the Pre-Petition Lenders (or any of their Affiliates) (including Dacian and/or National Founders and any of their respective Affiliates) related to the Pre-Petition Indebtedness (including the Dacian Claims and/or the National Founders Claims), the Pre-Petition Advances and/or the Pre-Petition Collateral

45

(including the Dacian Pre-Petition Collateral and/or the National Founders Pre-Petition Collateral);

(h)     DIP Loan Documents Impaired.  At any time after the execution and delivery thereof, (i) this Agreement or any DIP Loan Document ceases to be in full force and effect (other than by reason of a release of DIP Collateral in accordance with the terms hereof or thereof or the satisfaction in full of the DIP Obligations in accordance with the terms hereof) or shall be declared null and void, or the Agent shall not have or shall cease to have a valid and perfected first priority Lien in any portion of the DIP Collateral purported to be covered by the DIP Collateral Documents subject only to liens permitted under the Financing Orders, or (ii) the Debtors shall contest the validity or enforceability of any DIP Loan Document in writing or deny in writing that it has any further liability under any DIP Loan Document to which it is a party;

(i)     Liens.  At any time after the execution and delivery thereof, the DIP Liens created by the DIP Collateral Documents shall not constitute a valid and perfected first priority Lien on the DIP Collateral intended to be covered thereby (to the extent perfection by filing, registration, recordation or possession is required herein or therein) in favor of the Agent, free and clear of all other Liens (other than Permitted Liens), or, except for expiration in accordance with its terms, any of the DIP Collateral Documents shall for whatever reason be terminated or cease to be in full force and effect, or the enforceability thereof shall be contested by the Debtors;

(j)     Condemnation or Forfeiture of DIP Collateral.  Any judicial process, condemnation or forfeiture proceeding is brought against any material item or material portion of the DIP Collateral or any rights therein shall be subject to such judicial process, condemnation, or forfeiture proceeding, in each case which is not stayed in the Chapter 11 Cases by the Bankruptcy Code;

(k)     Pre-Petition Payments.  The Bankruptcy Court orders the Debtors to pay or the Debtors make any material Pre-Petition Payment which is not permitted under the Budget;

(l)     Government Restraint.  Any Governmental Body, by a final, non-appealable order, ruling or other action, shall prevent the Debtors from conducting any material part of the Debtors' businesses, to the extent such prevention could reasonably be expected to result in a Material Adverse Effect;

(m)     Operating Licenses.  The loss, revocation, or termination of any license, permit, lease, or agreement necessary or material to the Debtors' businesses, or the cessation of any material part of the Debtors' businesses, to the extent such loss, revocation, or termination could reasonably be expected to result in a Material Adverse Effect taken as a whole;

(n)     Relief from Automatic Stay.  The Bankruptcy Court shall enter an order granting relief from the automatic stay to any creditor or party in interest (i) to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any material assets of the Debtors, or (ii) to permit other actions that the Agent (acting at the direction of the Required Lenders) deems to have a Material Adverse Effect;

(o)     Bankruptcy Milestones.  The Debtors shall fail to provide the following draft documents, each in form and substance satisfactory to the DIP Lenders, in their sole

discretion, by the dates set forth below, or shall take such actions with regard to the Chapter 11 Cases unless such dates are otherwise extended by the Debtors and Agent in writing at the direction of the Required Lenders (collectively, the "Bankruptcy Milestones"):

(i)      On the Petition Date, the Debtors shall have filed (i) the Motion seeking approval of the Interim and Final Orders in form and substance acceptable to the DIP Lenders in all respects and (ii) such other "first day" pleadings and related filings reasonably necessary for the commencement of the Chapter 11 Cases.

(ii)     Within two (2) days following the Petition Date, the Debtors shall file a motion and any other reasonably necessary and appropriate pleadings and documents seeking to transfer venue of that certain involuntary petition filed against 777 Partners LLC in the United States Bankruptcy Court for the Southern District of Florida (the "SD Fla Case") so as to consolidate venue of the Debtors' cases before this Court.

(iii)    Within five (5) days following the Petition Date, the Bankruptcy Court shall have entered the Interim Order, which shall be in full force and effect and shall not have been (i) vacated, reversed, or stayed, or (ii) amended or modified except as otherwise agreed to in writing by Agent (acting at the direction of the Required Lenders).

(iv)     On or before September 1, 2026, the Debtors shall provide to the DIP Lenders a term sheet detailing the material terms and conditions of their Chapter 11 Plan, in form and substance satisfactory to the Required Lenders in their sole discretion.

(v)      Within thirty (30) days following the Petition Date, entry of an order directing transfer of the SD Fla Case to this Court for consolidation with the Chapter 11 Cases, or otherwise resolving the pendency of the SD Fla Case on terms reasonably satisfactory to the Required Lenders.

(vi)     Within thirty-five (35) days following the Petition Date, entry of the Final Order in form and substance acceptable to the Required Lenders in all respects, which Final Order shall be in full force and effect, shall be final and binding with respect to all of the Debtors (including, for the avoidance of doubt, the Subsequent Debtors) and shall not have been (i) vacated, reversed, or stayed, or (ii) amended or modified except as otherwise agreed to in writing by Agent with the consent of the Required Lenders.

(vii)    Within forty (40) days following the Petition Date, the Debtors shall deliver to the DIP Lenders of a complete set of all documents comprising the proposed Chapter 11 Plan, in form and substance satisfactory to the Required Lenders in their sole discretion.

(viii)   Within fifty-five (55) days following the Petition Date, the Debtors shall have filed in the Bankruptcy Court the Chapter 11 Plan and associated

Disclosure Statement (the "Disclosure Statement") along with a motion seeking, among other things, approval of the Disclosure Statement and approval of solicitation procedures and to set a hearing for confirmation of the Plan.

(ix)     Within ninety (90) days following the Petition Date, entry by the Bankruptcy Court of the order approving the Disclosure Statement, approving solicitation procedures, and setting a hearing to consider confirmation of the Chapter 11 Plan, in form and substance acceptable to the Required Lenders.

(x)     Within one hundred thirty (130) days following the Petition Date, the Debtors shall have obtained entry by the Bankruptcy Court of the order confirming the Plan (the "Confirmation Order"), in form and substance acceptable to the Required Lenders.

(xi)     Not later than fourteen (14) days following entry of the Confirmation Order, the effective date of the Chapter 11 Plan shall have occurred.

(p)     Financing Orders. The Interim Order and the Final Order, each in form and substance satisfactory to the DIP Lenders, in their sole discretion, are not entered by the Bankruptcy Court by seven (7) days after the Petition Date or thirty-five (35) days after the Petition Date, respectively, or the Debtors shall fail to comply with, or there is otherwise any material breach or default of, the Financing Orders or any other order of the Bankruptcy Court or any order shall be entered reversing, amending, supplementing, staying, vacating or otherwise modifying in any material respect the Financing Orders without the prior written consent of the Agent at the direction of the Required Lenders;

(q)     Judgments. Any uninsured judgments as to any Post-Petition obligation shall be rendered against the Debtors and the enforcement thereof shall not be stayed (by operation of law, the rules or orders of a court with jurisdiction over the matter or by consent of the party litigants), or there shall be rendered against the Debtors a nonmonetary judgment with respect to a Post-Petition event, in each case which causes or would reasonably be expected to cause a Material Adverse Effect; or

(r)     Material Impairment. The filing of a motion, pleading or proceeding by the Debtors which could reasonably be expected to result in a material impairment of the rights or interests of the Agent and the DIP Lenders under the DIP Loan Documents or the Financing Orders or a determination by a court with respect to a motion, pleading or proceeding brought by another party which results in such a material impairment.

Section 8.2     Notice and Opportunity to Cure.

(a)     Notice. The Agent shall provide written notice to the Debtors of any Event of Default arising under Section 8.1 (each, an "EOD Notice"). Each EOD Notice shall specify in reasonable detail the nature of the Event of Default and the applicable subsection of Section 8.1 under which it arises.

(b)     Cure Period and Contest Right. The Debtors shall have five (5) business days after receipt of an EOD Notice (the "Cure Period") to:

48

(i)  cure the Event of Default identified therein; provided that (i) no Cure Period shall apply with respect to any Event of Default arising under Section 8.1(f) (Conversion or Dismissal of Case), Section 8.1(h) (DIP Loan Documents Impaired), or Section 8.1(p) (Financing Orders), each of which shall constitute an immediate Event of Default upon the occurrence thereof without the requirement of notice or the passage of any cure or grace period; or

(ii)  deliver written notice to the Agent (a "Contest Notice") contesting the existence or validity of such Event of Default, which Contest Notice shall set forth in reasonable detail the factual and legal basis for such contest; provided that the Debtors shall not be entitled to deliver more than one Contest Notice with respect to any single Event of Default or any substantially similar Event of Default arising from the same or substantially similar facts or circumstances.

The Cure Period shall not be subject to extension, tolling, or suspension for any reason (other than by written consent of the Agent (acting at the direction of the Required Lenders)), including without limitation by reason of the commencement of any contest proceeding under Section 8.2(c) below. For the avoidance of doubt, the cure or contest of one Event of Default shall not preclude the Agent from issuing a subsequent EOD Notice with respect to a separate or recurring Event of Default, even if arising under the same subsection of Section 8.1.

(c)  Contest Period.  If the Debtors deliver a timely Contest Notice, the Debtors shall have an additional period not to exceed five (5) business days after delivery of the Contest Notice (the "Contest Period") in which to resolve the contested Event of Default to the reasonable satisfaction of the Required Lenders. The Contest Period shall not be subject to extension or renewal (other than by written consent of the Agent at the direction of the Required Lenders), and the delivery of a Contest Notice shall not restart or extend the Cure Period.

(d)  Deemed Event of Default. If the Debtors fail to cure the Event of Default within the Cure Period, or if the Debtors deliver a Contest Notice and fail to resolve the contested Event of Default to the reasonable satisfaction of the Required Lenders by the expiration of the Contest Period, then, in either case, an Event of Default shall be deemed to have occurred and be continuing for all purposes of this Agreement and the other DIP Loan Documents without further notice or demand, and the Agent, at the direction of the Required Lenders, may immediately exercise any and all remedies available under Section 8.3.

(e)  Reservation of Rights During Cure and Contest Periods. During the pendency of the Cure Period and any Contest Period: (i) the DIP Lenders shall have no obligation to make any DIP Loans or fund any DIP Commitment; (ii) unless the Debtors successfully contest such Event of Default within the Contest Period, default interest shall accrue at the rate set forth in Section 2.6(c) from and after the date of the EOD Notice; (iii) the Agent's right to (acting at the direction of the Required Lenders) declare a termination of the DIP Commitment and to accelerate the DIP Obligations under Section 8.3 shall be suspended solely during the applicable Cure Period or Contest Period, as the case may be, but all other rights and remedies of the Agent and the DIP Lenders (including, without limitation, the right to cease funding, the right to charge default interest, and the right to exercise setoff rights under Section 7.2) shall not be impaired, delayed, or otherwise affected; and (iv) neither the delivery of an EOD Notice, the running of a Cure Period,

nor the pendency of any Contest Period shall constitute a waiver of the Agent's or the DIP Lenders' rights or remedies with respect to the applicable Event of Default or any other Default or Event of Default.

Section 8.3 Remedies. Subject to the Financing Orders and Section 8.2, upon the occurrence of an uncured Event of Default then: (i) the Agent may, at the direction of the Required Lenders, and by written notice to the Debtors, take any or all of the following actions, at the same or different times, in each case without further order of or application to the Bankruptcy Court (subject to the proviso set forth in the last sentence of this paragraph): (a) declare the DIP Commitment terminated, whereupon the DIP Commitments of the DIP Lenders shall forthwith terminate immediately; (b) declare and otherwise accelerate the principal of and any accrued interest in respect of all New Pre-Petition Advances and/or the DIP Loans and any promissory notes evidencing the foregoing (to include, without limitation, the New Pre-Petition Advance Note) and all other DIP Obligations owing with respect thereto hereunder and thereunder to be, whereupon the same shall become, forthwith immediately due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Debtors; and (c) enforce all of the DIP Liens and security interests created pursuant to the DIP Collateral Documents securing DIP Obligations owing to the DIP Lenders in accordance with applicable Regulations; and (ii) in addition to the foregoing, upon the occurrence of an uncured Event of Default, the Agent may, at the direction of the Required Lenders, (a) exercise any right of counterclaim, setoff, banker's lien or otherwise which it may have with respect to money or property of the Debtors, (b) bring any lawsuit, action or other proceeding permitted by law for the specific performance of, or injunction against any violation of, any DIP Loan Document and may exercise any power granted under or to recover judgment under any DIP Loan Document, and (c) exercise any other right or remedy permitted by applicable Regulations or otherwise available to the Agent at law, in equity or otherwise. With respect to the enforcement of DIP Liens or other remedies with respect to the DIP Collateral under the preceding clause (i)(c) or (ii)(c), the Agent shall provide the Debtors with seven (7) days' written notice prior to taking the action contemplated thereby; provided that, in any hearing after the giving of the aforementioned notice, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an uncured Event of Default has occurred and is continuing, and the Debtors shall not be entitled to seek relief to the extent that such relief would in any way impair or restrict the rights and remedies of the Agent as set forth herein and in the Financing Orders; and provided further that the DIP Lenders shall be under no obligation to fund any DIP Loans during the pendency of such seven (7) day period.

Section 8.4 Remedies Cumulative. No remedy herein conferred upon the Agent is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or any other provision of law.

Section 8.5 Application of Proceeds. The Agent shall apply any proceeds from its pursuit of any remedy first to costs, fees and expenses provided for herein, then to principal on the New Money Loan which is due and outstanding, and then to interest on the DIP Obligations which is due and outstanding.

ARTICLE IX
MISCELLANEOUS

Section 9.1    Amendments and Waivers.

(a)    General Amendments and Waivers.  Subject to Section 9.3, no amendment, modification, termination (other than pursuant to the express terms of the DIP Loan Documents) or waiver of any provision of the DIP Loan Documents, or consent to any departure by the Debtors therefrom, shall be effective without the written consent of the Agent and the Required Lenders.

(b)    Additional Guarantors.

(i)    Additional persons or entities may become Guarantors under this Agreement after the Closing Date upon the execution and delivery of an addendum in the form attached hereto as **Exhibit D** (the "Joinder"). Upon the execution of a Joinder and its delivery to the Agent and DIP Lenders, the Additional Guarantor shall be deemed a Guarantor for all purposes of this Agreement with the same force and effect as if originally named herein. Unless otherwise waived by the Agent in writing pursuant to the direction of the Required Lenders, the Debtors will cause any Subsequent Debtor that files a Chapter 11 Case to promptly execute a Joinder.

(ii)    Subject to the Financing Orders, for any Debtor who executes a Joinder after the Interim Order Entry Date, the Debtors shall file a notice with the Bankruptcy Court (x) updating Schedule 1.2 hereof (if and as needed) and setting forth the names of  any Subsequent Debtor that has executed a Joinder and become an Additional Guarantor, and (y) setting forth the Challenge Period with respect to such Subsequent Debtor as it relates to (among other things) the effect of the Debtors' Stipulations, as such term is defined in the Interim Order, and/or the Releases provided hereunder or otherwise under the Financing Orders, which Challenge Period shall commence as of the applicable Subsequent Petition Date through and including thirty (30) days thereafter, and shall operate in the same manner set forth in Paragraph 28 of the Interim Order. For the avoidance of doubt, the resulting commencement of a new Challenge Period after the execution of a Joinder by any Subsequent Debtor shall have no effect upon the duration of any existing Challenge Period (or the effect of the expiration thereof) with respect to any other Debtor, whether an Initial Debtor or otherwise.

(c)    Effect of Notices, Waivers or Consents.  Any waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given.  No notice to or demand on Debtors in any case shall entitle the Debtors to any other or further notice (except as otherwise specifically required hereunder or under any of the DIP Loan Documents) or demand in similar or other circumstances.  Any amendment, modification, termination, waiver, or consent effected in accordance with this Section 9.1 shall be binding upon the Agent, the DIP Lenders and the Debtors.

Section 9.2    Notices.  All notices, requests, demands and other communications to any party or given under any DIP Loan Document (collectively, the "Notices") will be in writing and

51

delivered personally, by overnight courier or by registered mail to the parties at the following address or sent by electronic transmission (with confirmation of transmission), to the address specified below (or at such other address as will be specified by a party by like notice given at least five (5) calendar days prior thereto):

(a)     If to the Debtors, at:

777 Partners LLC and 600 Partners LLC
Attn: Legal Department
5850 San Felipe, Suite 500
Houston, Texas 77057
Email: legalnotices@777part.com

with a copy sent contemporaneously by email to (which shall not constitute notice)

GLASSRATNER ADVISORY & CAPITAL GROUP LLC
Attn: Mark Shapiro
Email: mshapiro@glassratner.com

SMITH GAMBRELL & RUSSELL LLP
Attn:   Shelly A. DeRousse
        Elizabeth L. Janczak
Email: sderousse@sgrlaw.com
        ejanczak@sgrlaw.com

(b)     If to the Agent, AAV2024, ACH, and/or Haymarket:

c/o ACM Delegate LLC
1180 Avenue of the Americas, 21st Floor
New York, NY 10036
Email:  legal@acap.com

with a copy sent contemporaneously by email to (which shall not constitute notice):

Email:  fmayer@acap.com
        jgettman@acap.com

- and –

CROKE FAIRCHILD DUARTE & BERES LLC
Attn:   Rob Isham
        Drew Beres
Email:  risham@crokefairchild.com
        dberes@crokefairchild.com

52

- and -

GOLDSTEIN & MCCLINTOCK LLLP
Attn:   Matthew E. McClintock
        Joshua M. Grenard
        Ainsley G. Moloney
Email: mattm@goldmclaw.com
        joshuag@goldmclaw.com
        ainsleym@goldmclaw.com

(c)     If to Dacian:

Dacian Master Fund LP
Attn: Scott D. Matthews
10201 N. Illinois St., Suite 280
Carmel, Indiana 46290
Email: scott.matthews@sterlinglifeco.com

- and -

MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO, P.C.
Attn:   Frank J. Earley
        Kaitlin R. Walsh
        Dormie Ko
Email: FJEarley@mintz.com
        KRWalsh@mintz.com
        DKo@mintz.com

(d)     If to National Founders :

National Founders LP
P.O. Box 1073
Wilmington, DE 19899
Attn:   General Counsel
Email: general.counsel@credigy.com

with a copy sent contemporaneously by email to (which shall not constitute notice):

Credigy Solutions Inc.
3715 Davinci Ct., Suite 200
Norcross, GA 30092
Attn:   General Counsel
Email: general.counsel@credigy.com

and:

SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60515
Attention:  Matthew Clemente and Mark Werner
Email:  mclemente@sidley.com; mwerner@sidley.com

All Notices will be deemed delivered when actually received.  Each of the parties will hereafter notify the other in accordance with this Section of any change of address or email address to which notice is required to be mailed.

