**ORDERED in the Southern District of Florida on August 24, 2026.**

Peter D. Russin, Judge
United States Bankruptcy Court

---

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

In re:

777 Partners LLC,

Debtor.
______________________________/

Case No. 26-19312-PDR

Chapter 7 (Involuntary)

**ORDER GRANTING MOTION TO TRANSFER VENUE AND DENYING MOTION TO STAY LATER-FILED RELATED BANKRUPTCY CASES**

Congress has supplied several criteria for venue in which a debtor may file, and sophisticated parties routinely choose among them. That choice is not inherently suspect merely because there may be some strategy involved. But the line between permissible planning and improper manipulation remains contested because the statute tolerates choice while the interest of justice demands substance.

The Court's task is not to decide whether forum shopping exists. It plainly does. Nor is the task to punish a party for engaging in lawful bankruptcy planning. The task is more practical and more difficult.

Here, an involuntary bankruptcy has been filed against 777 Partners LLC ("777," or the "Debtor") in this Court. However, 777 and twenty-two affiliates later filed voluntary chapter 11 petitions in the Northern District of Texas. A motion for joint administration is pending in *In re Signal National LLC*, Case No. 26-90190-ELM (the "Texas Case"), seeking to jointly administer all twenty-three.[1] The Debtor has filed in this Court an *Emergency Motion to Transfer Venue to the Northern District of Texas*,[2] seeking to transfer this case to that district. Both Florida and Texas are technically proper venues under the statute. So, the question this Court must answer is which is just or most convenient.[3]

777 spent almost its entire corporate existence in Miami. Its historical operations, many former employees and executives, substantial litigation, and several judgment creditors remain connected to South Florida. Even within the statutory venue period, the company represented to the State of Florida that Miami remained its principal office. The Texas venue anchor, by contrast, is a Texas company deliberately created during the restructuring in order to create venue in Texas. Those facts give Florida a genuine and substantial claim to these cases.

---

[1] *In re Signal National LLC*, Case No. 26-90190-ELM (Bankr. N.D. Tex.), Dkt. No. 2.

[2] Dkt. No. 15.

[3] The Petitioning Creditors filed an *Emergency Motion to Stay the Later-Filed Cases Pending Determination of Debtor's Transfer Motion* (the "Motion to Stay"). Dkt. No. 17. The Court denied that motion orally at the hearing on August 11, 2026, and does so in writing here.

But 777 no longer conducts the investment business it once operated from Miami. GlassRatner now manages 777 and its affiliates, principally from Texas, and has done so for many months. The remaining work is financial: preserve and service receivables, liquidate assets over time, investigate claims, reconcile intercompany obligations, and formulate a liquidating chapter 11 plan. The people charged with that work are centered in Texas. Twenty-three affiliated estates must proceed before one court, and no party seriously contends otherwise.

A debtor-in-possession financing question initially threatened to obscure the analysis. The facility contains a Texas venue milestone, and the Debtor initially warned that if this case was not timely transferred to Texas, the DIP Loan would be in default. For purposes of this ruling, the Court assumes that whatever financing the Texas court approves will remain available if the cases are transferred to Florida and that the Texas court's financing rulings can be continued or adopted without repeating the hearing. Financing is addressed, and set aside, below.

After considering the record, the testimony, and the parties' arguments at the hearing on August 11, 2026, the convenience of all constituencies, and the interest of justice, the Court concludes that the cases should proceed in the Northern District of Texas. Florida is the stronger historical forum; Texas is the stronger administrative forum. Controlling precedent makes the latter consideration most important. The Court therefore grants the motion to transfer and denies the Motion to Stay.

## I. <u>Background</u>

777 Partners was founded in Miami by Joshua Wander and Steven Pasko. At its height, the enterprise allegedly included more than 500 entities and had invested more than $10 billion across structured settlements, specialty receivables, insurance

and reinsurance, consumer and commercial finance, litigation funding, aviation, professional sports, media and entertainment, and sustainability investments. Miami was its longstanding center.