Section 9.3    Voting.

(a)    Except as provided in Section 9.3(c) and (d) hereof, all amendments and waivers with respect to the DIP Credit Facility require the approval of Required Lenders.

(b)    Any acceleration, enforcement, exercise of remedies, mandatory prepayment or other creditor decisions with respect to an Event of Default will require the approval of the Required Lenders.

(c)    The consent of each DIP Lender directly and adversely affected thereby shall be required with respect to amendments and waivers customarily requiring each lender's consent, including but not limited to, (1) increases in commitments, (2) reductions of principal, interest or fees, (3) extensions of final maturity of loans or commitments or extensions of time of payment for interest or fees and (4) changes in pro rata sharing and waterfall provisions.

(d)    The consent of 100% of the DIP Lenders shall be required with respect to amendments and waivers customarily requiring all lenders' consent, including but not limited to, (1) modifications to Section 9.1, this Section 9.3, or any of the voting provisions applicable to the DIP Lenders including, without limitation, the requirement that any rights or consideration in respect of any rights offerings, backstops, rights to purchase equity or provide other financing, major asset sales and any similar matters (excluding, for the avoidance of doubt, in connection with any normal day-to-day operational decisions made by the Debtors) offered to any DIP Lender in any capacity shall be offered to all DIP Lenders and no DIP Lender shall be offered any rights or consideration in respect of any rights offerings, backstops, rights to purchase equity or provide other financing, major asset sales and any similar matters (excluding, for the avoidance of doubt, in connection with any normal day-to-day operational decisions made by the Debtors) in any capacity unless such rights or consideration are offered to all DIP Lenders, (2) a release of all or substantially all of the guarantees or collateral, and (3) subordination of all or substantially all of the guarantees or liens.

Section 9.4    Enforceability; Successors and Assigns.

(a)    Enforceability; Successors and Assigns.  This Agreement will be binding upon and inure to the benefit of and is enforceable by the respective successors and permitted assigns of the parties hereto (and, with respect to the provisions applicable to them, to the Pre-Petition Lenders and/or the ACAP Holdco Lenders and their respective Affiliates).

54

(b)    Assignment by Debtors. This Agreement may not be assigned by the Debtors hereto without the prior written consent of the Agent and each of the DIP Lenders. Any assignment or attempted assignment in contravention of this Section 9.4(a) will be void *ab initio* and will not relieve the assigning party of any obligation under this Agreement.

(c)    Assignment by DIP Lenders / Agent.  Subject to the approval of the Required Lenders and the consent of the Debtors (which consent shall not be unreasonably withheld, and shall not be required for an Assignment to (i) National Founders LP (or any of its Affiliates or successors-in-interest) or (ii) any Affiliate of ACH, ACAP Holdco Lenders, or Dacian), the Agent and/or one or more of the DIP Lenders may assign (an "Assignment") all or a portion of its/their rights and obligations under the DIP Loan Documents (including all or a portion of the DIP Lenders' interest in the DIP Credit Facility and respective DIP Commitment, as the case may be, in a minimum amount of $500,000.00) to any Person (any such Person receiving such an Assignment, the "Assignee"). Notwithstanding anything herein to the contrary, the Debtor's consent shall not be required for an Assignment during the occurrence and/or continuance of an Event of Default. From and after the date of the Assignment, the Assignee shall be a party hereto and, to the extent of the interest assigned pursuant to the Assignment, have the rights and obligations of the Agent or the assigning DIP Lender(s) under this Agreement, and the assigning Agent or DIP Lender(s) shall, to the extent of the interest assigned, be released from its/their obligations under this Agreement.  No Assignment by the Agent or the DIP Lenders shall release the Agent or the DIP Lenders from their obligations hereunder arising prior to the date of such Assignment, and no Assignment by the Agent shall be effective without prior written consent by the Required Lenders. The Debtors hereby consent to the disclosure of any information obtained by the Agent in connection with this Agreement to any Person to which the Agent or any DIP Lender(s) sells, or proposes to sell, its/their interest in the DIP Credit Facility and/or DIP Commitment; provided any such Person shall agree to keep any such information confidential in a manner and on terms substantially consistent with the Agent's confidentiality obligations. Subject to the terms of the Financing Orders, to the extent that any Assignment occurs after the Interim Order Entry Date, the resulting commencement of a new Challenge Period with respect to such Assignee for purposes of Section 9.23 hereof shall have no effect upon the duration of any existing Challenge Period (or the effect of the expiration thereof) with respect to the Agent and/or any other DIP Lender.

Section 9.5    Participations.  Each DIP Lender also shall have the right to participate its interest in the DIP Credit Facility and/or DIP Commitments with any of its Affiliates.

Section 9.6    Financing of DIP Commitments.  Each DIP Lender shall have the right, without the consent of the Debtors, to finance their loans and commitments under the DIP Loan Documents, including by granting a security interest therein to their respective financing sources as collateral security, in each case without the consent of the Debtors or any other person, but without in any way limiting such DIP Lender's obligations in respect of the DIP Credit Facility and/or DIP Commitments.

Section 9.7    Integration.  This Agreement and the other DIP Loan Documents contain and constitute the entire agreement of the parties with respect to the subject matter hereof and supersede all prior negotiations, agreements, and understandings, whether written or oral, of the parties hereto.

55

Section 9.8     No Waiver; Remedies.  No failure or delay by any party in exercising any right, power, or privilege under this Agreement or any of the other DIP Loan Documents will operate as a waiver of such right, power or privilege.  A single or partial exercise of any right, power or privilege will not preclude any other or further exercise of the right, power or privilege or the exercise of any other right, power, or privilege.  The rights and remedies provided in the DIP Loan Documents will be cumulative and not exclusive of any rights or remedies provided by law.

Section 9.9     Setoff.  In addition to any rights and remedies of the DIP Lenders provided by law, upon the occurrence and during the continuance of any Event of Default, each DIP Lender is hereby independently authorized, at any time and from time to time, without prior notice to the Debtors (except as expressly set forth in the Financing Orders), any such notice being hereby expressly waived, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held, and other obligations (in whatever currency) at any time owing, by such DIP Lender to or for the credit or the account of any Debtor, against any and all DIP Obligations of such Debtor now or hereafter existing under this Agreement or any other DIP Loan Document to such DIP Lender, irrespective of whether or not such DIP Lender shall have made any demand under this Agreement or any other DIP Loan Document and although such DIP Obligations may be contingent or unmatured or are owed to a branch, office, or Affiliate of such DIP Lender different from the branch, office, or Affiliate holding such deposit or obligated on such indebtedness; provided that the exercising DIP Lender shall promptly notify the Agent, the other DIP Lenders, and the Debtors of such setoff and application, but the failure to give such notice shall not affect the validity of such setoff and application. Further, the Debtors hereby, subject to the Financing Orders and the Carve-Out, grant to the Agent a continuing lien, security interest, and right of setoff as security for all liabilities and obligations to the DIP Lenders, whether now existing or hereafter arising, upon and against all deposits, credits, collateral and property, now or hereafter in the possession, custody, safekeeping or control of the Agent or any Affiliate and their successors and assigns or in transit to any of them.  Regardless of the adequacy of any collateral, if any of the DIP Obligations are due and payable and have not been paid or any Event of Default shall have occurred, any deposits or other sums credited by or due from the DIP Lenders to the Debtors and any securities or other property of the Debtors in the possession of the DIP Lenders may be applied to or set off by the Agent against the payment of DIP Obligations and any and all other liabilities, direct, or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, of the Debtors to the DIP Lenders. **ANY AND ALL RIGHTS TO REQUIRE THE AGENT TO EXERCISE ITS RIGHTS OR REMEDIES WITH RESPECT TO ANY OTHER DIP COLLATERAL WHICH SECURES THE DIP OBLIGATIONS, PRIOR TO EXERCISING ITS RIGHT OF SETOFF WITH RESPECT TO SUCH DEPOSITS, CREDITS OR OTHER PROPERTY OF THE DEBTORS ARE HEREBY KNOWINGLY, VOLUNTARILY, AND IRREVOCABLY WAIVED.**

Section 9.10   Execution in Counterparts.  This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement.  Delivery of an executed counterpart of this Agreement by electronic transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement. To the extent permitted by applicable law, including the New York State Electronic Signatures and Records Act (N.Y. State Tech. Law §§ 301-309), this

56

Agreement and any other DIP Loan Document may be executed by electronic signature (including any electronic symbol or process attached to, or associated with, a contract or other record and adopted by a Person with the intent to sign, authenticate, or accept such contract or record), which shall be considered an original signature for all purposes and shall have the same legal effect, validity, and enforceability as a manually executed signature or use of a paper-based recordkeeping system, as the case may be, to the fullest extent permitted by applicable law. Each party hereto agrees that any electronic signature on or associated with any DIP Loan Document shall be valid and binding on such party to the same extent as a manual, original signature.

Section 9.11    Governing Law; Submission To Jurisdiction; Venue.

(a)      SUBJECT TO THE JURISDICTION OF THE BANKRUPTCY COURT, THIS AGREEMENT AND THE OTHER DIP LOAN DOCUMENTS AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER AND THEREUNDER SHALL, EXCEPT AS OTHERWISE PROVIDED IN CERTAIN OF THE OTHER DIP LOAN DOCUMENTS, BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE INTERNAL LAW OF THE STATE OF NEW YORK (WITHOUT REGARD TO CONFLICTS OF LAWS RULES AND PRINCIPLES THEREUNDER) AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE. ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER DIP LOAN DOCUMENT SHALL BE BROUGHT IN THE BANKRUPTCY COURT, OR IN THE EVENT THAT THE BANKRUPTCY COURT DOES NOT HAVE OR DOES NOT EXERCISE JURISDICTION, THEN IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE STATE OF NEW YORK, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT OR ANY OTHER DIP LOAN DOCUMENT, THE DEBTORS HEREBY IRREVOCABLY ACCEPT FOR THEMSELVES AND IN RESPECT OF THEIR PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID COURTS. THE DEBTORS HEREBY FURTHER IRREVOCABLY WAIVE ANY CLAIM THAT ANY SUCH COURTS LACK PERSONAL JURISDICTION OVER THE DEBTORS, AND AGREE NOT TO PLEAD OR CLAIM, IN ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER DIP LOAN DOCUMENT BROUGHT IN THE AFOREMENTIONED COURTS, THAT SUCH COURTS LACK PERSONAL JURISDICTION OVER THE DEBTORS. THE DEBTORS FURTHER IRREVOCABLY CONSENT TO THE SERVICE OF PROCESS OUT OF THE AFOREMENTIONED COURTS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO THE DEBTORS AT THE ADDRESS SET FORTH IN SECTION 9.2 HEREOF, SUCH SERVICE, NOTWITHSTANDING THE PERIODS OF TIME PROVIDED FOR IN SECTION 9.2, TO BECOME EFFECTIVE 30 DAYS AFTER SUCH MAILING. THE DEBTORS HEREBY IRREVOCABLY WAIVE ANY OBJECTION TO SUCH SERVICE OF PROCESS AND FURTHER IRREVOCABLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN ANY ACTION OR PROCEEDING COMMENCED HEREUNDER OR UNDER ANY OTHER DIP LOAN DOCUMENT THAT SERVICE OF PROCESS WAS IN ANY WAY INVALID OR INEFFECTIVE. NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE AGENT AND THE DIP LENDERS TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST THE DEBTORS IN ANY OTHER JURISDICTION.

(b)     THE DEBTORS HEREBY IRREVOCABLY WAIVE ANY OBJECTION WHICH THEY MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY OF THE AFORESAID ACTIONS OR PROCEEDINGS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER DIP LOAN DOCUMENT BROUGHT IN THE COURTS REFERRED TO IN CLAUSE (a) ABOVE AND HEREBY FURTHER IRREVOCABLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURTS HAVE BEEN BROUGHT IN AN INCONVENIENT FORUM.

Section 9.12     Waiver of Jury Trial.  **THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THAT THEY MAY HAVE TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION, OR IN ANY LEGAL PROCEEDING, DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY).  EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTIES WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION**.

Section 9.13     Severability.  If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any rule of law, or public policy, all other conditions and provisions of this Agreement will nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner adverse to any party.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto will negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the extent possible.

Section 9.14     Survival.  All representations, warranties, covenants, agreements, and conditions contained in or made pursuant to this Agreement or the other DIP Loan Documents shall survive (i) the making of the New Pre-Petition Advances and the DIP Loans and the payment of the DIP Obligations, and (ii) the performance, observance and compliance with the covenants, terms and conditions, express or implied, of all DIP Loan Documents, until the due and punctual (a) indefeasible payment of the DIP Obligations, and (b) performance, observance and compliance with the covenants, terms and conditions, express or implied, of this Agreement and all of the other DIP Loan Documents; provided, however, that the provisions of Article VII of this Agreement shall survive (x) indefeasible payment of the DIP Obligations and (y) performance, observance and compliance with the covenants, terms and conditions, express or implied, of this Agreement and all of the other DIP Loan Documents.

Section 9.15     Maximum Lawful Interest.  Notwithstanding anything to the contrary contained herein, in no event shall the amount of interest and other charges for the use of money

payable under this Agreement or any other DIP Loan Document exceed the maximum amounts permissible under any law that a court of competent jurisdiction shall, in a final determination, deem applicable. The Debtors, the Agent, and the DIP Lenders, in executing and delivering this Agreement, intend legally to agree upon the rate or rates of interest and other charges for the use of money and manner of payment stated within it; provided, however, that, anything contained herein to the contrary notwithstanding, if the amount of such interest and other charges for the use of money or manner of payment exceeds the maximum amount allowable under applicable law, then, ipso facto as of the Closing Date, the Debtors are and shall be liable only for the payment of such maximum as allowed by law, and payment received from the Debtors in excess of such legal maximum, whenever received, shall be applied to reduce the principal balance of the Loans to the extent of such excess.

Section 9.16    No Marshalling.  The Agent and the DIP Lenders shall not be required to marshal any present or future DIP Collateral and the Debtors hereby agree that they will not invoke any law relating to the marshalling of collateral and irrevocably waive the benefits of any such laws.

Section 9.17    Interpretation.  As used in this Agreement, references to the singular will include the plural and vice versa and references to the masculine gender will include the feminine and neuter genders and vice versa, as appropriate.  Unless otherwise expressly provided in this Agreement (i) the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement will refer to this Agreement as a whole and not to any particular provision of this Agreement, and (ii) article, section, subsection, and schedule references are references with respect to this Agreement unless otherwise specified.  Unless the context otherwise requires, the term "including" will mean "including, without limitation." The headings in this Agreement and in the Schedules are included for convenience of reference only and will not affect in any way the meaning or interpretation of this Agreement.

Section 9.18    Ambiguities.  This Agreement and the other DIP Loan Documents were negotiated between legal counsel for the parties and any ambiguity in this Agreement or the other DIP Loan Documents shall not be construed against the party who drafted this Agreement or such other DIP Loan Documents.

Section 9.19    The PATRIOT Act.  The DIP Lenders hereby notify the Debtors, that pursuant to the requirements of the PATRIOT Act, they are required to obtain, verify, and record information that identifies the Debtors and other information that will allow the DIP Lenders to identify the Debtors in accordance with the PATRIOT Act.

Section 9.20    Conflicting Provisions in DIP Loan Documents.  In the event that any provisions of this Agreement conflict with any DIP Loan Document, to include, without limitation, the New Pre-Petition Advance Note and/or any DIP Collateral Document, the provisions of this Agreement shall govern; provided, however, in the event that any provisions of this Agreement conflict with the with the DIP Loan Intercreditor Agreement, the provisions of the DIP Loan Intercreditor Agreement shall govern.

Section 9.21 <u>Conflicting Provisions in the Financing Orders</u>. In the event that any provisions of this Agreement conflict with any provisions in the Financing Orders, the provisions of the Financing Orders shall control.

Section 9.22 <u>Modifications</u>. Except as specifically set forth in the Financing Orders, the DIP Liens, lien priority, administrative priorities, and other rights and remedies granted to the Agent and the DIP Lenders pursuant to this Agreement and the Financing Orders (specifically, including, but not limited to, the existence, perfection and priority of the DIP Liens provided herein and therein and the administrative priority herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of Indebtedness by the Debtors (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of the Chapter 11 Cases, or by any other act or omission whatsoever (other than in connection with any asset disposition permitted hereunder). Without limitation, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act or omission: (i) except for the Carve-Out having priority over the DIP Obligations, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on a parity with any claim of the Agent or the DIP Lenders against the Debtors in respect of any DIP Obligation; (ii) the Liens granted under the DIP Loan Documents shall continue to be valid and perfected and with the specified priority without the necessity that financing statements be filed or that any other action be taken, or document or instrument registered or delivered, under applicable non-bankruptcy law; and (iii) notwithstanding any failure on the part of the Debtors, the Agent or the DIP Lenders to perfect, maintain, protect or enforce the Liens in the DIP Collateral granted under the DIP Loan Documents, the Financing Orders shall automatically, and without further action by any Person, perfect such Liens against the DIP Collateral of the Debtors.