The enterprise eventually encountered severe financial and legal distress. Its papers attribute the decline to rising interest rates, post-pandemic problems in aviation and professional sports, regulatory difficulties affecting reinsurance investments, tightening liquidity, extensive litigation, and alleged misconduct by former management. Civil actions and governmental investigations have included allegations of double-pledged collateral, diversion of proceeds, false financial reporting, and fraud. The Court recounts those allegations only as background.

Wander and Pasko resigned from management, over two years ago, in May 2024. Mark Shapiro, a senior managing director of GlassRatner Advisory & Capital Group LLC, thereafter assumed operational responsibility for 777 Partners and its affiliates. Shapiro serves as interim chief operating officer and is the person most knowledgeable about the present winddown. He testified under oath at the venue hearing and adopted the statements he previously made in a declaration of record in support of the transfer motion.[4]

GlassRatner did not attempt to revive the enterprise's historical investment business. It began an extended winddown instead. The record describes more than thirty asset sales, foreclosures, consensual surrenders, and foreign insolvency proceedings. Some entities are in immediate liquidation. Others hold receivables or servicing portfolios that may take years to run off in an orderly manner. The

[4] Dkt. No. 15, Ex. B.

contemplated chapter 11 endgame is a liquidating plan, potentially involving additional sales and a liquidating trust, rather than a conventional operational reorganization.

The remaining assets are principally financial and intangible. They include self-liquidating structured receivables portfolios, servicing operations, residual equity and contract rights, litigation claims, avoidance actions, and other causes of action. They are not concentrated in either Florida or Texas.

The Debtor's funded debt is largely attributable to two lender groups. ACAP, an insurance and financial services group, financed 777 and affiliated 600 Partners and their portfolio investments through a secured facility with approximately $1.259 billion outstanding. National Founders LP, a Credigy/National Bank of Canada affiliate, provided another approximately $1.187 billion of receivables-backed financing to affiliated special purpose vehicles, with 777 and 600 Partners guaranteeing those obligations. The Debtor separately estimates approximately $142 million of unsecured liabilities.

The evidence also shows a business with little remaining liquidity. At the venue hearing, Shapiro identified approximately $74,000 in projected cash against approximately $118,000 in payroll and benefits due during the following two weeks. The enterprise had no material operating revenue that he could identify. It had been sustained through lender advances and asset-sale proceeds. Without postpetition financing, Shapiro believed that the proposed chapter 11 liquidation could not continue and that chapter 7 would likely follow.

Florida nevertheless remained important during the winddown. In October 2025, 777 reinstated its Florida registration and identified Miami as its principal

office. On April 16, 2026, within the 180-day venue period, it filed an annual report again identifying a Miami principal office and mailing address. Shapiro signed that report as manager and did not dispute its authenticity at the hearing. The Miami lease had not yet been rejected, and personal property remained there, although rejection and abandonment were contemplated.

The personnel evidence was mixed. All fifteen remaining employees worked remotely. Three members of the relevant working group were in Florida and two were in Texas, and that arrangement had not materially changed by April 2026. Some GlassRatner personnel traveled to or worked from Miami after their appointment. Former executives, employees, in-house lawyers, and witnesses connected to historical conduct and pending litigation remain in Florida.

Texas, however, has become the center of present management. Shapiro testified that he had lived and worked in Texas throughout his approximately two-year tenure. GlassRatner's relevant office and core restructuring personnel are there. Although not every professional is physically present in Texas every day, the people directing the enterprise's financial winddown have operated principally from Texas for months.

The Debtors also constructed a more formal Texas bankruptcy connection. Approximately six months before the petitions, they formed Signal National LLC as a Texas entity and established Texas operating and payment accounts. Shapiro testified candidly that the entity was created to provide the ability to file bankruptcy in Texas and to make the proceeding convenient for the professionals.