Section 9.23 <u>Release</u>.

(A) EFFECTIVE AS OF THE CLOSING DATE, EACH OF THE DEBTORS, ON ITS OWN BEHALF AND ON BEHALF OF ITS AND THEIR RESPECTIVE PREDECESSORS, SUCCESSORS AND ASSIGNS, HEREBY ABSOLUTELY, UNCONDITIONALLY AND IRREVOCABLY RELEASES AND FOREVER DISCHARGES AND ACQUITS THE AGENT, THE PRE-PETITION LENDERS, THE DIP LENDERS, ANY ASSIGNEE (AS DEFINED IN <u>SECTION 9.4(C)</u>), AND EACH OF THEIR RESPECTIVE REPRESENTATIVES AND AFFILIATES (COLLECTIVELY, THE "<u>RELEASED PARTIES</u>") FROM ANY AND ALL OBLIGATIONS AND LIABILITIES TO THE DEBTORS (AND THEIR SUCCESSORS AND ASSIGNS) AND FROM ANY AND ALL CLAIMS, COUNTERCLAIMS, DEMANDS, DEFENSES, OFFSETS, DEBTS, ACCOUNTS, CONTRACTS, LIABILITIES, ACTIONS AND CAUSES OF ACTION OF ANY KIND, NATURE OR DESCRIPTION, WHETHER MATURED OR UNMATURED, KNOWN OR UNKNOWN, ASSERTED OR UNASSERTED, FORESEEN OR UNFORESEEN, ACCRUED OR UNACCRUED, SUSPECTED OR UNSUSPECTED, LIQUIDATED OR UNLIQUIDATED, PENDING OR THREATENED, ARISING IN LAW OR EQUITY, UPON CONTRACT OR TORT OR UNDER ANY STATE OR FEDERAL LAW OR OTHERWISE, HOWEVER ARISING AND IN ANY CAPACITY WHATSOEVER, IN EACH CASE THAT THE DEBTORS AT ANY TIME HAD, NOW HAVE OR MAY HAVE, OR THAT THEIR PREDECESSORS, SUCCESSORS OR ASSIGNS AT ANY TIME HAD OR MAY HAVE

60

AGAINST ANY OF THE RELEASED PARTIES FOR OR BY REASON OF ANY ACT, OMISSION, MATTER, CAUSE OR THING WHATSOEVER ARISING AT ANY TIME ON OR PRIOR TO THE CLOSING DATE. THE DEBTORS HEREBY ACKNOWLEDGE AND AGREE THAT AS OF THE CLOSING DATE, THEY HAVE NO DEFENSE, COUNTERCLAIM, OFFSET, CROSS-COMPLAINT, CLAIM OR DEMAND OF ANY KIND OR NATURE WHATSOEVER THAT CAN BE ASSERTED TO REDUCE OR ELIMINATE ALL OR ANY PART OF THEIR LIABILITY TO REPAY THE DIP OBLIGATIONS ARISING HEREUNDER OR THE PRE-PETITION OBLIGATIONS OWED TO THE PRE-PETITION LENDERS OR TO SEEK AFFIRMATIVE RELIEF OR DAMAGES OF ANY KIND OR NATURE FROM ANY OF THE RELEASED PARTIES IN ANY CAPACITY WHATSOEVER.

(b)     SUBJECT IN ALL RESPECTS TO THE OTHER TERMS THEREOF, THE FINANCING ORDERS SHALL PROVIDE THAT, EFFECTIVE AS OF THE INTERIM ORDER ENTRY DATE, THE DEBTORS SHALL VOLUNTARILY AND KNOWINGLY RELEASE AND FOREVER DISCHARGE THE AGENT, THE DIP LENDERS, THE PRE-PETITION LENDERS, AND EACH OF THE OTHER RELEASED PARTIES (WHETHER IN THEIR RESPECTIVE CAPACITIES AS AGENT AND/OR DIP LENDERS HEREUNDER OR AS PRE-PETITION LENDERS UNDER THE PRE-PETITION LOAN DOCUMENTS, THE DACIAN PRE-PETITION LOAN DOCUMENTS, OR THE NATIONAL FOUNDER PRE-PETITION LOAN DOCUMENTS), FROM ANY AND ALL OBLIGATIONS AND LIABILITIES TO THE DEBTORS (AND THEIR SUCCESSORS AND ASSIGNS) AND FROM ANY AND ALL CLAIMS, COUNTERCLAIMS, DEMANDS, DEFENSES, OFFSETS, DEBTS, ACCOUNTS, CONTRACTS, LIABILITIES, ACTIONS AND CAUSES OF ACTION OF ANY KIND, NATURE OR DESCRIPTION, WHETHER MATURED OR UNMATURED, KNOWN OR UNKNOWN, ASSERTED OR UNASSERTED, FORESEEN OR UNFORESEEN, ACCRUED OR UNACCRUED, SUSPECTED OR UNSUSPECTED, LIQUIDATED OR UNLIQUIDATED, PENDING OR THREATENED, ARISING IN LAW OR EQUITY, UPON CONTRACT OR TORT OR UNDER ANY STATE OR FEDERAL LAW OR OTHERWISE, IN ANY CASE ORIGINATING IN WHOLE OR IN PART BEFORE THE INTERIM ORDER ENTRY DATE THAT THE DEBTORS MAY NOW OR HEREAFTER HAVE AGAINST THE RELEASED PARTIES, IF ANY, IN EACH CASE ARISING FROM OR RELATED TO THE DIP CREDIT FACILITY OR THE PRE-PETITION INDEBTEDNESS OR ANY OF THE DIP COLLATERAL OR PRE-PETITION COLLATERAL (INCLUDING THE DACIAN PRE-PETITION COLLATERAL AND/OR THE NATIONAL FOUNDERS PRE-PETITION COLLATERAL), TO INCLUDE WHETHER RELATED TO THE NEGOTIATION FOR AND EXECUTION OF THIS AGREEMENT OR ANY OTHER DIP LOAN DOCUMENT OR PRE-PETITION LOAN DOCUMENTS (INCLUDING THE DACIAN PRE-PETITION LOAN DOCUMENTS AND/OR THE NATIONAL FOUNDERS PRE-PETITION LOAN DOCUMENTS ) OR THE EXERCISE OF ANY RIGHTS AND REMEDIES UNDER THE DIP LOAN DOCUMENTS OR THE PRE-PETITION LOAN DOCUMENTS (OR ANY OF THEIR RELATED AGREEMENTS, INCLUDING THE DACIAN PRE-PETITION LOAN DOCUMENTS AND/OR THE NATIONAL FOUNDERS PRE-PETITION LOAN DOCUMMENTS) WHETHER BY REASON OF ANY ACT, OMISSION, MATTER, CAUSE OR THING WHATSOEVER ARISING AT ANY TIME ON OR PRIOR TO THE INTERIM ORDER ENTRY DATE. NOTWITHSTANDING ANYTHING TO THE CONTRARY SET FORTH HEREIN, THE FOREGOING RELEASE SHALL BE SUBJECT TO THE RIGHTS OF THE COMMITTEE OR ANY OTHER PARTY IN INTEREST UNDER THE FINANCING

61

ORDERS AND SHALL NOT BECOME EFFECTIVE UNTIL THE EXPIRATION OF THE APPLICABLE "CHALLENGE PERIOD" AS SUCH TERM IS DEFINED IN THE FINANCING ORDERS.

Section 9.24    Electronic Transactions.    The transaction described herein may be conducted, and related documents may be stored, by electronic means.  Copies, telecopies, facsimiles, electronic files, and other reproductions of original executed documents will be deemed to be authentic and valid counterparts of such original documents for all purposes, including the filing of any claim, action or suit in the appropriate court of law.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their respective representatives thereunto duly authorized as of the date first written above.

**BORROWERS**:

**777 PARTNERS LLC**

By: _____
Name:
Title:

**600 PARTNERS LLC**

By: _____
Name:
Title:

**SIGNAL NATIONAL LLC**

By: _____
Name:
Title:

PRIMING SUPERPRIORITY
DEBTOR-IN-POSSESSION CREDIT AGREEMENT

**GUARANTORS:**

**777 ASSET MANAGEMENT LLC**

By: _____

Name:

Title:

**DAEDALUS I LLC**

By: _____

Name:

Title:

**EMPLOYEE FUNDING OF AMERICA, LLC**

By: _____

Name:

Title:

**F3EA CAPITAL LLC**

By: _____

Name:

Title:

**F3EA HOLDINGS LLC**

By: _____

Name:

Title:

PRIMING SUPERPRIORITY
DEBTOR-IN-POSSESSION CREDIT AGREEMENT

**F3EA SERVICING LLC**


By: _____
Name:
Title:

**IRONMAN CAPITAL LLC**


By: _____
Name:
Title:

**LEX CAPITAL HOLDINGS LLC**


By: _____
Name:
Title:

**LUMIERE ACQUISITIONS COMPANY LLC**


By: _____
Name:
Title:

**LUMIERE FINANCING LLC**

By: _____
Name:
Title:

**PHOENICIA LLC**


By: _____
Name:
Title:

PRIMING SUPERPRIORITY
DEBTOR-IN-POSSESSION CREDIT AGREEMENT

**SIGNAL AHF MEDICAL RECEIVABLES HOLDCO LLC**

By: _____
Name:
Title:

**SIGNAL LF PORTFOLIO HOLDCO LLC**

By: _____
Name:
Title:

**SIGNAL MLH MEDICAL RECEIVABLES HOLDCO LLC**

By: _____
Name:
Title:

**SIGNAL SERVICING LLC**

By: _____
Name:
Title:

**SINGER ASSET FINANCE COMPANY, L.L.C.**

By: _____
Name:
Title:

**SUTTONPARK CAPITAL LLC**


By: _____
Name:
Title:

**SUTTONPARK SERVICING LLC**


By: _____
Name:
Title:

**TACTICAL MARKETING PARTNERS LLC**


By: _____
Name:
Title:

**THRESHER ACQUISITION LLC**


By: _____
Name:
Title:

PRIMING SUPERPRIORITY
DEBTOR-IN-POSSESSION CREDIT AGREEMENT

**AGENT**:

**ACM DELEGATE LLC,** *not individually, but
as Administrative Agent for the DIP Lenders*

By:         _____
Name:
Title:

PRIMING SUPERPRIORITY
DEBTOR-IN-POSSESSION CREDIT AGREEMENT

# SCHEDULE 1.1

## INITIAL/SUBSEQUENT DEBTORS

**Initial Debtors:**

1. 600 Partners LLC
2. 777 Asset Management LLC
3. 777 Partners LLC
4. Daedalus I LLC
5. Employee Funding of America, LLC
6. F3EA Capital LLC
7. F3EA Holdings LLC
8. F3EA Servicing LLC
9. Ironman Capital LLC
10. Lex Capital Holdings LLC
11. Lumiere Acquisitions Company LLC
12. Lumiere Financing LLC
13. Phoenicia LLC
14. Signal AHF Medical Receivables HoldCo LLC
15. Signal LF Portfolio Holdco LLC
16. Signal MLH Medical Receivables HoldCo LLC
17. Signal National LLC
18. Signal Servicing LLC
19. Singer Asset Finance Company, L.L.C.
20. SuttonPark Capital LLC
21. SuttonPark Servicing LLC
22. Tactical Marketing Partners LLC
23. Thresher Acquisition LLC

**Subsequent Debtors:**

[Reserved]

Schedule 1.1 – Initial/Subsequent Debtors

## SCHEDULE 1.2

### INITIAL/ADDITIONAL GUARANTORS

**Initial Guarantors:**

1. 777 Asset Management LLC
2. Daedalus I LLC
3. Employee Funding of America, LLC
4. F3EA Capital LLC
5. F3EA Holdings LLC
6. F3EA Servicing LLC
7. Ironman Capital LLC
8. Lex Capital Holdings LLC
9. Lumiere Acquisitions Company LLC
10. Lumiere Financing LLC
11. Phoenicia LLC
12. Signal AHF Medical Receivables HoldCo LLC
13. Signal LF Portfolio Holdco LLC
14. Signal MLH Medical Receivables HoldCo LLC
15. Singer Asset Finance Company, L.L.C.
16. Signal Servicing LLC
17. SuttonPark Capital LLC
18. SuttonPark Servicing LLC
19. Tactical Marketing Partners LLC
20. Thresher Acquisition LLC

**Additional Guarantors:**

[Reserved]

Schedule 1.2 – Initial/Additional Guarantors

# SCHEDULE 1.3

## PRE-PETITION LOAN DOCUMENTS/PRE-PETITION INDEBTEDNESS

[SEE ATTACHED]

FINAL

# SCHEDULE 1.3[1]

### Pre-Petition Loans and Pre-Petition Loan Documents[2][3]

(1) **HoldCo Facility (777-600 Bridge Loan)**

   (a) Outstanding Amounts:

      (i) Principal:     $558,477,057.96
      (ii) Interest:     $162,568,109.11
      (iii) **Total:**     **$721,045,167.07**

   (b) Borrowers:

      (i) 600 Partners LLC ("*600 Partners*")
      (ii) 777 Partners LLC ("*777 Partners*" together with 600 Partners, collectively, the "*Holdco Borrowers*")

   (c) Guarantors:

      (i) The corporate guarantors listed on Exhibit A to this Schedule 1.2 (collectively, the "*Holdco Guarantors*")
      (ii) Steven W. Pasko ("*Pasko*")
      (iii) Joshua Wander ("*Wander*")

   (d) Obligor:

      (i) Pasko

   (e) Collateral: All assets of each of the Holdco Borrowers and Holdco Guarantors, whether now existing or hereafter acquired and all proceeds thereof. Pasko's beneficial interest in the SNIH Trust, a Delaware statutory trust (collectively, the "*Holdco Collateral*")

   (f) Status: In default/accelerated.

   (g) Pre-Petition Loan Documents (collectively, the "*Holdco Facility Documents*"):

      (i) Amended and Restated Loan and Security Agreement, dated as of November 2, 2023, by and among, the Holdco Borrowers, JARM Capital LLC ("*JARM*"), as a borrower with respect to certain obligations thereunder, the Holdco Guarantors time to time party thereto, ACM Delegate LLC ("*ACM Delegate*"), as administrative agent and collateral agent ("*Holdco Agent*"), and the lenders time to time party thereto ("*Holdco Lenders*").

---

[1] This schedule does not include pre-petition advances made under the DIP Credit Agreement.
[2] The DIP Lenders reserve the right to amend, update, and otherwise revise figures throughout.
[3] All outstanding amounts herein calculated as of June 30, 2026, unless otherwise noted.

(ii) First Amendment to Amended and Restated Loan and Security Agreement, dated as of November 8, 2023, by and among the Holdco Borrowers, the Holdco Guarantors time to time party thereto, the Holdco Agent, and the Holdco Lenders.

(iii) Second Amendment to Amended and Restated Loan and Security Agreement, dated as of November 17, 2023, by and among the Holdco Borrowers, the Holdco Guarantors time to time party thereto, the Holdco Agent, and the Holdco Lenders.

(iv) Third Amendment to Amended and Restated Loan and Security Agreement, dated as of November 28, 2023, by and among the Holdco Borrowers, the Holdco Guarantors time to time party thereto, the Holdco Agent, and the Holdco Lenders.

(v) Fourth Amendment to Amended and Restated Loan and Security Agreement, dated as of November 30, 2023, by and among the Holdco Borrowers, the Holdco Guarantors time to time party thereto, the Holdco Agent, and the Holdco Lenders.

(vi) Fifth Amendment to Amended and Restated Loan and Security Agreement, dated as of December 29, 2023, by and among the Holdco Borrowers, the Holdco Guarantors time to time party thereto, the Holdco Agent, and the Holdco Lenders.

(vii) Sixth Amendment to Amended and Restated Loan and Security Agreement, dated as of January 2, 2024, by and among the Holdco Borrowers, the Holdco Guarantors time to time party thereto, the Holdco Agent, and the Holdco Lenders.

(viii) Seventh Amendment to Amended and Restated Loan and Security Agreement, dated as of January 24, 2024, by and among the Holdco Borrowers, the Holdco Guarantors time to time party thereto, the Holdco Agent, and the Holdco Lenders.

(ix) Eighth Amendment to Amended and Restated Loan and Security Agreement, dated as of February 8, 2024, by and among the Holdco Borrowers, the Holdco Guarantors time to time party thereto, the Holdco Agent, and the Holdco Lenders.

(x) Ninth Amendment to Amended and Restated Loan and Security Agreement, dated as of February 14, 2024, by and among the Holdco Borrowers, the Holdco Guarantors time to time party thereto, the Holdco Agent, and the Holdco Lenders.

(xi) Reaffirmation and Acknowledgement Agreement dated as of February 14, 2024 by each Holdco Guarantor party thereto and acknowledged and accepted by the Holdco Agent and the Holdco Lenders.

(xii) Tenth Amendment to Amended and Restated Loan and Security Agreement, dated as of February 19, 2024, by and among the Holdco Borrowers, the Holdco Guarantors time to time party thereto, the Holdco Agent, and the Holdco Lenders.

(xiii) Eleventh Amendment to Amended and Restated Loan and Security Agreement, dated as of February 22, 2024, by and among the Holdco Borrowers, the Holdco Guarantors time to time party thereto, the Holdco Agent, and the Holdco Lenders.

(xiv) Twelfth Amendment to Amended and Restated Loan and Security Agreement, dated as of February 27, 2024, by and among the Holdco Borrowers, the Holdco Guarantors time to time party thereto, the Holdco Agent, and the Holdco Lenders.

(xv) Thirteenth Amendment to Amended and Restated Loan and Security Agreement, dated as of February 28, 2024, by and among the Holdco Borrowers, the Holdco Guarantors time to time party thereto, the Holdco Agent, and the Holdco Lenders.

(xvi) Fourteenth Amendment to Amended and Restated Loan and Security Agreement, dated as of March 4, 2024, by and among the Holdco Borrowers, JARM, as a borrower with respect to certain obligations thereunder, the Holdco Guarantors time to time party thereto, the Holdco Agent, and the Holdco Lenders.