The immediate controversy began with a judgment. On July 13, 2026, a New York state court entered an amended consent judgment totaling $26 million against

777, SuttonPark Capital, Signal Financial Holdings, and Brickell PC Insurance Holdings.[5] The judgment allocated $11,813,932 to Vida Longevity Fund, LP; $7,088,354 to Vida Insurance Credit Opportunity Fund II, LP; and $7,097,714 to Vida Insurance Credit Opportunity Fund III, LP.

Three days later, those funds (the "Petitioning Creditors") filed an involuntary chapter 7 petition against 777 in this Court. They relied on their judgment claims, alleged that 777 generally was not paying its debts as they became due, and alleged that venue was proper because 777 maintained its principal place of business in this District for the relevant portion of the preceding 180 days.

On August 7, JPC Phase 2, LLC joined the involuntary petition.[6] JPC asserts an assigned, unsecured Florida judgment claim of $36,071.25. It represents that the judgment is unpaid, unstayed, and unappealed. Its joinder supplies another Florida judgment creditor.

Other Florida creditors soon appeared. Scott Sidell holds an April 9, 2026 Miami-Dade judgment against 777 for $2,697,909.97, with the state court retaining jurisdiction over postjudgment proceedings.[7] Peter Meyers has a pending Miami-Dade employment action seeking unpaid compensation, including a deferred-cash award.[8] His employment agreement selected Florida law and Dade County as the exclusive forum for disputes.

---

[5] *Notice of Filing Amended Judgment*, Dkt. No. 6.

[6] Dkt. No. 12.

[7] Dkt. No. 29, Ex. A.

[8] Dkt. No. 29, Ex. B.

777 does not contest that an order for relief should be entered and has filed a motion to convert this case to chapter 11.[9] Its dispute concerns the forum in which the estates will be liquidated. On August 9, approximately three weeks after the Florida petition and two days before 777's response deadline, 777 and twenty-two affiliates filed twenty-three voluntary chapter 11 cases in the Northern District of Texas.[10] They requested joint administration under Signal National's case.[11]

On August 10, 777 filed its emergency motion asking this Court to transfer the involuntary case to Texas.[12] The Petitioning Creditors filed their own emergency motion, asking the Court to direct the parties not to proceed in the later-filed Texas cases until venue was decided.[13] JPC joined the stay request and opposed transfer.[14] Sidell and Meyers did the same.[15]

The proposed debtor-in-possession facility sharpened the dispute. It contemplated a loan from ACAP-related entities of up to $24.952 million in postpetition financing, consisting of up to $6.238 million of new-money loans and up to $18.714 million of roll-up loans.[16] Among other milestones, the documents required

[9] Dkt. No. 34.

[10] 777 in particular filed *In re 777 Partners LLC*, Case No. 26. 90193-ELM (Bankr. N.D. Tex.). In the case of an affiliate, *In re Signal National LLC*, Case No. 26-90190-ELM (Bankr. N.D. Tex.), Signal National LLC filed a motion for joint administration, seeking to jointly administer that case with the cases of the other twenty-two affiliated entities.

[11] Texas Case, Dkt. No. 2.

[12] Dkt. No. 15.

[13] Dkt. No. 17.

[14] Dkt. No. 24.

[15] Dkt. No. 31.

[16] Texas Case, Dkt. No. 11.

the Debtors to file a transfer motion within two days, obtain an interim financing order within five days, and to obtain transfer or another lender-satisfactory resolution of the Florida case within thirty days.[17] Failure to do so constituted a default.

However, when asked at the venue hearing whether the required lenders had made a final and irrevocable decision to terminate financing if the cases proceeded in Florida, lender counsel indicated that the issue required consultation. The Court therefore took venue under advisement and declined to prevent the Texas court from considering necessary financing relief.

While venue remained under advisement, the Texas court held multiple hearings on financing, including a competing proposal. For purposes of this decision, the Court assumes without deciding that any financing approved in Texas will remain available if the estates are transferred to Florida and that any financing rulings and record can travel with the cases without a new evidentiary presentation. This Order accordingly does not treat the availability of financing as a meaningful factor in its determination of venue.