FINAL

(xvii)   Consent and Fifteenth Amendment to Amended and Restated Loan and Security Agreement, dated as of March 4, 2024, by and among the Holdco Borrowers, JARM, as a borrower with respect to certain obligations thereunder, the Holdco Guarantors time to time party thereto, the Holdco Agent, and the Holdco Lenders.

(xviii)   Sixteenth Amendment to Amended and Restated Loan and Security Agreement, dated as of March 14, 2024, by and among the Holdco Borrowers, JARM, as a borrower with respect to certain obligations thereunder, the Holdco Guarantors time to time party thereto, the Holdco Agent, and the Holdco Lenders.

(xix)   Seventeenth Amendment to Amended and Restated Loan and Security Agreement, dated as of March 18, 2024, by and among the Holdco Borrowers, JARM, as a borrower with respect to certain obligations thereunder, the Holdco Guarantors time to time party thereto, the Holdco Agent, and the Holdco Lenders.

(xx)   Eighteenth Amendment to Amended and Restated Loan and Security Agreement, dated as of March 21, 2024, by and among the Holdco Borrowers, JARM, as a borrower with respect to certain obligations thereunder, the Holdco Guarantors time to time party thereto, the Holdco Agent, and the Holdco Lenders.

(xxi)   Nineteenth Amendment to Amended and Restated Loan and Security Agreement, dated as of March 25, 2024, by and among the Holdco Borrowers, JARM, as a borrower with respect to certain obligations thereunder, the Holdco Guarantors time to time party thereto, the Holdco Agent, and the Holdco Lenders.

(xxii)   Twentieth Amendment to Amended and Restated Loan and Security Agreement, dated as of March 28, 2024, by and among the Holdco Borrowers, JARM, as a borrower with respect to certain obligations thereunder, the Holdco Guarantors time to time party thereto, the Holdco Agent, and the Holdco Lenders.

(xxiii)   Twenty-First Amendment to Amended and Restated Loan and Security Agreement, dated as of April 3, 2024, by and among the Holdco Borrowers, JARM, as a borrower with respect to certain obligations thereunder, the Holdco Guarantors time to time party thereto, the Holdco Agent, and the Holdco Lenders.

(xxiv)   Twenty-Second Amendment to Amended and Restated Loan and Security Agreement, dated as of April 9, 2024, by and among the Holdco Borrowers, JARM, as a borrower with respect to certain obligations thereunder, the Holdco Guarantors time to time party thereto, the Holdco Agent, and the Holdco Lenders.

(xxv)   Amended and Restated Pledge and Security Agreement dated as of March 30, 2021, by JARM in favor of Haymarket Insurance Company ("**HMI**") and acknowledged and agreed by SuttonPark Acquisition LLC ("**SPA**") and SPA II LLC ("**SPA II**").

(xxvi)   Amended and Restated Pledge and Security Agreement dated as of March 30, 2021, by MTCP LLC and Pasko in favor of HMI and acknowledged and agreed by SPA and SPA II.

(xxvii)   Personal Guaranty dated as of February 27, 2020, executed by Pasko in favor of HMI.

(xxviii)   Personal Guaranty dated as of February 27, 2020, executed by Wander in favor of HMI.

(xxix)   Side Letter (Re Top Up Fee) dated as of June 30, 2021, by and among 777 Partners, HMI, and Metropolitan Partners Fund VII, LP.

(xxx)   Side Letter dated as of September 28, 2023, by and between HMI and 777 Re Ltd.

FINAL

(xxxi) Side Letter Agreement to Amended and Restated Loan and Security Agreement dated as of November 2, 2023, by and among Holdco Borrowers and Holdco Agent.

(xxxii) Amended and Restated Side Letter (Re Top Up Fees) dated as of November 9, 2023, by and among Holdco Borrowers, Holdco Agent, and HMI.

(xxxiii) Second Amended and Restated Side Letter (Re Top Up Fees) dated as of March 4, 2024, by and among Holdco Borrowers, Holdco Agent, and HMI.

(xxxiv) Side Letter: Acknowledgement and Agreement in Respect of Limited Guaranty dated as of February 28, 2024, by HMI, Jazz Reinsurance Company ("*Jazz*"), Southern Atlantic RE Inc. ("*SAR*"), Pasko, 777 Partners, 600 Partners, Brickell PC Insurance Holdings LLC ("*BPC*"), acknowledged and agreed to by Holdco Agent.

(xxxv) Side Letter: Acknowledgement and Agreement in Respect of Fee Letter and Joinder to Fee Letter dated as of February 28, 2024, by and among Holdco Agent, HMI, Jazz, and SAR.

(xxxvi) Pledge and Security Agreement dated as of February 28, 2024, by Pasko in favor of Holdco Agent.

(xxxvii) First Amendment to Pledge and Security Agreement dated as of June 11, 2024, by Pasko in favor of Holdco Agent.

(xxxviii) Reaffirmation Agreement dated as of November 2, 2023, by Pasko in favor of Holdco Agent.

(xxxix) Reaffirmation Agreement dated as of November 2, 2023, by Wander in favor of Holdco Agent.

(2) **Under HoldCo: TAMI Tranche (ERM 2023-2)**

    (a) <u>Outstanding Amounts</u>:

        (i) Principal: $77,848,719.43
        (ii) Interest: <u>$36,031,236.08</u>
        (iii) **Total:** **$113,879,955.51**

    (b) <u>Borrowers</u>:

        (i) The Holdco Borrowers

    (c) <u>Guarantors</u>:

        (i) The Holdco Guarantors
        (ii) Pasko
        (iii) Wander

    (d) <u>Obligor</u>: Pasko

    (e) <u>Collateral</u>: The Holdco Collateral

    (f) <u>Status</u>: In default/accelerated.

(g) <u>Pre-Petition Loan Documents</u>:

   (i)   The Holdco Facility Documents.
   (ii)  TAMI Tranche Promissory Note, dated as of September 30, 2023, made by the Holdco Borrowers to HMI.

## (3) <u>**Under HoldCo: JARM Obligations**</u>

   (a) <u>Outstanding Amounts</u>:

    (i)   Principal:     $170,525,597.70
    (ii)  Interest:     <u>$127,769,301.00</u>
    (iii) **Total:**     **$298,294,898.70**

   (b) <u>Borrowers</u>:

   (i)   The Holdco Borrowers

   (c) <u>Guarantors</u>:

   (i)   The Holdco Guarantors
   (ii)  Pasko
   (iii) Wander

   (d) <u>Obligor</u>:

   (i)   Pasko

   (e) <u>Collateral</u>: The Holdco Collateral

   (f) <u>Status</u>: In default/accelerated.

   (g) <u>Pre-Petition Loan Documents</u>:

   (i)    The Holdco Facility Documents.
   (ii)   Secured Promissory Note dated as of December 8, 2020, made by JARM to HMI.
   (iii)  Personal Guaranty dated as of December 8, 2020, by Wander as guarantor in favor of HMI as recipient.
   (iv)   Amended and Restated Secured Promissory Note dated as of January 27, 2021, made by JARM to HMI.
   (v)    Second Amended and Restated Secured Promissory Note dated as of April 12, 2021, made by JARM to HMI.
   (vi)   Third Amended and Restated Secured Promissory Note dated as of June 21, 2021, made by JARM to HMI.
   (vii)  First Amendment to Third Amended and Restated Secured Promissory Note dated as of June 28, 2021, made by JARM to HMI.

Case 26-90190 Case 26-19310 Doc PTR Filed 15/09/26 Filed Entered 03/10/26 08/09/26 14:53:53:29 Desc Main
Document    Page 182 of 225

FINAL

(viii)  Fourth Amended and Restated Secured Promissory Note dated as of August 2, 2021, made by JARM to HMI.

(ix)  Fifth Amended and Restated Secured Promissory Note dated as of December 9, 2021, made by JARM to HMI.

(x)  Sixth Amended and Restated Secured Promissory Note dated as of June 23, 2022, made by JARM to HMI.

(xi)  First Amendment to Sixth Amended and Restated Secured Promissory Note dated as of December 31, 2022, made by JARM to HMI.

(xii)  Seventh Amended and Restated Secured Promissory Note dated as of March 7, 2023, made by JARM to HMI.

(xiii)  Eighth Amended and Restated Secured Promissory Note dated as of March 14, 2023, made by JARM to HMI.

(xiv)  First Amendment to Eighth Amended and Restated Secured Promissory Note dated as of July 27, 2023, made by JARM to HMI.

(4)  **Under HoldCo: MCAG Tranche**

(a)  Outstanding Amounts:

(i)  Principal:        $84,384,237.50
(ii)  Interest:        $41,849,752.99
(iii)  **Total:**        **$126,233,990.48**

(b)  Borrowers:

(i)  The Holdco Borrowers

(c)  Guarantors:

(i)  The Holdco Guarantors
(ii)  Pasko
(iii)  Wander

(d)  Obligor: Pasko

(e)  Collateral: The Holdco Collateral

(f)  Status: In default/accelerated.

(g)  Pre-Petition Loan Documents:

(i)  The Holdco Facility Documents.
(ii)  MCAG Tranche Promissory Note dated as of September 30, 2023, made by the Holdco Borrowers to HMI.
(iii)  First Amended and Restated MCAG Tranche Promissory Note dated as of January 23, 2024, made by the Holdco Borrowers to HMI.

FINAL

## (5) **BCP Loan (Brickell Loan)**

(a) Outstanding Amounts:

|  |  |  |
|---|---|---|
| (i) | Principal: | $46,000,000.00 |
| (ii) | Interest: | $47,851,429.80 |
| (iii) | **Total:** | **$93,851,429.80** |

(b) Borrowers:

(i)  BPC

(c) Guarantors:

(i)  Pasko

(d) Obligor:

(i)  Pasko

(e) Collateral:[4] All of BPC's right, title and interest in and to or otherwise with respect to, the following property and assets whether now owned or existing or hereafter acquired or arising and regardless of where located:

(i)  6,358,069 shares of Randall & Quilter PS Holdings Inc (the "**Collateral Shares**");

(ii)  Account number 142213-003 bearing the name "BRICKELL PC INS HLDGS-PLD HAYMARKET" maintained at Wilmington Trust, N.A.;

(iii)  all shares, securities, cash, instruments or property representing dividends, distributions, returns of capital, split-ups, reclassifications, recapitalizations, conversions, or exchanges in respect of the Collateral Shares, including subscription warrants, rights, or options;

(iv)  all other rights and privileges appurtenant to the foregoing, including conversion, voting, and redemption rights;

(v)  all accounts, chattel paper, deposit accounts, documents, equipment, goods, general intangibles, instruments, inventory, investment property, letter-of-credit rights, supporting obligations, and related records pertaining to the foregoing; and

(vi)  all proceeds, profits, products, rents, or receipts arising from the collection, sale, lease, exchange, assignment, or other disposition of the foregoing collateral.

(f) Status: In default/accelerated.

(g) Pre-Petition Loan Documents:

(i)  Loan and Security Agreement, dated as of May 14, 2021, by and among BPC as borrower, and HMI, Jazz, and SAR as lenders.

---

[4] Collateral statement summarized from UCC-1.

(ii)  First Amendment to Loan and Security Agreement, dated as of July 8, 2022, by and among BPC as borrower and HMI, Jazz, and SAR as lenders.

(iii)  Limited Personal Guaranty dated as of February 28, 2024, by Pasko in favor of HMI, Jazz, and SAR as lenders.

(iv)  Pledge and Security Agreement dated as of February 28, 2024, by Pasko in favor of HMI, Jazz, and SAR as lenders.

(v)  First Amendment to Pledge and Security Agreement dated as of June 11, 2024, by Pasko in favor of HMI, Jazz, and SAR as lenders.

(vi)  Side Letter: Acknowledgement and Agreement in Respect of Fee Letter and Joinder to Fee Letter dated as of February 28, 2024, by and among Holdco Agent, HMI, Jazz, and SAR.

(vii)  Side Letter: Acknowledgement and Agreement in Respect of Limited Guaranty dated as of February 28, 2024, by HMI, Jazz, SAR, Pasko, 777 Partners, 600 Partners, BPC, acknowledged and agreed to by Holdco Agent.

## (6) **Ironman Loan**

(a) <u>Outstanding Amounts</u>:

    (i)  Principal:    $5,775,563.64
    (ii)  Interest:    <u>$3,661,386.48</u>
    (iii)  **Total:**    **$9,436,950.12**

(b) <u>Borrowers</u>:

    (i)  Ironman Capital LLC ("***Ironman***")

(c) <u>Collateral</u>: All assets of Ironman, including but not limited to, all right and interest of Ironman in the Convertible Loan and Security Agreement, dated as of April 22, 2021, by and between Ironman, as the lender, Omni Management Company Ltd, as the borrower, and the guarantors party thereto.

(d) <u>Status</u>: In default/accelerated.

(e) <u>Pre-Petition Loan Documents</u>:

    (i)  Loan and Security Agreement, dated as of April 22, 2021, by and between Ironman as borrower and HMI as lender.

    (ii)  First Amendment to Loan and Security Agreement, dated as of November 28, 2022, by and between Ironman as borrower and HMI as lender.

## (7) **SPS Secured Rated Loan**

(a) <u>Outstanding Amounts</u>:

**1L**

FINAL

    (i)  Principal:        $38,501,145.49
    (ii)  Interest:         $158,620.95
    (iii)  **Total:**       **$38,659,766.44**

**2L**

    (i)  Principal:        $18,153,434.21
    (ii)  Interest:         $9,153,434.21
    (iii)  **Total:**       **$27,306,868.42**

(b) <u>Borrowers</u>:

    (i)  SuttonPark Servicing LLC ("***Servicer***")

(c) <u>Guarantors</u>:

    (i)  SuttonPark Capital LLC ("***SuttonPark***")

(d) <u>Collateral</u>: All assets of Servicer, now or hereafter acquired, and all proceeds thereof.

(e) <u>Status</u>: In default/accelerated.

(f) <u>Pre-Petition Loan Documents</u>:

    (i)  Loan and Security Agreement dated as of December 22, 2021, by and among Servicer, as borrower, 777 Asset Management LLC ("***777 AM***"), as security agent, and the lenders party thereto.

    (ii)  First Amendment to Loan and Security Agreement dated as of November 17, 2022, by and among Servicer, as borrower, 777 AM, as security agent, and the lenders party thereto.

    (iii)  Amended and Restated Loan and Security Agreement dated as of December 22, 2022, by and among Servicer, as borrower, 777 AM, as security agent, and the lenders party thereto.

    (iv)  First Amendment to Amended and Restated Loan and Security Agreement dated as of March 14, 2025, by and among Servicer, as borrower, ACM Delegate, as security agent, the lenders party thereto, and SuttonPark, as guarantor.

    (v)  Security Agent Removal and Replacement Agreement dated as of March 14, 2025, by and among 777 AM, as existing security agent, ACM Delegate, as replacement security agent, Servicer, as borrower, SuttonPark, as guarantor, and HMI, SILAC Insurance Company ("***SILAC***"), Jazz,, and SAR, each as a lender.

    (vi)  Servicing Transition Agreement dated as of March 14, 2025, by and among Vervent Inc., Servicer, SuttonPark, SILAC, HMI, Jazz, and SAR.

**(8) SPSS 2020-1**

(a) <u>Outstanding Amounts</u>:

FINAL

     (i)  Principal:     $43,053,827.58
     (ii)  Interest:      <u>$89,759.05</u>
     (iii)  **Total:**     **$43,143,586.63**

(b) <u>Borrower</u>:

     (i)  SPSS 2020-1 LLC ("***SPSS 2020-1***")

(c) <u>Collateral</u>: All assets of SPSS 2021-1, now or hereafter acquired, and all proceeds thereof.

(d) <u>Status</u>: In default/accelerated.

(e) <u>Pre-Petition Loan Documents</u>:

     (i)  Indenture dated as of December 21, 2020, by and between SPSS 2020-1, as issuer, and Wells Fargo Bank, National Association, as indenture trustee.
     (ii)  Note Purchase Agreement dated as of December 21, 2020, by and among SPSS 2020-1, as issuer, SuttonPark, as sponsor, and HMI, Jazz, and SAR, each as purchaser.
     (iii)  Certificated Note A/R-1, representing $47,389,559.72 Fixed Rate Asset Backed Notes, Class A, Due 2076, dated December 21, 2020, issued by SPSS 2020-1, in the principal amount of $31,000,000.00, payable to HMI.
     (iv)  Certificated Note A/R-2, representing $47,389,559.72 Fixed Rate Asset Backed Notes, Class A, Due 2076, dated December 21, 2020, issued by SPSS 2020-1, in the principal amount of $8,194,779.86, payable to Jazz.
     (v)  Certificated Note A/R-3, representing $47,389,559.72 Fixed Rate Asset Backed Notes, Class A, Due 2076, dated December 21, 2020, issued by SPSS 2020-1, in the principal amount of $8,194,779.86, payable to SAR.

(9) **<u>SPSS Fund 1</u>**

(a) <u>Outstanding Amounts</u>:

     (i)  Principal:     $5,665,934.44
     (ii)  Interest:      <u>$1,119,355.81</u>
     (iii)  **Total:**     **$6,785,290.25**

(b) <u>Borrower</u>:

     (i)  SPSS FUND 1 LLC ("***SPSS 1***")

(c) <u>Pledgor</u>:

     (i)  SuttonPark

(d) <u>Guarantors</u>:

FINAL

(i) 777 Partners

(ii) 600 Partners (together with 777 Partners, collectively, the "***SPSS Fund 1 Guarantors***")

(e) <u>Collateral</u>: All assets of SPSS 1, now or hereafter acquired, and all proceeds thereof.

(f) <u>Status</u>: In default/accelerated.

(g) <u>Pre-Petition Loan Documents</u>:

(i) Credit Agreement dated as of June 30, 2021, by and among SPSS 1, as borrower, HMI as agent for the lenders ("***SPSS Fund 1 Agent***"), and the lenders time to time party thereto, including without limitation, HMI, Jazz, and SAR as lenders ("***SPSS Fund 1 Lenders***").