One matter has become clear, however. No party has offered a workable proposal under which 777 would be administered separately from its affiliates. GlassRatner manages the enterprise as a whole. The cases share management, financing, collateral, records, and substantial intercompany issues. The Court therefore accepts that the twenty-three cases must proceed before one court.

[17] *Id.*

## II. Jurisdiction

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A). Venue is permitted in this district pursuant to 28 U.S.C. § 1408.

The Petitioning Creditors filed the first petition involving 777. This Court therefore is the court designated by Federal Rule of Bankruptcy Procedure 1014(b)(2) to determine the district or districts in which the related cases should proceed.

## III. Legal Standard

The bankruptcy venue statute permits a case to be commenced where the debtor's domicile, residence, principal place of business, or principal assets were located for the greater part of the 180 days preceding the petition.[18] It also permits venue where a case concerning an affiliate is pending.[19] More than one district may therefore satisfy the statute, and technical eligibility does not end the venue inquiry.

Federal law separately permits transfer of a bankruptcy case to another district in the interest of justice or for the convenience of the parties.[20] The statute is disjunctive. Either ground may support transfer. Because the grounds are independent, the Court considers each in turn: whether convenience alone supports transfer, and separately, whether the interest of justice affirmatively requires or forecloses that result. Rule 1014 uses the same standards and specifically addresses petitions filed in different districts by or against the same debtor or related debtors.[21]

---

[18] 28 U.S.C. § 1408(1).

[19] 28 U.S.C. § 1408(2).

[20] 28 U.S.C. § 1412.

[21] Fed. R. Bankr. P. 1014(a)–(b).

In an ordinary transfer motion, the movant generally bears the burden of establishing that transfer is warranted by a preponderance of the evidence.[22] However, competing voluntary and involuntary petitions present a less conventional problem. Courts have explained that Rule 1014(b) calls on the first-filed court to determine venue and does not clearly assign the burden to either side.[23] The better question is how much deference either forum choice deserves. Neither the creditors' first filing nor the debtor's later filing controls mechanically. The Court need not resolve that allocation question here: applying either a preponderance standard to the Debtor as movant, or the deference ordinarily due a debtor's first-filed forum, the record supports the same outcome for the reasons that follow.

In assessing convenience for the parties, the Court begins with *Commonwealth Oil Refining Company*, commonly called CORCO.[24] Because the former Fifth Circuit decided CORCO before October 1, 1981, it is binding precedent in this Circuit.[25] CORCO identifies six familiar considerations bearing on convenience: the proximity of creditors of every kind; the proximity of the debtor; the proximity of witnesses necessary to administration; the location of assets; the economic administration of the estate; and the need for ancillary administration if liquidation results.[26]

---

[22] *Commonwealth of P.R. v. Commonwealth Oil Refining Co. (In re Commonwealth Oil Refining Co.)*, 596 F.2d 1239, 1241 (5th Cir. 1979).

[23] *In re Caesars Entm't Operating Co.*, No. 15-10047 (KG), 2015 WL 495259, at *5 (Bankr. D. Del. Feb. 2, 2015); *In re Cox Operating, L.L.C.*, 652 B.R. 49, 56 (Bankr. E.D. La. 2023).

[24] *In re Commonwealth Oil Refining Co.* ("CORCO"), 596 F.2d at 1241.

[25] *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

[26] *CORCO*, 596 F.2d at 1247.

CORCO holds that the most important consideration is whether transfer will promote economic and efficient administration.[27] In a financial rehabilitation, the court focuses on the people charged with formulating and implementing the solution.[28] CORCO retained venue in Texas even though the debtor's physical operations, assets, many employees, records, litigation, and most creditors were in Puerto Rico. The debtor's problems were financial, and the people capable of addressing them were in Texas.[29]

Modern practice reduces the importance of geography that once dominated venue disputes. Electronic records, remote hearings, national law firms, and accessible transportation make many locations workable. That does not make place irrelevant. It reduces the importance of where documents happen to sit and increases the importance of where the people responsible for administering the estate actually perform their work.