(ii) Security Agreement dated as of June 30, 2021, by SPSS 1 in favor of SPSS Fund 1 Agent.

(iii) Pledge and Security Agreement dated as of June 30, 2021, by and between SuttonPark as pledgor and SPSS Fund 1 Agent.

(iv) Guaranty dated as of June 30, 2021, by SPSS Fund 1 Guarantors in favor of SPSS Fund 1 Agent.

(10) **SPSS Fund 2**

(a) <u>Outstanding Amounts</u>:

(i) Principal: $16,492,064.18
(ii) Interest: <u>$8,410,353.84</u>
(iii) **Total:** **$24,902,418.02**

(b) <u>Borrower</u>:

(i) SPSS FUND 2 LLC ("***SPSS 2***")

(c) <u>Guarantors</u>:

(i) 777 Partners

(ii) 600 Partners (together with 777 Partners, collectively, the "***SPSS Fund 2 Guarantors***")

(d) <u>Pledgor</u>:

(i) SuttonPark

(e) <u>Collateral</u>: All assets of SPSS 2, now or hereafter acquired, and all proceeds thereof.

FINAL

(f) <u>Status</u>: In default/accelerated.

(g) <u>Pre-Petition Loan Documents</u>:

   (i) Credit Agreement dated as of July 20, 2021, by and among SPSS 2, as borrower and HMI as agent for the lenders ("***SPSS Fund 2 Agent***") and lenders time to time party thereto, including without limitation, HMI, SAR, and Jazz ("***SPSS Fund 2 Lenders***").

   (ii) Security Agreement dated as of July 20, 2021 by SPSS 2, as borrower in favor of SPSS Fund 2 Agent.

   (iii) Pledge and Security Agreement dated as of July 20, 2021, by and between SuttonPark, as pledgor in favor of SPSS Fund 2 Agent.

   (iv) Guaranty dated as of July 20, 2021, by SPSS Fund 2 Guarantors in favor of SPSS Fund 2 Agent.

   (v) First Amendment to Credit Agreement dated as of August 13, 2021, by and among SPSS 2 as borrower, SPSS Fund 2 Guarantors, SPSS Fund 2 Agent, and SPSS Fund 2 Lenders.

   (vi) Second Amendment to Credit Agreement dated as of September 13, 2021, by and among SPSS 2 as borrower, SPSS Fund 2 Guarantors, SPSS Fund 2 Agent, and SPSS Fund 2 Lenders.

   (vii) Third Amendment to Credit Agreement dated as of September 17, 2021, by and among SPSS 2 as borrower, SPSS Fund 2 Guarantors, SPSS Fund 2 Agent, and SPSS Fund 2 Lenders.

   (viii) Fourth Amendment to Credit Agreement dated as of September 22, 2021, by and among SPSS 2 as borrower, SPSS Fund 2 Guarantors, SPSS Fund 2 Agent, and SPSS Fund 2 Lenders.

   (ix) Fifth Amendment to Credit Agreement dated as of September 30, 2021, by and among SPSS 2 as borrower, SPSS Fund 2 Guarantors, SPSS Fund 2 Agent, and SPSS Fund 2 Lenders.

   (x) Sixth Amendment to Credit Agreement dated as of October 6, 2021, by and among SPSS 2 as borrower, SPSS Fund 2 Guarantors, SPSS Fund 2 Agent, and SPSS Fund 2 Lenders.

   (xi) Seventh Amendment to Credit Agreement dated as of October 13, 2021, by and among SPSS 2 as borrower, SPSS Fund 2 Guarantors, SPSS Fund 2 Agent, and SPSS Fund 2 Lenders.

   (xii) Eighth Amendment to Credit Agreement dated as of October 15, 2021, by and among SPSS 2 as borrower, SPSS Fund 2 Guarantors, SPSS Fund 2 Agent, and SPSS Fund 2 Lenders.

   (xiii) Ninth Amendment to Credit Agreement dated as of October 19, 2021, by and among SPSS 2 as borrower, SPSS Fund 2 Guarantors, SPSS Fund 2 Agent, and SPSS Fund 2 Lenders.

   (xiv) Tenth Amendment to Credit Agreement dated as of October 29, 2021, by and among SPSS 2 as borrower, SPSS Fund 2 Guarantors, SPSS Fund 2 Agent, and SPSS Fund 2 Lenders.

FINAL

(xv)   Eleventh Amendment to Credit Agreement dated as of November 12, 2021, by and among SPSS 2 as borrower, SPSS Fund 2 Guarantors, SPSS Fund 2 Agent, and SPSS Fund 2 Lenders.

(xvi)   Twelfth Amendment to Credit Agreement dated as of December 31, 2021, by and among SPSS 2 as borrower, SPSS Fund 2 Guarantors, SPSS Fund 2 Agent, and SPSS Fund 2 Lenders.

(xvii)   Thirteenth Amendment to Credit Agreement dated as of January 7, 2022, by and among SPSS 2 as borrower, SPSS Fund 2 Guarantors, SPSS Fund 2 Agent, and SPSS Fund 2 Lenders.

(xviii)   Fourteenth Amendment to Credit Agreement dated as of January 14, 2022, by and among SPSS 2 as borrower, SPSS Fund 2 Guarantors, SPSS Fund 2 Agent, and SPSS Fund 2 Lenders.

(xix)   Fifteenth Amendment to Credit Agreement dated as of January 27, 2022, by and among SPSS 2 as borrower, SPSS Fund 2 Guarantors, SPSS Fund 2 Agent, and SPSS Fund 2 Lenders.

(xx)   Sixteenth Amendment to Credit Agreement dated as of March 31, 2022, by and among SPSS 2 as borrower, SPSS Fund 2 Guarantors, SPSS Fund 2 Agent, and SPSS Fund 2 Lenders.

(xxi)   Seventeenth Amendment to Credit Agreement dated as of June 30, 2022, by and among SPSS 2 as borrower, SPSS Fund 2 Guarantors, SPSS Fund 2 Agent, and SPSS Fund 2 Lenders.

(xxii)   Eighteenth Amendment to Credit Agreement dated as of June 26, 2023, by and among SPSS 2 as borrower, SPSS Fund 2 Guarantors, SPSS Fund 2 Agent, and SPSS Fund 2 Lenders.

(11)   **SPSS Fund 3**[5]

   (a) Outstanding Amounts:

      (i)  Principal:     $18,216,077.21
      (ii)  Interest:     $1,761,130.22
      (iii)  **Total:**     **$19,977,207.43**

   (b) Borrower:

      (i)  SPSS Fund 3 LLC ("*SPSS 3*")

   (c) Guarantors

      (i)  SuttonPark

   (d) Collateral: All assets of SuttonPark, now or hereafter acquired, and all proceeds thereof (the "*Collateral*")

---

[5] The hereinafter defined SPSS 3 surrendered, assigned, and transferred the hereinafter defined Collateral to SILAC, as security agent, and SILAC, as security agent, accepted said Collateral in full satisfaction of the Obligations (as such term is defined in the hereinafter defined Credit Agreement).

FINAL

(e) <u>Status</u>: In default/accelerated.

(f) <u>Pre-Petition Loan Documents</u>:

   (i)   Credit Agreement dated as of September 2, 2021 (the "***Credit Agreement***"), by and among SPSS 3, as borrower, the lenders party thereto, and Jazz, as agent.

   (ii)   Security Agreement dated as of September 2, 2021, by SPSS 3, as borrower, in favor of Jazz, as agent.

   (iii)   Limited Guaranty dated as of September 2, 2021, by SuttonPark, as guarantor, in favor of Jazz, as agent.

   (iv)   Escrow Agreement dated as of September 2, 2021, by and among SuttonPark, Wells Fargo Bank, N.A., as escrow agent, Jazz, as lender, and SAR, as lender.

   (v)   Servicing Agreement dated as of September 2, 2021, by and among SPSS 3, as borrower, Jazz, as agent, and Servicer as servicer.

   (vi)   Sale and Contribution Agreement dated as of September 2, 2021, by and between SuttonPark, as seller, and SPSS 3, as buyer.

   (vii)   Indenture dated as of September 2, 2021, by and between SPSS 2021-A LLC ("***SPSS 2021-A***"), as issuer, and Wells Fargo Bank, National Association, as indenture trustee.

   (viii)   Sale and Servicing Agreement dated as of September 2, 2021, by and among SPSS 2021-A, as issuer, Servicer, as servicer, SuttonPark, as sponsor, Vervent Inc., as backup servicer, and Wells Fargo Bank, National Association, as indenture trustee and securities intermediary.

   (ix)   Certificated Note C/R-1, representing $11,750,000.00 Fixed Rate Asset Backed Notes, Class C, Due 2075, dated September 2, 2021, issued by SPSS 2021-A, in the principal amount of $11,750,000.00.

   (x)   Certificated Note D/R-1, representing $6,500,000.00 Fixed Rate Asset Backed Notes, Class D, Due 2075, dated September 2, 2021, issued by SPSS 2021-A, in the principal amount of $6,500,000.00.

(12)   **SPSS Fund 6[6]**

(a) <u>Outstanding Amounts</u>:

   (i)  Principal:     $23,081,412.03
   (ii)  Interest:     <u>$6,833,195.68</u>
   (iii)  **Total:**     **$29,914,607.71**

(b) <u>Borrower</u>:

   (i)   SPSS Fund 6 LLC ("***SPSS 6***")

(c) <u>Guarantors</u>:

---

[6] The hereinafter defined SPSS 6 surrendered, assigned, and transferred the hereinafter defined Collateral to SILAC, as security agent, and SILAC, as security agent, accepted said Collateral in full satisfaction of the Obligations (as such term is defined in the hereinafter defined Credit Agreement).

FINAL

       (i)  SuttonPark

(d) <u>Pledgor</u>:

       (i)  SuttonPark

(e) <u>Collateral</u>:[7]

    (i)   All assets of SPSS 6, now or hereafter acquired, and all proceeds thereof.
    (ii)   100% of SuttonPark's Equity Interests in SPSS 6.
    (iii)   All certificates, instruments, or document evidencing any Pledged Equity Interests.
    (iv)   All Distributions, interest, and other payments and rights with respect to any Pledged Equity Interests, and all rights of SuttonPark to receive any of the foregoing.
    (v)   All of SuttonPark's rights under the Borrower Organizational Documents and under applicable law.
    (vi)   The right of SuttonPark to perform under and exercise consensual and voting rights pursuant to the Borrower Organizational Documents and applicable law, including the right to manage, make determinations, exercise any election or option, give or receive any notice, consent, waiver or approval and seek to compel performance, recover damages and otherwise exercise remedies thereunder.
    (vii)   All options and other rights, contractual or otherwise, with respect to any Pledged Equity Interests.
    (viii)   All Proceeds and all products of, and all rights associated with, the foregoing (iii) through (vii) (all of the foregoing (i) through (viii), the "***Collateral***").

(f) <u>Status</u>: In default/accelerated.

(g) <u>Pre-Petition Loan Documents</u>:

    (i)   Credit Agreement dated as of May 17, 2022 (the "***Credit Agreement***"), by and among SPSS 6, as borrower, the lenders thereto, and SILAC, as agent.
    (ii)   Sale and Contribution Agreement dated as of May 17, 2022, by and between SuttonPark, as seller, and SPSS 6, as buyer.
    (iii)   Security Agreement dated as of May 17, 2022, by SPSS 6, as borrower, in favor of SILAC, as agent.
    (iv)   Pledge and Security Agreement dated as of May 17, 2022, by SuttonPark, as pledgor, and SILAC, as agent.
    (v)   Limited Guaranty dated as of May 17, 2022, by SuttonPark, as guarantor, in favor of SILAC, as agent.
    (vi)   First Amendment to Credit Agreement, Sale and Contribution Agreement, Security Agreement and Limited Guaranty dated as of September 21, 2022, by and among SPSS 6, the lenders thereto, and SILAC, as agent.

---

[7] Capitalized terms used and not otherwise defined in this Section 12(e) shall have the meanings ascribed thereto in the Pledge and Security Agreement dated as of May 17, 2022, by and between SuttonPark, as pledgor, and SILAC, as agent.

FINAL

(vii) Indenture dated as of September 2, 2021, by and between SPSS 2021-A, as issuer, and Wells Fargo Bank, National Association, as indenture trustee.

(viii) Sale and Servicing Agreement dated as of September 2, 2021, by and among SPSS 2021-A, as issuer, Servicer, as servicer, SuttonPark, as sponsor, Vervent Inc., as backup servicer, and Wells Fargo Bank, National Association, as indenture trustee and securities intermediary, Vervent Inc., as backup servicer, and Wells Fargo Bank, National Association, as indenture trustee and securities intermediary.

(ix) Certificated Note E/R-1, representing $23,614,468.00 Subordinated Notes, Due 2075, issued by SPSS 2021-A, in the principal amount of $23,614,468.00.

(13) **Sucnas 2021 LLC**

(a) Outstanding Amounts:

(i) Principal:        $22,104,335.38
(ii) Interest:        $0.00
(iii) **Total:**        **$22,104,335.38**

(b) Borrower:

(i) Sucnas 2021 LLC ("***Sucnas***")

(c) Pledgor:

(i) Sentinel Security Life Insurance Company ("***Sentinel***")
(ii) OLC Legacy I LLC

(d) Collateral:[8]
(i) All assets of Sucnas tangible or intangible, whether now existing or hereafter acquired and all proceeds thereof.
(ii) Sentinel's limited liability company interests in Sucnas (39.58%), and all dividends, distributions, cash, instruments, proceeds, and additional equity interests related thereto.
(iii) OLC Legacy I LLC's limited liability company interests in Sucnas (60.42%), and all dividends, distributions, cash, instruments, proceeds, and additional equity interests related thereto.

(e) Status: In default/accelerated.

(f) Pre-Petition Loan Documents:

(i) Secured Promissory Note dated as of April 1, 2022, made by Sucnas to HMI, as lender.

---

[8] The description of Sentinel's and OLC Legacy I LLC's pledged collateral is a summary from the applicable UCC-1s.

(ii) First Amendment to Senior Secured Promissory Note dated as of December 31, 2022, by and among Sucnas as borrower, HMI as lender, Advantage Capital Management LLC ("*ACM*") as custodian, and Sentinel and OLC Legacy I LLC as pledgors.

(iii) Second Amendment to Secured Promissory Note dated as of December 30, 2023, by and among Sucnas as borrower, HMI as lender, ACM as custodian, and Sentinel and OLC Legacy I LLC as pledgors.

(iv) Security Agreement dated as of April 1, 2022, by Sucnas as grantor in favor of HMI as secured party.

(v) Securities Pledge Agreement dated as of April 1, 2022, by and among Sucnas as pledgor and ACM as note custodian and pledgor, and HMI as lender.

(vi) Pledge Agreement dated as of April 1, 2022, by Sentinel as pledgor in favor of HMI as secured party.

(vii) Pledge Agreement dated as of April 1, 2022, by OLC Legacy I LLC as pledgor in favor of HMI as secured party.

(viii) Custody Agreement dated as of April 1, 2022, by and between Sucnas and ACM, as custodian.

(14) **Employee Funding of America (Participation)**

(a) Outstanding Amounts:

    (i) Principal:    $76,379,331.00
    (ii) Interest:    $29,296.00
    (iii) **Total:**    **$76,408,627.00**

(b) Original Lender:

    (i) Employee Funding of America LLC ("*EFOA*")

(c) Participants:

    (i) HMI

(d) Collateral**:**

    (i) All of Employee Funding of America, LLC's right, title and interest in, to and under the term loans made by Employee Funding of America pursuant to the EFOA Credit Agreement (as defined below) and the other Credit Documents (as the principal balance of such terms loans is increased as a result of (x) additional advances made pursuant to the EFOA Credit Agreement and (y) all capitalized amounts) and the EFOA Credit Documents (as defined below), whether now owned or hereafter acquired, including all proceeds of the foregoing.

(e) Status: In default/accelerated.

(f) Pre-Petition Loan Documents:

FINAL

(i)   Credit Agreement dated as of April 26, 2019, by and among EFOA, Phipps Anderson Deacon LLP, Martin Phipps, PLLC, Phipps LLP, J. Barrett Deacon, PLLC, Simon Purnell, PLLC, and Phipps Deacon Purnell, PLLC, collectively as the borrower ("***EFOA Credit Agreement***").

(ii)   Security Agreement dated as of April 26, 2019, by and between the Borrower and EFOA.

(iii)   Deposit Account Control Agreement dated as of April 26, 2019, relating to the Collection Account, by and among Wilmington Trust, N.A., the Borrower, and EFOA.

(iv)   Subordination Agreement dated as of April 26, 2019, among the Borrower, EFOA, Martin Phipps, M & JP Investments, LTD, R.A.S.H. LLC, and EMET, LLC.

(v)   Limited Guaranty dated as of April 26, 2019, by the Limited Guarantors in favor of EFOA.

(vi)   Participation Agreement dated as of February 28, 2023, by Employee Funding of America, LLC as lender and HMI as participant ("***EFOA Participation Agreement***", together with the above, the "***EFOA Credit Documents***").

## (15)   **Phipps (Payment of Guaranteed Return)**

(a) <u>Outstanding Amounts</u>:

    (i)   Principal:     $54,853,746.41
    (ii)  Interest:      $19,544,464.99
    (iii) **Total:**     **$74,398,211.40**

(b) <u>Guarantors/Obligors</u>:

    (i)   600 Partners
    (ii)  777 Partners

(c) <u>Collateral</u>**:**

    (i)   All personal property of each Original Debtor.

(d) <u>Status</u>: In default/accelerated.

(e) <u>Pre-Petition Loan Documents</u>:

    (i)   EFOA Credit Agreement
    (ii)  EFOA Credit Documents
    (iii) EFOA Participation Agreement
    (iv) Participation Agreement dated as of February 28, 2020, by and between Employee Funding of America, LLC and HMI.
    (v)  Payment of Guaranteed Return Agreement dated as of February 16, 2024, by 600 Partners and 777 Partners in favor of HMI.