The interest of justice, the other consideration in the change of venue statute,[30] is broader and more flexible. While courts often consider factors that overlap with convenience, at its core the interest of justice inquiry requires a particularized, case-by-case analysis of fairness.[31]

---

[27] *Id.*

[28] *Id.*

[29] *Id.*

[30] 28 U.S.C. § 1412.

[31] *Gulf States Exploration Co. v. Manville Forest Products Corp. (In re Manville Forest Products Corp.)*, 896 F.2d 1384, 1391 (2d Cir. 1990).

## IV. Analysis

The Court turns first to the cases' unity and then to venue.

### A. The Cases Must Proceed Together

The parties' disagreement is substantial, but it begins with an important point of consensus. These cases cannot sensibly be administered in two districts. GlassRatner manages 777 and its affiliates together. The remaining portfolios, financing, collateral, records, professional engagements, and intercompany relationships cross entity lines. Separate courts could impose duplicative costs and enter inconsistent orders affecting a common liquidation.

That conclusion does not decide the geographic question. Joint administration is available in either district, and the fact that twenty-three later-filed cases presently sit in Texas cannot itself defeat the first filed proceeding. Otherwise, a debtor could decide venue by filing enough affiliated cases after an involuntary petition. Rule 1014(b) exists to prevent numerical momentum from replacing judicial judgment.

The relevant comparison is therefore between administering all twenty-three cases in Florida and administering all twenty-three in Texas. The Court turns first to convenience as evaluated by the CORCO factors, then to the interest of justice.

### B. Convenience of the Parties

Here most conventional geographic factors are neutral or divided. 777 is no longer an operating company; it is a dispersed financial enterprise in liquidation. As explained below, the convenience analysis nevertheless reveals an important distinction between witnesses connected to the former business and the people responsible for administering the present estates.

1. Proximity of Creditors

Creditor geography does not clearly support either forum. The original Petitioning Creditors are in New York, not Florida. JPC, Sidell, Meyers, and other appearing creditors have meaningful Florida claims and favor this Court. Their judgments, employment agreements, arbitrations, and pending litigation make Florida more than a courthouse selected by strangers to the Debtor.

The Debtors presented a broader numerical picture. They represented that only five of the combined thirty largest creditors are in Florida and that those creditors hold approximately $10 million of roughly $2.6 billion in asserted debt. The prepetition and proposed postpetition lenders assert claims exceeding $2 billion and support Texas. But that support is not a disinterested measure of convenience: the DIP facility those lenders negotiated contains the very milestone requiring transfer to Texas, so their preference reflects contract terms of their own choosing as much as forum efficiency.

CORCO cautions against considering only the desires of the creditors holding the largest claims.[32] It holds that number and amount are of equal significance in that analysis.[33] The Florida creditors who appeared may hold a small percentage of total debt, but their ties are more than financial: Sidell holds a Miami-Dade judgment with the state court retaining postjudgment jurisdiction, and Meyers' employment agreement selects Florida law and an exclusive Dade County forum. Those are jurisdictional commitments, not just claims of convenience.

---

[32] *CORCO*, 596 F.2d at 1248.

[33] *Id.*

On the available record, creditor proximity weighs modestly toward Texas by dollar amount, tempered by the self-interested structure of that preference and by the more concrete, jurisdictional character of the Florida creditors' ties. The Court gives this factor slight weight in favor of Texas, insufficient standing alone to affect the outcome.

2. Proximity of the Debtor

777 has two relevant locations because it has two relevant lives. The first is the investment enterprise built and operated in Miami. The second is the financial winddown managed by GlassRatner. Both lives must be considered in the analysis.

Florida has the stronger historical proximity to the Debtor. 777 was founded in Miami, operated there for years, employed people there, entered Florida-centered agreements, litigated there, and continued reporting a Miami principal office into April 2026.