FINAL

(vi)   Pledge and Security Agreement dated as of February 16, 2024, by and among 600 Partners and 777 Partners as grantors and ACM Delegate as administrative agent and collateral agent.

(16)   **OLC I – Senior Secured Note**

(a) Outstanding Amounts:

(i)   Principal:       $9,084,541.04
(ii)   Interest:       $466,132.89
(iii)   **Total:**       **$9,550,673.92**

(b) Borrower:

(i)   OLC Legacy I LLC

(c) Collateral: All assets of OLC Legacy I LLC, now or hereafter acquired, and all proceeds thereof.

(d) Status: In default/accelerated.

(e) Pre-Petition Loan Documents:

(i)   Senior Secured Promissory Note dated as of June 30, 2020, by OLC Legacy I LLC in favor of Jazz, acknowledged and agreed by Atlas VIII Subordinated Notes Holdings, LLC ("*Atlas 1*") and Atlas VIII Subordinated Notes Holdings II, LLC ("*Atlas 2*").
(ii)   Custodial and Administrative Agent Agreement dated as of June 30, 2020, by and among Atlas 1 and Atlas 2 as subordinated noteholders, OLC LEGACY I LLC, HMI, Jazz, Advantage Capital Holdings, LLC ("*ACH*"), and ACM.

(17)   **OLC I – Junior Secured Note**

(a) Outstanding Amounts:

(i)   Principal:       $1,000,214.00
(ii)   Interest:       $0.00
(iii)   **Total:**       **$1,000,214.00**

(b) Borrower:

(i)   OLC Legacy I LLC

(c) Collateral: All assets of OLC Legacy I LLC, now or hereafter acquired, and all proceeds thereof.

FINAL

(d) <u>Status:</u> In default/accelerated.

(e) <u>Pre-Petition Loan Documents</u>:

    (i)   Junior Secured Promissory Note dated as of June 30, 2020, by OLC Legacy I LLC in favor of ACH, acknowledged and agreed by Atlas 1 and Atlas 2.

    (ii)  Custodial and Administrative Agent Agreement dated as of June 30, 2020, by and among Atlas 1 and Atlas 2 as subordinated noteholders, OLC LEGACY I LLC, HMI, Jazz, ACH, and ACM.

**(18)**    **Unsecured 777 Facility**

(a) <u>Outstanding Amounts</u>:

| | | |
|---|---|---|
| (i) | Principal: | $25,037,805.82 |
| (ii) | Interest: | <u>$282,370.81</u> |
| (iii) | **Total:** | **$25,320,176.63** |

(b) <u>Borrower</u>:

    (i)   777 Partners

(c) <u>Collateral</u>: Unsecured

(d) <u>Status</u>: In default/accelerated.

(e) <u>Pre-Petition Loan Documents</u>:

    (i)   Unsecured Loan Agreement dated as of December 12, 2024, by and between 777 Partners as borrower, and ACH as lender.

**(19)**    **777 Condo Loan**

(a) <u>Outstanding Amounts</u>:

| | | |
|---|---|---|
| (i) | Principal: | $4,620,000.00 |
| (ii) | Interest: | <u>$367,676.67</u> |
| (iii) | **Total:** | **$4,987,676.67** |

(b) <u>Borrower</u>:

    (i)   777 Partners

(c) <u>Collateral</u>: The collateral described in that certain Mortgage, Security Agreement and Assignment of Leases and Rents executed by Michael Fuqua as Co-Trustee of the Carillon 313 Trust dated March 24, 2022.

(d) Status: In default/accelerated.

(e) Pre-Petition Loan Documents:

    (ii) Promissory Note effective as of May 28, 2025, by 777 Partners as borrower in favor of ACH as lender.

(20) **MedSet/Signal Revolving Facility (Participated)**

(a) Outstanding Amounts:

Calculated as of July 23, 2026
(i)   Principal:     $129,065,000.00
(ii)  Interest:     $15,677,208.80
(iii) **Total:**     **$144,742,208.80**

(b) Borrower:

    (i)   Signal SML 3 LLC
    (ii)  Deed Street SPV RE LLC
    (iii) SuttonPark SPV RE LLC
    (iv) Signal SLF 1 LLC (collectively, the "*MedSet Borrowers*")

(c) Participants:

    (i)   SILAC
    (ii)  HMI
    (iii) Jazz
    (iv) SAR (collectively, the "*MedSet Participants*")

(d) Collateral: For each of the MedSet Borrowers, all assets of the Debtor, whether now owned or hereafter acquired or arising and wheresoever located, including all accessions thereto and products and proceeds thereof.

(e) Status: In default/accelerated.

(f) Pre-Petition Loan Documents:

    (i)   Amended and Restated Credit Agreement dated as of December 30, 2020, by and among the MedSet Borrowers and MedSet Funding LLC ("*MedSet Funding*").
    (ii)  First Amendment to Amended and Restated Credit Agreement dated as of December 17, 2021, by and among the MedSet Borrowers and MedSet Funding.
    (iii) Second Amendment to Amended and Restated Credit Agreement dated as of October 21, 2022, by and among the MedSet Borrowers and MedSet Funding.

FINAL

(iv)   Omnibus Participation Agreement dated as of October 21, 2022, by and among the MedSet Participants and MedSet Funding.

(v)   First Amendment to Omnibus Participation Agreement dated as of October 21, 2022, by and among the MedSet Participants and MedSet Funding.

(vi)   Second Amendment to Omnibus Participation Agreement dated as of October 26, 2022, by and among the MedSet Participants and MedSet Funding.

(vii)   Third Amendment to Omnibus Participation Agreement dated as of October 28, 2022, by and among the MedSet Participants and MedSet Funding.

(viii)   Fourth Amendment to Omnibus Participation Agreement dated as of November 22, 2022, by and among the MedSet Participants and MedSet Funding.

(ix)   Fifth Amendment to Omnibus Participation Agreement dated as of November 28, 2022, by and among the MedSet Participants and MedSet Funding.

(x)   Second Amended and Restated Participation Repurchase Agreement dated as of October 21, 2022, by and among the MedSet Participants and MedSet Funding.

(21)   **Thresher Seller Note**

(a) Outstanding Amounts:

(i)   Principal:        $19,342,782.41
(ii)   Interest:        $34,464.12
(iii)   **Total:**        **$19,377,246.54**

(b) Borrower:

(i)   Thresher Acquisition LLC

(c) Collateral: Unsecured

(d) Status: In default/accelerated.

(e) Pre-Petition Loan Documents:

(i)   Amended and Restated Promissory Note dated as of June 24, 2023, made by Thresher Acquisition LLC, as borrower to the order of PACA-E LLC, Ensurem Holdings I, LLC and Ensurem II, LLC, as lenders.

(22)   **CSG Loan[9]**

(a) Outstanding Amounts:

(i)   Principal:        $10,770,693.49

---

[9] The hereinafter defined CSG Borrowers and EFOA surrendered, assigned, and transferred the Loan Agreement Collateral and EFOA Collateral to SILAC, as security agent, and SILAC, as security agent, accepted said Loan Agreement Collateral and EFOA Collateral in full satisfaction of the Obligations (as such term is defined in the hereinafter defined Amended Loan Agreement).

   (ii)   Interest:      <u>$4,195,701.52</u>

   (iii)  **Total:**      **$14,966,395.01**

(b) <u>Borrower</u>:

   (i)   Case Strategies Group, LLC
   (ii)  Principled Engineering Consultants LLC
   (iii) Global Claim Advisors LLC (collectively, the "***CSG Borrowers***")

(c) <u>Pledgors</u>:
   (i)   EFOA
   (ii)  Sphinx Funding LLC ("***Sphinx***")

(d) <u>Prior Collateral</u>:[10]
   (i)   Each of the Borrowers' personal property and other assets of whatever kind or nature, whether now existing or hereafter arising or acquired (collectively the "***Loan Agreement Collateral***")
   (ii)  All of EFOA's right, title, and interest in and to (i) any loan made or acquired by EFOA to an obligor who was a member of the settlement class in the case known as In re: National Football League Players' Concussion Injury Litigation, No. 2:12-md-02323 (E.D. Pa.), whether now existing or hereafter made, and (ii) all proceeds and products of, and all rights associated with, the foregoing (the "***EFOA Collateral***")
   (iii) All of Sphinx's right, title and interest in and to (i) that certain Interim Deed of Priority, dated March 9, 2021, by and between Park Street Litigation Services LP, as a funder, Sphinx, as a funder, and Harbour Underwriting Limited, as the insurer; (ii) that certain Litigation Funding Agreement, dated March 9, 2021, by and between Alexander Gorbachev, as the beneficiary, Ivan Alexandrovich Gorbachev, Larisa Alexandrovna Smirnova, and Alexandra Alexandrovna Gorbacheva, each as a beneficiary affiliate, Marholm Limited, as a funding party, Park Street Litigation Services LP, as a funding party, and Sphinx Funding LLC, as a funding party; and (iii) all proceeds and products of, and all rights associated with, the foregoing (the "***Sphinx Collateral***")

(e) <u>Status</u>: In default/accelerated.

(f) <u>Pre-Petition Loan Documents</u>:

   (i)   Loan and Security Agreement dated as of September 15, 2021, among the CSG Borrowers, SILAC, as security agent, and lenders party thereto.
   (ii)  Amended and Restated Loan and Security Agreement dated as of August 8, 2022 (the "***Amended Loan Agreement***"), among CSG Borrowers and SAR, as lender.
   (iii) Pledge and Security Agreement dated September 15, 2021 by EFOA, pledgor, in favor of SILAC, as security agent for the lenders ("***EFOA Pledge Agreement***").

---

[10] The description of the EFOA Collateral and Sphinx Collateral is a summary of the collateral described on the applicable UCC-1s.

    (iv) Pledge and Security Agreement dated September 15, 2021 by Sphinx Funding LLC, pledgor, in favor of SILAC, as security agent for the lenders ("**Sphinx Pledge Agreement**").

(23) **Noble**

    (a) Outstanding Amounts:

        (i) Principal:     $45,000,000.00
        (ii) Interest:     $17,545,019.87
        (iii) **Total:**     **$62,545,019.87**

    (b) Borrower:

        (i) Noble Financial Solutions LLC ("**Noble**")

    (c) Guarantor:

        (i) Joshua Wander

    (d) Collateral: All assets, now or hereafter acquired, and all proceeds thereof.

    (e) Status: In default/accelerated.

    (f) Pre-Petition Loan Documents:

        (i) Loan and Security Agreement dated as of September 20, 2021, by and among Noble Financial Solutions LLC, as borrower, 777AM, as security agent, and the lenders party thereto.
        (ii) Promissory Note dated as of September 20, 2021, made by Noble, in the principal amount of $70,000,000.00.
        (iii) Guaranty dated as of September 20, 2021, by Joshua Wander, as guarantor, to SILAC Insurance Company, as lender.

(24) **777 Revolver**

    (a) Outstanding Amounts:

        (i) Principal:     $14,000,000.00
        (ii) Interest:     $6,783,684.24
        (iii) **Total:**     **$20,783,684.24**

    (b) Borrower:

        (i) 777 Partners

FINAL

(c) <u>Guarantor</u>:

  (i)  Brickell Insurance Holdings LLC ("***Brickell***")

(d) <u>Collateral</u>:

  (i)  777's Merrill Lynch brokerage account as identified in the Second Amended and Restated Revolving Loan and Security Agreement described below, and all of 777's rights and interests under such asset.

  (ii)  Brickell's brokerage account as identified in the Second Amended and Restated Revolving Loan and Security Agreement described below, and all of Brickell's rights and interests under such asset.

  (iii)  Proceeds of each of the foregoing.

(e) <u>Status</u>: In default/accelerated.

(f) <u>Pre-Petition Loan Documents</u>:

  (i)  Revolving Loan and Security Agreement dated as of January 2, 2020, by and among 777 Partners, as borrower, and 77 RE LLC, as lender.

  (ii)  Amended and Restated Revolving Loan and Security Agreement dated as of December 23, 2021, by and between 777 Partners, as borrower, and SILAC, as lender.

  (iii)  Second Amended and Restated Revolving Loan and Security Agreement dated as of February 17, 2022, by and among 777 Partners, as borrower, SILAC, as lender, and Brickell, as guarantor.

  (iv)  Pledged Collateral Account Control Agreement dated as of February 17, 2022, by and among 777 Partners, SILAC, and Merrill Lynch, Pierce, Fenner, & Smith Incorporated.

  (v)  Account Control Agreement dated as of February 17, 2022, by and among Brickell, 777 Partners, SILAC, and Wilmington Trust, National Association.

  (vi)  Assignment and Assumption Agreement dated as of September 20, 2021, by and between 777 RE LLC, as assignor, and SILAC, as assignee.

(25) **SPSS Residual**
  (a) <u>Outstanding Amounts</u>:

<u>Class A Notes</u>
  (i)  Principal:    $472,941,636.84
  (ii)  Interest:    <u>$1,182,354.09</u>
  (iii)  **Total:**    **$474,123,990.93**

<u>Class B Notes</u>
  (i)  Principal:    $99,266,015.68
  (ii)  Interest:    <u>$277,117.63</u>
  (iii)  Total:    **$99,543,133.31**

FINAL

(b) <u>Issuer</u>

    (i)  SPFS Residual LLC ("***Issuer***")

(c) <u>Collateral</u>:
    (i)  All assets of the Issuer, whether now owned or hereafter acquired.
    (ii)  All of Sponsor's (as defined below) right, title and interest, whether now owned or hereafter acquired, in and to the JGW III Residual Notes and the SPSS 2021-Residual Note, all "Other Conveyed Property"[11] related thereto and all products and proceeds thereof.
    (iii)  All of SPSS Fund 4 LLC's right, title and interest, whether now owned or hereafter acquired, in and to the JGW III Residual Notes and the SPSS 2021-Residual Note, all "Other Conveyed Property"[12]  related thereto and all products and proceeds thereof

(d) <u>Status</u>: Not in default.

(e) <u>Pre-Petition Loan Documents</u>:

    (i)  Indenture dated as of January 19, 2022 by and between Issuer and Computershare Trust Company National Association as indenture trustee ("***Indenture Trustee***").
    (ii)  Sale and Servicing Agreement dated as of January 19, 2022 among Issuer, SPSS Fund 4 LLC, Servicer, SuttonPark ("***Sponsor***"), Vervent Inc., as backup servicer, and Indenture Trustee.
    (iii)  Note Purchase Agreement dated as of January 19, 2022 among Issuer, Sponsor, the purchasers time to time party thereto, including without limitation, HMI, Jazz, SAR, SILAC, Atlantic Coast Life Insurance Company ("***ACL***"), and Sentinel.
    (iv)  Account Control Agreement dated as of January 19, 2022 among Issuer, Indenture Trustee, and Wells Fargo Bank, N.A. as account bank.
    (v)  $490,566,245.25 3.00% Fixed Rate Asset-Backed Notes, Class A, Due 2082 (Global Class A Note), dated January 19, 2022, issued by Issuer payable to Cede & Co. or registered assigns.
    (vi)  Certificated Note B/R-1, representing $99,266,015.68 Fixed Rate Asset-Backed Notes, Class B, Due 2082, dated January 19, 2022, issued by Issuer, in the principal amount of $13,560,930.68, payable to HMI.
    (vii)  Certificated Note B/R-2, representing $99,266,015.68 Fixed Rate Asset-Backed Notes, Class B, Due 2082, dated January 19, 2022, issued by Issuer, in the principal amount of $9,926,602.00, payable to Jazz.

---

[11] "Other Conveyed Property" defined in the applicable UCC-1 includes (i) the issuer's rights in the collection account and related securities, investments, and income thereon; other agreements supporting or securing payment of the Residuals (including guaranties, letters of credit, or other credit support); all rights, benefits, and privileges as holder of the Residuals; all records and instruments relating to the Residuals; and products and proceeds of the foregoing; (ii) all Residual Records; (iii) the debtor's and Fund 4 Seller's rights and interests in the Transaction Documents; and (iv) all proceeds of the foregoing. The "Residuals" are defined to include JGW I Residual Notes, the JGW III Residual Notes, the SAF Residual, and the SPSS 2017-1 Residual Note.
[12] Reference is made to Footnote 8 above.

FINAL

(viii) Certificated Note B/R-3, representing $99,266,015.68 Fixed Rate Asset-Backed Notes, Class B, Due 2082, dated January 19, 2022, issued by Issuer, in the principal amount of $9,926,602.00, payable to SAR.

(ix) Certificated Note B/R-4, representing $99,266,015.68 Fixed Rate Asset-Backed Notes, Class B, Due 2082, dated January 19, 2022, issued by Issuer, in the principal amount of $33,088,672.00, payable to SILAC.

(x) Certificated Note B/R-5, representing $99,266,015.68 Fixed Rate Asset-Backed Notes, Class B, Due 2082, dated January 19, 2022, issued by Issuer, in the principal amount of $13,235,469.00, payable to SILAC.

(xi) Certificated Note B/R-6, representing $99,266,015.68 Fixed Rate Asset-Backed Notes, Class B, Due 2082, dated January 19, 2022, issued by Issuer, in the principal amount of $9,763,870.00, payable to HMI.

(xii) Certificated Note B/R-7, representing $99,266,015.68 Fixed Rate Asset-Backed Notes, Class B, Due 2082, dated January 19, 2022, issued by Issuer, in the principal amount of $9,763,870.00, payable to HMI.

(xiii) Certificated Subordinated Note C/R-1, representing $50,593,646.70 Subordinated Notes, Due 2082, dated January 19, 2022, issued by Issuer, payable to Sponsor.

(xiv) Assignment (SPSS 2017-1 Residual Note), dated as of January 19, 2022, from Sponsor as assignor, to Issuer as assignee.

(xv) Assignment (JGW III Residual Notes), dated as of January 19, 2022, from SPSS Fund 4 LLC as assignor, to Issuer as assignee,

(xvi) Payment Direction Letter (JGW I Residual Notes), dated as of January 19, 2022, among Issuer, Sponsor, and Indenture Trustee.