Texas, however, has the more proximate connection to the Debtor as it exists today. Shapiro has lived and worked in Texas throughout his tenure. GlassRatner replaced former management, directed the winddown, executed asset dispositions, maintained the remaining portfolios, and developed the contemplated chapter 11 liquidation from Texas. Although some personnel work remotely and several members of the working group are located in Florida, the record establishes that the Debtor's current affairs are closer to Texas. This factor thus favors Texas venue.

3. Proximity of Witnesses Necessary for Administration

The witness analysis is similarly divided between 777's historical affairs and the administration that lies ahead. Florida is home to witnesses concerning former management, historical transactions, lender control, employment claims, and

potential estate causes of action. Those witnesses may become important in particular contested matters or litigation.

But witnesses are also necessarily present in Texas. This includes Shapiro and the GlassRatner personnel who have directed the winddown, managed the remaining portfolios, and developed the contemplated chapter 11 liquidation from Texas. The personnel are not exclusively Texan. Some work remotely, and several members of the working group are in Florida.

Given this division in location of potential witnesses, the factor of witness proximity is neutral.

4. Location of the Debtor's Assets

The location of assets sometimes deserves special weight in liquidation. That concern is most powerful when a court must supervise local real property, a plant, inventory, or other tangible assets.[34]

The assets here, however, do not support either forum. They are primarily receivables, servicing rights, equity interests, contractual rights, litigation claims, and avoidance actions. Their value is dispersed and intangible. The Miami lease and personal property are immaterial compared with the financial portfolios and claims that remain.

The records are similarly neutral. Most are electronic and accessible in either district. While some physical documents exist in Miami, physical documents being moved from Miami do not make Texas their natural situs, and their incomplete

[34] *Id.* at 1248 n.19.

transfer does not make Florida necessary. Modern digital access makes the records usable wherever the cases proceed.

<u>5. Economic and Efficient Estate Administration</u>

As held in CORCO, economic and efficient administration is the most important factor.[35] Here, it favors Texas. The reason is not that the Debtors filed twenty-three cases there. It is not that their lawyers prefer that court. It is not that the financing documents contain a Texas milestone. It is that GlassRatner, the enterprise's actual management, has been conducting the financial winddown principally from Texas for many months.

CORCO supplies the closest binding analogy. The debtor there had extensive physical operations, employees, assets, records, litigation, and creditors in Puerto Rico. Yet its financial management was in San Antonio. The court reasoned that the debtor's problems were financial and that the people charged with solving them were in Texas.[36] Those realities outweighed the more visible physical connections elsewhere.

The same distinction applies here. Miami is where 777 built and conducted the business that failed, but Texas is where GlassRatner is administering what remains. The work ahead includes protecting and servicing receivables, completing asset dispositions, evaluating litigation, resolving intercompany accounts, investigating claims, negotiating with constituencies, and implementing a liquidating plan or trust. The people directing that work are centered in Texas.

---

[35] *Id.* at 1247.

[36] *Id.*

This is not a case in which management moved to Texas on the eve of bankruptcy to create venue. Shapiro worked from Texas throughout his approximately two-year tenure. GlassRatner's operational role preceded the formation of Signal National and the Texas filing by a meaningful period. The formal venue mechanism was constructed, but the management connection is a long-standing and present reality.

The Texas court has also acquired familiarity with the Debtors' liquidity, collateral, financing alternatives, and immediate operating needs through a multi-day contested hearing. Because any resulting ruling and record can travel, that learning curve receives only modest weight. Still, judicial familiarity with the enterprise is not erased merely because an order remains effective after transfer.[37]

The Court therefore concludes that economic and efficient administration materially favors Texas. CORCO instructs that this factor receives the greatest weight, and the record establishes a current administrative center in Texas that Florida does not presently duplicate.