(xvii) Payment Direction Letter (JGW III Residual Notes), dated as of January 19, 2022, among Issuer, Sponsor, and Indenture Trustee.

(xviii) Payment Direction Letter (SAF Residual), dated as of January 19, 2022, among Issuer and the paying agent under the SAF Indenture.

(xix) Payment Direction Letter (SPSS 2017-1 Residual Note), dated as of January 19, 2022, among Issuer and the indenture trustee under the SPSS 2017-1 Sale and Servicing Agreement.

(26)    **"Knightsbridge" Facility**

(a) Outstanding Amounts:

(i) Principal: $1,181,932,760.60
(ii) Interest: $5,180,329.99
(iii) **Total:    $1,187,113,090.59**

(b) Borrowers:

(i) Volans 2018 LLC (the "**Volans Borrower**")

(c) Guarantors:

(i) 600 Partners

FINAL

     (ii)   777 Partners
    (iii)   LR Company III, L.L.C., ("**Lottery SPV**")
    (iv)   Asellus Receivables, LLC ("**Lottery SPV2**")
     (v)   Acubens, LLC ("**Lottery SPV3**")
    (vi)   Acubens II, LLC ("**Lottery SPV4**")
   (vii)   Bluehill Annuities LLC ("**Annuity SPV**")
  (viii)   Conway Member Corp. ("**Conway Corp**")
    (ix)   Conway Acceptance LLC ("**Conway Acceptance**")

(d) <u>Collateral</u>:

     (i)   all assets of the Volans Borrower, whether now owned or hereafter arising or acquired and wheresoever located and all proceeds.
    (ii)   100% of the equity interests of the Volans Borrower owned by SuttonPark (as defined below) and all related rights, distributions and proceeds.
   (iii)   all assets of each of Lottery SPV, Lottery SPV2, Lottery SPV3, Lottery SPV4, Annuity SPV, Conway Corp and Conway Acceptance, whether now owned or hereafter arising or acquired and wheresoever located and all proceeds.
    (iv)   The collateral securing the "Mayfair" facility described herein.

(e) <u>Status</u>: In default but not accelerated.

(f) <u>Pre-Petition Loan Documents</u>:

     (i)   Amended and Restated Credit Agreement, dated as of July 29, 2022, by and among the Volans Borrower, as borrower, Lottery SPV, Lottery SPV2, Lottery SPV3, Lottery SPV4, Annuity SPV, Conway Corp, Conway Acceptance, SuttonPark, as seller, SuttonPark Servicing LLC, as servicer (the "**Volans Servicer**"), Vervent Inc., as backup servicer, National Founders LP ("**National Founders**"), as administrative agent (the "**Volans Administrative Agent**") and as initial lender, and the other lenders party thereto from time to time.
    (ii)   First Amendment to Amended and Restated Credit Agreement, dated as of October 20, 2022, by and among the Volans Borrower, Lottery SPV, Lottery SPV2, Lottery SPV3, Lottery SPV4, Annuity SPV, Conway Corp, Conway Acceptance, SuttonPark, the Volans Servicer, the Volans Administrative Agent, National Founders, as initial lender, and Vervent Inc., as backup servicer.
   (iii)   Second Amendment to Amended and Restated Credit Agreement, dated as of April 29, 2023, by and among the Volans Borrower, Lottery SPV, Lottery SPV2, Lottery SPV3, Lottery SPV4, Annuity SPV, Conway Corp, Conway Acceptance, SuttonPark, the Volans Servicer, the Volans Administrative Agent, National Founders, as initial lender, and Vervent Inc., as backup servicer.
    (iv)   Third Amendment to Amended and Restated Credit Agreement, dated as of June 30, 2023, by and among the Volans Borrower, Lottery SPV, Lottery SPV2, Lottery SPV3, Lottery SPV4, Annuity SPV, Conway Corp, Conway Acceptance, SuttonPark, the Volans Servicer, the Volans Administrative Agent, National Founders, as initial lender, and Vervent Inc., as backup servicer.

FINAL

   (v)   Fourth Amendment to Amended and Restated Credit Agreement, dated as of July 31, 2023, by and among the Volans Borrower, Lottery SPV, Lottery SPV2, Lottery SPV3, Lottery SPV4, Annuity SPV, Conway Corp, Conway Acceptance, SuttonPark, the Volans Servicer, the Volans Administrative Agent, National Founders, as initial lender, and Vervent Inc., as backup servicer.

   (vi)   Fifth Amendment to Amended and Restated Credit Agreement, dated as of December 31, 2023, by and among the Volans Borrower, Lottery SPV, Lottery SPV2, Lottery SPV3, Lottery SPV4, Annuity SPV, Conway Corp, Conway Acceptance, SuttonPark, the Volans Servicer, the Volans Administrative Agent, National Founders, as initial lender, and Vervent Inc., as backup servicer.

   (vii)   Pledge Agreement, dated as of November 20, 2018, by and among SuttonPark and the Volans Administrative Agent.

   (viii)   Pledge and Security Agreement, dated as of November 20, 2018, by and among Lottery SPV, Lottery SPV2, Lottery SPV3, Lottery SPV4, Annuity SPV, Conway Corp, Conway Acceptance and the Volans Administrative Agent.

   (ix)   Guaranty Agreement, dated as of November 20, 2018, made by 600 Partners, 777 Partners, Lottery SPV, Lottery SPV2, Lottery SPV3, Lottery SPV4, Conway Corp, Conway Acceptance and Annuity SPV.

   (x)   Amendment No. 1 to Guaranty Agreement, dated as of July 31, 2019, made by 600 Partners, 777 Partners, Lottery SPV, Lottery SPV2, Lottery SPV3, Lottery SPV4, Conway Corp, Conway Acceptance and Annuity SPV.

   (xi)   Amendment No. 2 to Guaranty Agreement, dated as of June 30, 2020, made by 600 Partners, 777 Partners, Lottery SPV, Lottery SPV2, Lottery SPV3, Lottery SPV4, Conway Corp, Conway Acceptance and Annuity SPV.

   (xii)   Amendment No. 3 to Guaranty Agreement, dated as of July 29, 2022, made by 600 Partners, 777 Partners, Lottery SPV, Lottery SPV2, Lottery SPV3, Lottery SPV4, Conway Corp, Conway Acceptance and Annuity SPV.

   (xiii)   Amended and Restated Letter Agreement Related to Designated Receivables, dated as of December 31, 2023, by and among the Volans Borrower, Lottery SPV, Lottery SPV2, Lottery SPV3, Lottery SPV4, Annuity SPV, Conway Corp, Conway Acceptance, SuttonPark, 600 Partners, 777 Partners, SuttonPark Servicing LLC, Chiller Island 1 LLC and National Founders.

   (xiv)   Sale and Contribution Agreement, dated as of November 20, 2018, by and between SuttonPark and the Volans Borrower.

   (xv)   Structured Settlement Payment Servicing Agreement, dated as of August 6, 2010, by and among Wells Fargo Bank, National Association, WestLB AG, New York Branch, Winchester Global Trust Company Limited, Structured Asset Receivable Fund I, LLC, Structured Asset Services, LLC and the SAF Companies party thereto.

   (xvi)   Amendment No. 1 to Structured Settlement Payment Servicing Agreement, dated as of November 17, 2010, by and among Wells Fargo Bank, National Association, WestLB AG, New York Branch, Winchester Global Trust Company Limited, Structured Asset Receivable Fund I, LLC, Structured Asset Services, LLC and the SAF Companies party thereto.

   (xvii)   Collateral Trust and Intercreditor Agreement, dated as of October 7, 2010, by and among DZ Bank AG Deutsche Zentral-Genossenschaftsbank, Wells Fargo Bank, National Association, NC Legacy LLC (f/k/a/ Novation Capital, LLC), Eisbock

Funding, LLC, Novation Receivables Funding LLC, Obsidis Trust One, Pilsen Trust, Mead Receivables Trust, and No More Waiting LLC.

(xviii) Amendment No. 1 to Collateral Trust and Intercreditor Agreement, dated as of May 14, 2013, by and among DZ Bank AG Deutsche Zentral-Genossenschaftsbank, Wells Fargo Bank, National Association, NC Legacy LLC (f/k/a/ Novation Capital, LLC), Eisbock Funding, LLC, Novation Receivables Funding LLC, Obsidis Trust One, Pilsen Trust, Mead Receivables Trust, and No More Waiting LLC.

(xix) Amendment No. 2 to Collateral Trust and Intercreditor Agreement, dated as of May 15, 2014, by and among DZ Bank AG Deutsche Zentral-Genossenschaftsbank, Wells Fargo Bank, National Association, NC Legacy LLC (f/k/a/ Novation Capital, LLC), Eisbock Funding, LLC, Novation Receivables Funding LLC, Obsidis Trust One, Pilsen Trust, Mead Receivables Trust, and No More Waiting LLC.

(xx) Amendment No. 3 to Collateral Trust and Intercreditor Agreement, dated as of October 23, 2014, by and among DZ Bank AG Deutsche Zentral-Genossenschaftsbank, Wells Fargo Bank, National Association, NC Legacy LLC (f/k/a/ Novation Capital, LLC), Eisbock Funding, LLC, Novation Receivables Funding LLC, Obsidis Trust One, Pilsen Trust, Mead Receivables Trust, and No More Waiting LLC.

(xxi) Intercreditor Agreement Supplement, dated as of October 23, 2014, by and between SuttonPark and Novation Funding, LLC, and accepted by Wells Fargo Bank, National Association.

(xxii) Amended and Restated Intercreditor and Concentration Account Administration Agreement, dated as of May 23, 2013, among Wells Fargo Bank, National Association, SuttonPark, the Volans Servicer, SuttonPark Structured Settlements LLC and certain other parties from time to time party thereto.

(xxiii) Intercreditor Agreement, dated as of October 3, 2014, by and among Wells Fargo Bank, N.A., DRB Capital, LLC, Majestic GSS L.L.C., Majestic LCSS L.L.C., EquiTrust Life Insurance Company, and the other secured parties from time to time party thereto.

(xxiv) First Amendment to Intercreditor Agreement, dated as of November 16, 2016, by and among Wells Fargo Bank, N.A., DRB Capital, LLC, Majestic GSS L.L.C., Majestic LCSS L.L.C., EquiTrust Life Insurance Company, and the other secured parties from time to time party thereto.

(xxv) Second Amendment to Intercreditor Agreement, dated as of November 18, 2018, by and among Wells Fargo Bank, N.A., DRB Capital, LLC, Majestic GSS L.L.C., Majestic LCSS L.L.C., EquiTrust Life Insurance Company, and the other secured parties from time to time party thereto.

(xxvi) Intercreditor and Concentration Account Administration Agreement, dated as of January 28, 2015, by and among Wells Fargo Bank, National Association, as concentration account bank and account custodian, Structured Asset Funding, LLC, Structured Asset Services, LLC, and each of the other parties thereto.

(xxvii) ISDA 2002 Master Agreement, dated as of January 21, 2021, by and between the Volans Borrower and Goldman Sachs International.

(xxviii) Collateral Assignment, dated as of February 25, 2021, by and between the Volans Borrower and the Volans Administrative Agent, and consented to by Goldman Sachs International.

FINAL

(xxix) Appointment and Acceptance Agreement, dated as of October 24, 2024, by and between DRB Capital, LLC, as successor servicer, and the Volans Administrative Agent.

(xxx) Intercreditor and Concentration Account Administration Agreement, dated as of February 5, 2025, by and among Regions Bank, DRB Capital, LLC, DRB Advantage, LLC, National Founders, NMLSP1, LLC, and each of the other parties thereto.

**"Mayfair" Facility**

(a) Outstanding Amounts:

Principal:     $162,889,079.83
Interest:      $49,716.11
**Total:**     **$162,938,795.94**

(b) Borrower/MRA Seller:

Chiller Island 1 LLC

(c) Guarantor:

600 Partners, 777 Partners and SuttonPark

(d) Collateral:

(i)      All assets of the MRA Seller, including certain 3.00% Fixed Rate Asset Backed Notes, Class A Notes issued by SPFS Residual LLC under the Indenture CUSIP #78470U AD2, and all proceeds of the foregoing.

(ii)     The collateral securing the "Knightsbridge" facility described herein.

(e) Status: In default but not accelerated.

(f) Pre-Petition Loan Documents:

(i) Master Repurchase Agreement, dated as of January 19, 2022 (the "**MRA**"), between National Founders, as buyer (the "**MRA Buyer**") and Chiller Island 1 LLC, as seller (the "**MRA Seller**").

(ii) Amendment No. 1 to Master Repurchase Agreement, dated as of June 10, 2022, between the MRA Buyer and the MRA Seller.

(iii) Amendment No. 2 to Master Repurchase Agreement, dated as of June 17, 2022, between the MRA Buyer and the MRA Seller.

(iv) Amendment No. 3 to Master Repurchase Agreement, dated as of October 20, 2022, between the MRA Buyer and the MRA Seller.

(v) Amendment No. 4 to Master Repurchase Agreement, dated as of March 16, 2023, between the MRA Buyer and the MRA Seller.

FINAL

    (vi)    Amendment No. 5 to Master Repurchase Agreement, dated as of April 29, 2023, between the MRA Buyer and the MRA Seller.

   (vii)    Amendment No. 6 to Master Repurchase Agreement, dated as of July 31, 2023, between the MRA Buyer and the MRA Seller.

  (viii)    Amendment No. 7 to Master Repurchase Agreement, dated as of December 31, 2023, between the MRA Buyer and the MRA Seller.

    (ix)    Guaranty Agreement, dated as of January 19, 2022, made by 600 Partners, 777 Partners and SuttonPark and acknowledged and accepted by MRA Buyer.

     (x)    Amendment No. 1 to Guaranty Agreement, dated as of July 29, 2022, made by 600 Partners, 777 Partners and SuttonPark and acknowledged and accepted by MRA Buyer.

    (xi)    Pledge Agreement, dated as of January 19, 2022, by SuttonPark Servicing LLC, as grantor, in favor of the MRA Buyer.

   (xii)    Amended and Restated Transaction Confirmation, dated as of June 17, 2022, between the MRA Buyer and the MRA Seller.

  (xiii)    Amendment No. 1 to Amended and Restated Transaction Confirmation, dated as of August 17, 2022, between the MRA Buyer and the MRA Seller.

  (xiv)    Amendment No. 2 to Amended and Restated Transaction Confirmation, dated as of August 29, 2022, between the MRA Buyer and the MRA Seller.

   (xv)    Amendment No. 3 to Amended and Restated Transaction Confirmation, dated as of October 20, 2022, between the MRA Buyer and the MRA Seller.

  (xvi)    Amendment No. 4 to Amended and Restated Transaction Confirmation, dated as of October 28, 2022, between the MRA Buyer and the MRA Seller.

  (xvii)    Amendment No. 5 to Amended and Restated Transaction Confirmation, dated as of December 19, 2022, between the MRA Buyer and the MRA Seller.

 (xviii)    Amendment No. 6 to Amended and Restated Transaction Confirmation, dated as of December 23, 2022, between the MRA Buyer and the MRA Seller.

  (xix)    Amendment No. 7 to Amended and Restated Transaction Confirmation, dated as of January 13, 2023, between the MRA Buyer and the MRA Seller.

   (xx)    Amendment No. 8 to Amended and Restated Transaction Confirmation, dated as of January 25, 2023, between the MRA Buyer and the MRA Seller.

  (xxi)    Amendment No. 9 to Amended and Restated Transaction Confirmation, dated as of February 13, 2023, between the MRA Buyer and the MRA Seller.

  (xxii)    Amendment No. 10 to Amended and Restated Transaction Confirmation, dated as of March 16, 2023, between the MRA Buyer and the MRA Seller.

 (xxiii)    Amendment No. 11 to Amended and Restated Transaction Confirmation, dated as of April 29, 2023, between the MRA Buyer and the MRA Seller.

 (xxiv)    Amendment No. 12 to Amended and Restated Transaction Confirmation, dated as of May 26, 2023, between the MRA Buyer and the MRA Seller.

  (xxv)    Amendment No. 13 to Amended and Restated Transaction Confirmation, dated as of July 31, 2023, between the MRA Buyer and the MRA Seller.

 (xxvi)    Amendment No. 14 to Amended and Restated Transaction Confirmation, dated as of December 31, 2023, between the MRA Buyer and the MRA Seller.

(xxvii)    Amendment No. 15 to Amended and Restated Transaction Confirmation, dated as of March 25, 2026, between the MRA Buyer and the MRA Seller.

FINAL

(xxviii)  Sale and Servicing Agreement, dated as of January 19, 2022, among SPFS Residual LLC, as issuer, the Volans Servicer, SuttonPark, as sponsor and as a seller, SPSS Fund 4 LLC, as a seller, Vervent, Inc., as backup servicer, and Computershare Trust Company, National Association, as indenture trustee.