6. <u>Necessity for Ancillary Administration if Liquidation Results</u>

The final CORCO factor does not affect the outcome. The contemplated chapter 11 is already a liquidation. Some portfolios may run off for years; others may be sold. Because the assets are dispersed and principally intangible, neither Florida nor Texas appears to require material ancillary proceedings that the other would avoid.

[37] *In re Enron Corp.*, 274 B.R. 327, 349 (Bankr. S.D.N.Y. 2002); *Gulf States Exploration Co. v. Manville Forest Products Corp. (In re Manville Forest Products Corp.)*, 896 F.2d 1384, 1391 (2d Cir. 1990).

C. The Interest of Justice

Convenience does not exhaust the inquiry. Section 1412 likewise permits transfer of a bankruptcy case "in the interest of justice."[38] The interest of justice inquiry is broad and requires an individualized, case-by-case consideration of fairness.[39] In this case, the principal considerations are the weight the Court should give Texas contacts deliberately created to facilitate bankruptcy venue, and whether the timing and structure of the Texas filings reflect bad faith.

1. The Manufactured Venue Discount

*Patriot Coal*, a bankruptcy case from the Southern District of New York, illustrates a useful distinction between technically proper venue and the weight that a deliberately created venue connection should receive. The debtors in that case formed two New York entities shortly before bankruptcy and used those entities as the statutory predicates for filing approximately one hundred affiliated chapter 11 cases in New York.[40] The court accepted that venue was technically proper and did not find that the debtors acted in bad faith.[41] It nevertheless concluded that the purposeful creation of the New York affiliates was relevant to the interest of justice inquiry and that permitting those newly created contacts to control venue would

[38] 28 U.S.C. § 1412.

[39] *Gulf States Exploration Co. v. Manville Forest Products Corp. (In re Manville Forest Products Corp.)*, 896 F.2d 1384, 1391 (2d Cir. 1990).

[40] *In re Patriot Coal Corp.*, 482 B.R. 718, 726–28 (Bankr. S.D.N.Y. 2012).

[41] *Id.* at 742.

elevate form over substance.[42] The court ultimately transferred the cases to the district associated with the debtors' actual headquarters and operations.[43]

That principle applies here. Signal National and the Texas accounts were created during the restructuring in part to facilitate a Texas bankruptcy filing. The Court therefore gives those deliberately created contacts little independent weight. Florida, by contrast, is not a manufactured forum. 777 was founded and operated in Miami for years, maintained significant legal and employment relationships here, and continued identifying Miami as its principal office during the relevant venue period. Those connections give Florida a genuine and substantial interest that cannot be displaced merely because the Debtors created a technical predicate for Texas venue.

2. Good Faith and the Timing of the Texas Filings

The timing and structure of the Texas filings are troubling on their face. The Debtors filed twenty-three Texas cases three weeks after the involuntary petition and two days before their response deadline and negotiated a DIP facility whose default provisions required a Florida transfer within thirty days. Viewed in isolation, that sequence looks like precisely the pattern that concerned the *Patriot Coal* court: a bankruptcy structured to force a particular venue outcome regardless of the merits.

The distinction is what the sequence was used to achieve. In *Patriot Coal*, the newly formed New York entities were the debtors' only connection to New York — before their creation, the debtors had no presence there at all. The timing and

[42] *Id.* at 742-43.

[43] *Id.* at 754.

financing terms did not accelerate access to something real; they manufactured the jurisdictional predicate itself. Here, by contrast, GlassRatner's Texas presence long predates Signal National's formation and the DIP negotiations, for the reasons detailed below. The compressed timeline and the default trigger did not create that connection — they were leverage aimed at securing a fast transfer to a forum with which the Debtors already had a genuine administrative relationship.

That distinction is what separates aggressive positioning from bad faith. The Court does not find that the Debtors acted deceptively or in violation of any duty. Using financing terms and litigation timing to press for a preferred outcome is not, without more, misconduct. It is meaningfully different from, and less troubling than, inventing the underlying connection to the forum. The Court has already discounted Signal National's formal contribution to venue on that basis; the timing and DIP structure do not independently call for a different result, because unlike *Patriot Coal*, they sought to hasten a genuine connection rather than fabricate one.