FINAL

**EXHIBIT A**
Schedule 1.2

- SuttonPark Acquisition LLC
- SPA II LLC
- F3EA Holdings LLC
- F3EA Funding LLC
- MedSet Funding LLC
- Signal MLH Medical Receivables Holdco LLC
- Speed Leasing Company LLC
- Triple 7 Irish Operations Limited
- FFI Holdings Limited
- Sustainable Supplies LLC
- Signal Funding, LLC
- Nimble Funding LLC
- Signal AHF Medical Receivables HoldCo LLC
- Signal Medical Receivables LLC
- Signal Financial Holdings LLC
- Signal SML 1 LLC
- Signal SML 2 LLC
- SLF 2 LLC
- Signal LF Portfolio Holdco LLC
- Signal Servicing LLC
- SKC 1 LLC
- SKC RX LLC
- Triple7 Sports Management LLC
- 777 Asset Management LTD
- 777 Asset Management LLC
- 777 Real Estate LLC
- 777 Software LLC
- 777 Partners UK Limited
- Lumiere Financing LLC
- Lumiere Acquisitions Company LLC
- Lex Capital Holdings LLC
- Triplet Global LLC
- Jarm Capital LLC
- MTCP LLC

## SCHEDULE 2.1

## DIP COMMITMENTS

| Loan Type | Commitment Amount |
|---|---|
| New Pre-Petition Advances | $8,631,500 |
| Insurance Reimbursement | $125,000 |
| Initial Post-Petition Advances (Between Interim & Final Order) | $575,000 |
| Subsequent Post-Petition Advances (Following Entry of Final Order) | $5,663,000 |
| Total Post-Petition Advances (Interim + Final) | $6,238,000 |
| Total New Money Loan | $14,869,500 |

## SCHEDULE 5.1(f)

### CONTROLLED ACCOUNTS

Account Number:    XXXXX6762
Account Holder:    SMR LLC
Depository Bank:    East West Bank

Account Number:    XXXXX6398
Account Holder:    Signal National
Depository Bank:    East West Bank

# <u>EXHIBIT A</u>

**Budget**

Exhibit A - Budget

**777 Partners LLC & Affiliates**

**DIP Budget**

$ - Thousands

| | July | August | | | | September | | | | | October | | | | November | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Period Ending ----> | 7/31 | 8/7 | 8/14 | 8/21 | 8/28 | 9/4 | 9/11 | 9/18 | 9/25 | 10/2 | 10/9 | 10/16 | 10/23 | 10/30 | 11/6 | 11/13 |
| | Actual | | | | | | | | | | | | | | | |
| **Beginning Cash:** | 893 | 575 | 74 | 611 | 511 | 486 | 371 | 971 | 838 | 2,013 | 1,813 | 3,188 | 3,070 | 3,070 | 2,506 | 3,181 |
| **Cash Inflows:** | | | | | | | | | | | | | | | | |
| DIP Loan - ACAP | - | - | 75 | - | - | - | - | - | 900 | - | 1,525 | - | - | - | 950 | - |
| DIP Loan - ACAP[1] | - | - | - | - | - | - | 125 | - | - | - | - | - | - | - | - | - |
| DIP Loan - Dacian | - | - | - | - | - | - | 575 | - | 275 | - | 150 | - | - | - | - | - |
| DIP Loan - National Founders | - | - | 500 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total DIP Inflows | - | - | 575 | - | - | - | 700 | - | 1,175 | - | 1,675 | - | - | - | 950 | - |
| Non-DIP Inflows | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Cash Outflows:** | | | | | | | | | | | | | | | | |
| **Payroll & Benefits:** | | | | | | | | | | | | | | | | |
| US Holdco | - | 100 | - | 100 | - | 100 | - | 100 | - | 85 | - | 85 | - | 85 | - | 85 |
| Benefits | - | - | 18 | - | - | - | - | 18 | - | - | - | 18 | - | - | - | 18 |
| *Total Payroll & Benefits* | - | 100 | 18 | 100 | - | 100 | - | 118 | - | 85 | - | 103 | - | 85 | - | 103 |
| **Other Expenses:** | | | | | | | | | | | | | | | | |
| RAMP Corporate Card | 19 | - | - | - | 25 | - | - | - | - | 25 | - | - | - | 25 | - | - |
| Rent | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Legal | 20 | 115 | - | - | - | 15 | - | - | - | 15 | - | - | - | 15 | - | - |
| Other Vendors | 5 | 16 | 20 | - | - | - | - | 15 | - | - | - | 15 | - | - | - | 10 |
| *Total Other Expenses* | 44 | 131 | 20 | - | 25 | 15 | - | 15 | - | 40 | - | 15 | - | 40 | - | 10 |
| **Operating Cash Flow** | (44) | (231) | 537 | (100) | (25) | (115) | 700 | (133) | 1,175 | (125) | 1,675 | (118) | - | (125) | 950 | (113) |
| **Restructuring:** | | | | | | | | | | | | | | | | |
| Professional Fees & UST Quarterly Fees | 275 | 270 | - | - | - | - | 100 | - | - | 75 | 300 | - | - | 438 | 275 | - |
| Wind Down Expenses | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| *Subtotal* | 275 | 270 | - | - | - | - | 100 | - | - | 75 | 300 | - | - | 438 | 275 | - |
| **Cash Flow net of Restructuring** | (319) | (501) | 537 | (100) | (25) | (115) | 600 | (133) | 1,175 | (200) | 1,375 | (118) | - | (563) | 675 | (113) |
| **Ending Cash Balance:** | 575 | 74 | 611 | 511 | 486 | 371 | 971 | 838 | 2,013 | 1,813 | 3,188 | 3,070 | 3,070 | 2,506 | 3,181 | 3,068 |

Notes:
1. Cash draw or insurance refund re-loan

**777 Partners LLC & Affiliates**

**DIP Budget**

$ - Thousands

| | November | | December | | | | Jan | | Feb | | Total |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Period Ending -----> | 11/20 | 11/27 | 12/4 | 12/11 | 12/18 | 12/25 | 1/1 | 1/31 | 2/28 | Total | Actual + Forecast |
| **Beginning Cash:** | 3,068 | 3,068 | 2,518 | 2,443 | 3,303 | 3,293 | 2,483 | 2,408 | 1,471 | $ 997 | 12 |
| **Cash Inflows:** | | | | | | | | | | | |
| DIP Loan - ACAP | - | - | - | 1,163 | - | - | - | - | - | 4,613 | 8,508 |
| DIP Loan - ACAP[1] | - | - | - | - | - | - | - | - | - | 125 | 3,690 |
| DIP Loan - Dacian | - | - | - | - | - | - | - | - | - | 1,000 | 2,172 |
| DIP Loan - National Founders | - | - | - | - | - | - | - | - | - | 500 | 500 |
| Total DIP Inflows | - | - | - | 1,163 | - | - | - | - | - | 6,238 | 14,870 |
| Non-DIP Inflows | - | - | - | - | - | - | - | - | - | - | - |
| **Cash Outflows:** | | | | | | | | | | | |
| **Payroll & Benefits:** | | | | | | | | | | | |
| US Holdco | - | 85 | - | 85 | - | 85 | - | 170 | 170 | 1,428 | 1,746 |
| Benefits | - | - | - | 18 | - | - | - | 18 | 18 | 136 | 160 |
| *Total Payroll & Benefits* | - | 85 | - | 103 | - | 85 | - | 188 | 188 | 1,564 | 1,907 |
| **Other Expenses:** | | | | | | | | | | | |
| RAMP Corporate Card | - | 25 | - | - | - | 25 | - | 25 | 25 | 194 | 213 |
| Rent | - | - | - | - | - | - | - | - | - | - | 12 |
| Legal | - | 15 | - | - | - | - | - | - | - | 195 | 1,147 |
| Other Vendors | - | - | - | - | 10 | - | - | 10 | 10 | 112 | 133 |
| *Total Other Expenses* | - | 40 | - | - | 10 | 25 | - | 35 | 35 | 501 | 1,504 |
| **Operating Cash Flow** | - | (125) | - | 1,060 | (10) | (110) | - | (223) | (223) | 4,173 | 11,459 |
| **Restructuring:** | | | | | | | | | | | |
| Professional Fees & UST Quarterly Fees | - | 425 | 75 | 200 | - | 700 | 75 | 714 | 1,005 | 4,927 | 11,226 |
| Wind Down Expenses | - | - | - | - | - | - | - | - | 225 | 225 | 225 |
| *Subtotal* | - | 425 | 75 | 200 | - | 700 | 75 | 714 | 1,230 | 5,152 | 11,451 |
| **Cash Flow net of Restructuring** | - | (550) | (75) | 860 | (10) | (810) | (75) | (937) | (1,453) | (979) | 7 |
| **Ending Cash Balance:** | 3,068 | 2,518 | 2,443 | 3,303 | 3,293 | 2,483 | 2,408 | 1,471 | 19 | 19 | 19 |

Notes:
1. Cash draw or insurance refund re-loan

DRAFT - For Discussion Purposes Only

**777 Partners LLC & Affiliates**

**DIP Budget**

| $ - Thousands | July | August | | | | September | | | | | October | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Period Ending -----> | 7/31 | 8/7 | 8/14 | 8/21 | 8/28 | 9/4 | 9/11 | 9/18 | 9/25 | 10/2 | 10/9 | 10/16 | 10/23 | 10/30 | 11/6 |
| **Legal** | | | | | | | | | | | | | | | |
| Independent Director Fees & Expenses | - | 115 | - | - | - | 15 | - | - | - | 15 | - | - | - | 15 | - |
| Bayard PC - DE Counsel | 20 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Legal** | **20** | **115** | **-** | **-** | **-** | **15** | **-** | **-** | **-** | **15** | **-** | **-** | **-** | **15** | **-** |
| | | | | | | | | | | | | | | | |
| **Restructuring** | | | | | | | | | | | | | | | |
| GlassRatner | - | 150 | - | - | - | - | - | - | - | - | 300 | - | - | - | 200 |
| Berger Singerman | - | 10 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Debtors' Counsel (SGR/Gray Reed) | 275 | 50 | - | - | - | - | - | - | - | - | - | - | - | 425 | - |
| Claims & Noticing Agent | - | 60 | - | - | - | - | 100 | - | - | 75 | - | - | - | - | 75 |
| Unsecured Creditors Committee | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| US Trustee Fees - Quarterly | - | - | - | - | - | - | - | - | - | - | - | - | - | 13 | - |
| **Total Restructuring** | **275** | **270** | **-** | **-** | **-** | **-** | **100** | **-** | **-** | **75** | **300** | **-** | **-** | **438** | **275** |

Note:
1. Total includes actuals for w/e 07.31.26 prior
to filing date of 8/09/26

Prepared by GlassRatner Advisory & Capital Group, LLC

3 of 4

DRAFT - For Discussion Purposes Only

**777 Partners LLC & Affiliates**

**DIP Budget**

| $ - Thousands | November | | | December | | | | Jan | | Feb | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Period Ending -----> | 11/13 | 11/20 | 11/27 | 12/4 | 12/11 | 12/18 | 12/25 | 1/1 | 1/31 | 2/28 | Total[1] |
| **Legal** | | | | | | | | | | | |
| Independent Director Fees & Expenses | - | - | 15 | - | - | - | 15 | - | 15 | 15 | 220 |
| Bayard PC - DE Counsel | - | - | - | - | - | - | - | - | - | - | 20 |
| **Total Legal** | **-** | **-** | **15** | **-** | **-** | **-** | **15** | **-** | **15** | **15** | **240** |
| | | | | | | | | | | | |
| **Restructuring** | | | | | | | | | | | |
| GlassRatner | - | - | - | - | 200 | - | - | - | 175 | 175 | 1,200 |
| Berger Singerman | - | - | - | - | - | - | - | - | - | - | 10 |
| Debtors' Counsel (SGR/Gray Reed) | - | - | 425 | - | - | - | 425 | - | 425 | 425 | 2,450 |
| Claims & Noticing Agent | - | - | - | 75 | - | - | - | 75 | 75 | 75 | 610 |
| Unsecured Creditors Committee | - | - | - | - | - | - | 275 | - | | 300 | 575 |
| US Trustee Fees - Quarterly | - | - | - | - | - | - | - | - | 39 | 30 | 82 |
| **Total Restructuring** | **-** | **-** | **425** | **75** | **200** | **-** | **700** | **75** | **714** | **1,005** | **4,927** |

Note:
1. Total includes actuals for w/e 07.31.26 prior
to filing date of 8/09/26

Prepared by GlassRatner Advisory & Capital Group, LLC

4 of 4

## EXHIBIT B

## Form of Borrowing Certificate

**Borrowing Certificate**

Reference is hereby made to that certain PRIMING SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT (as it may be amended, restated, supplemented, or otherwise modified from time to time, the "DIP Credit Agreement" or "Agreement") made as of June 9, 2026 by and among 777 Partners LLC ("777"), 600 Partners LLC ("600") and Signal National LLC ("Signal National"), as borrowers (the "Borrowers") and the "Initial Guarantors" (as defined therein), any "Additional Guarantors" (as defined therein) as may be party hereto from time to time, and each other direct and/or indirect subsidiary of the foregoing that files a Chapter 11 Case (collectively with the Initial Guarantors and any Additional Guarantors, the "Guarantors" and, together with the Borrowers, the "Debtors"), ACM Delegate LLC ("ACM"), in its capacity as administrative agent hereunder (the "Agent"), AAV2024 LLC ("AAV2024"), Advantage Capital Holdings LLC ("ACH"), Dacian Master Fund LP ("Dacian"), Haymarket Insurance Company ("Haymarket"), National Founders LP ("National Founders") each in its capacity as a DIP Lender hereunder (and together with such other lenders as may be party hereto from time to time, collectively, the "DIP Lenders"). The undersigned, in his/her capacity as an Authorized Officer of the Debtors, and not individually, hereby certifies as follows as of _____, 2026 (the "Borrowing Date"):

1. New Money Loans. Pursuant to the terms of the DIP Credit Agreement, the Debtors are authorized to borrow New Money Loans in an amount equal to the DIP Commitment during the DIP Commitment Period, solely in compliance with the DIP Credit Agreement. The Debtors hereby request an advance of New Money Loans in the aggregate amount of $_____ (the "Borrowing") to be transferred to the Debtors within two (2) Business Days of the Borrowing Date.

2. Representations and Warranties. On and as of the Borrowing Date (both before and after giving effect to the Borrowing requested hereby and application of such proceeds), the representations and warranties of the Debtors contained in the DIP Loan Documents are true and correct in all material respects (except to the extent such representations and warranties specifically relate to an earlier date, such representations and warranties are true and correct on and as of such earlier date).

3. No Default or Event of Default. As of the Borrowing Date, no event has occurred or is continuing or would result from the consummation of the Borrowing requested hereby, or the application of such proceeds, that would constitute a Default or an Event of Default.

4. Available Commitments. After making the New Money Loan requested by this Borrowing, the aggregate outstanding principal amount of the New Money Loans will not exceed the DIP Commitment.

5. Use of Proceeds. The proceeds of the New Money Loan advanced under this Borrowing will be used by the Debtors in accordance with the Budget and the DIP Credit Agreement.

*[remainder of page intentionally left blank; signature page(s) to follow]*

Exhibit B – Form of Borrowing Certificate

IN WITNESS WHEREOF, the undersigned has executed this Borrowing Certificate as of the date first above written.

**BORROWERS**:

**777 PARTNERS LLC**

By: _____
Name:
Title:

**600 PARTNERS LLC**

By: _____
Name:
Title:

**SIGNAL NATIONAL LLC**

By: _____
Name:
Title:

Exhibit B – Form of Borrowing Certificate

# **EXHIBIT C**

## **[RESERVED]**

Exhibit C – [RESERVED]

# EXHIBIT D

## Form of Guarantor Joinder

*EXECUTION VERSION*

**GUARANTOR JOINDER**

This GUARANTOR JOINDER (this "Guarantor Joinder") dated as of _____, 2026 (the "Effective Date") is executed and delivered by [●] (the "Additional Guarantor") pursuant to Section 9.1(b) of that certain FIRST AMENDED PRIMING SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT dated as of August [▮], 2026 (as amended, restated, supplemented or modified from time to time, the "DIP Credit Agreement"), by and among 777 Partners LLC, 600 Partners LLC and Signal National LLC, as borrowers (the "Borrowers"), the guarantors party thereto (collectively, the "Guarantors" and, together with the Borrowers, the "Loan Parties" or the "Debtors"), ACM Delegate LLC, in its capacity as Agent (the "Agent"), and the lenders as may be party thereto from time to time (collectively, the "DIP Lenders"), each in its capacity as a DIP Lender thereto. Capitalized terms used but not defined in this Guarantor Joinder have the meanings set forth in the DIP Credit Agreement.

In consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each signatory hereby agrees as follows:

1.      The Additional Guarantor hereby agrees that, upon execution and delivery of this Guarantor Joinder to the Agent and the DIP Lenders, it shall be deemed a "Guarantor" under the DIP Credit Agreement for all purposes thereof with the same force and effect as if originally named as a Guarantor therein.

2.      The Additional Guarantor hereby assumes and agrees to perform all obligations of a Guarantor under the DIP Credit Agreement and the other DIP Loan Documents to which Guarantors are parties and acknowledges and agrees that it is bound as a Guarantor thereunder as if it had been an original signatory thereto, including, without limitation, Section 2.11 thereof

3.      The Additional Guarantor hereby acknowledges and agrees that it shall be immediately subject to and bound by any Financing Orders entered by the Bankruptcy Court then in-force or otherwise in effect from time to time as a "Subsequent Debtor" thereunder and shall at all times hereafter abide by the terms and conditions set forth in the Financing Orders in all respects as if had been an Initial Debtor thereunder.

4.      The Additional Guarantor hereby makes to the Agent and the DIP Lenders the representations and warranties set forth in the DIP Credit Agreement and the applicable DIP Loan Documents, and confirms that such representations and warranties are true and correct with regard to the Additional Guarantor as of the Effective Date.

5.      The DIP Credit Agreement may be amended to add the name of such Additional Guarantor to the list of Guarantors set forth on Schedule 1.1 of the DIP Credit Agreement.

6.      Notices to the Additional Guarantor shall be given in accordance with Section 9.2 of the DIP Credit Agreement at the address set forth for the Debtors.

7.      This Guarantor Joinder shall be deemed to be part of, and a modification to, the DIP Credit Agreement and shall be governed by all the terms and provisions of the DIP Credit Agreement, with respect to the modifications intended to be made to such agreement, which terms are incorporated herein by reference, are ratified and confirmed and shall continue in full force and effect as valid and binding agreements of each such person or entity enforceable against such person or entity.

IN WITNESS WHEREOF, the undersigned has executed this Guarantor Joinder as of the date first above written.

**[ADDITIONAL GUARANTOR]**

By:_____
Name:
Title:

Address for Notices:

[TBD]

Acknowledged and accepted:

**ACM DELEGATE LLC,** *not individually, but as Administrative Agent for the DIP Lenders*

By: _____
Name:
Title:

- 2 -

SGR/81953992.2

**<u>EXHIBIT E</u>**

**Security Agreement**

[TO COME]