3. <u>Distinguishing Patriot Coal on the Merits</u>

This case differs from *Patriot Coal* in two critical respects. First, Texas venue does not depend on Signal National alone. Shapiro and GlassRatner had been directing 777's financial winddown from Texas since Shapiro assumed operational responsibility in May 2024, roughly eighteen months before Signal National was formed approximately six months before the petitions and these bankruptcy cases were filed. GlassRatner displaced former management, oversaw numerous asset dispositions, administered the remaining portfolios, and developed the contemplated liquidation.

Second, the forum to which the cases were transferred in *Patriot Coal*, Missouri, was the debtors' existing corporate and management center. The debtors remained an operating business, and corporate headquarters and executive offices, key corporate functions, and substantial executive management were centered in St. Louis, Missouri.[44]

Here, by contrast, 777's historical business center and its present administrative center no longer coincide. Miami was the center of the investment enterprise that formerly operated, but that business is now in winddown. The remaining enterprise is being administered and liquidated principally by GlassRatner from Texas. Thus, unlike *Patriot Coal*, looking past the manufactured venue anchor does not point back to the Debtors' historical headquarters; it reveals a substantive administrative center in Texas.

The Court therefore distinguishes between the formal mechanism that made Texas venue available and the substantive activity that makes Texas an appropriate place to administer the estates. The former receives little weight, but the latter remains entitled to substantial weight because it reflects the enterprise's actual, prepetition center of financial administration. Accordingly, although the interest of justice requires the Court to discount the deliberately created Texas venue contacts, that consideration does not require retention of the cases here.

D. The Balance Favors Texas

This is a close case because many of the factors are divided. Creditor proximity tilts slightly toward Texas by dollar amount, tempered by the self-interested

[44] *Id.*

structure of that preference and by Florida creditors' direct jurisdictional ties. Witness proximity is genuinely split. Assets and records do not favor either forum given their intangible, electronically accessible nature. Texas has the stronger current proximity to the Debtor, but Florida has the stronger historical connection, coupled with a fair argument concerning deliberately created venue contacts in Texas.

Texas nevertheless has the answer to the factor that matters most: economic administration. The remaining enterprise is not conducting its former Miami investment business. It is being financially administered and liquidated by GlassRatner. That management has operated principally from Texas for many months, and its lead decisionmaker has worked there throughout his tenure. The cases must remain together, and the work ahead is the financial work centered in Texas.

The Court does not hold that a restructuring adviser can manufacture venue merely by opening an office or accepting a management title. The result depends on the evidence that GlassRatner actually displaced former management, directed the winddown for a substantial period, completed numerous dispositions, managed the remaining portfolios, and developed the proposed liquidation from Texas. A professional address without that substantive work would not carry the same weight.

The convenience of the parties, principally economic and efficient administration, favors Texas and is sufficient standing alone to support transfer. The interest of justice does not independently support transfer. Florida retains a genuine and substantial claim as 777's historical forum. But for the reasons explained that

claim is not a sufficiently weighty counterweight to overcome CORCO's controlling emphasis on economic administration. Transfer is therefore appropriate.

## V. CONCLUSION

Accordingly, the Court **ORDERS**:

1. The Debtor's *Emergency Motion to Transfer Venue to the Northern District of Texas* [Dkt. No. 15] is **GRANTED**.

2. The Clerk is directed to transfer this case to the United States Bankruptcy Court for the Northern District of Texas.

3. The Petitioning Creditors' *Emergency Motion to Stay the Later-Filed Cases Pending Determination of Debtor's Transfer Motion* [Dkt. No. 17] is **DENIED.**

4. Any pending motions, including the *Motion to Convert Chapter 7 Case to Chapter 11* [Dkt. No. 34], will be considered by the United States Bankruptcy Court for the Northern District of Texas.

###

Copies To:
All Parties in Interest.